UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| BT PRIME LTD. | ) |
| | ) Case No. 15-10745-FJB |
| Debtor. | ) |
| | ) |
| | ) |
| BT PRIME LTD. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Adversary Proceeding |
| v. | ) No. _____ |
| | ) |
| BOSTON TECHNOLOGIES POWERED BY | ) |
| FOREXWARE LLC f/k/a FOREXWARE LLC, | ) |
| CURRENCY MOUNTAIN HOLDINGS | ) |
| LIMITED f/k/a FOREXWARE MALTA | ) |
| HOLDINGS LTD., FXDIRECTDEALER, LLC, | ) |
| and FXDD MALTA LTD. | ) |
| | ) |
| Defendants | ) |
| | ) |

## **COMPLAINT**

BT Prime Ltd. ("BT Prime" or the "Debtor"), brings this action against Boston

Technologies Powered by Forexware LLC f/k/a Forexware LLC, Currency Mountain Holdings

Limited f/k/a Forexware Malta Holdings Ltd., FXDirectDealer, LLC and FXDD Malta Ltd.

(collectively, "Defendants") seeking a determination that Defendants are liable for all of the

debts and liabilities of the Debtor.  Upon their acquisition of Boston Technologies, Inc., the

Defendants gained control over the management, operation and assets of the Debtor without

compensating the Debtor, effectively stripping the Debtor of its assets and leaving the Debtor

without the financial ability to pay its obligations.  The Defendants breached their fiduciary duty

to the Debtor through their manipulation and control of the Debtor for the financial advantage of

the Defendants and to the detriment of the Debtor.  The Debtor also seeks recovery from

Defendants of payments made to or for the benefit of the Defendants on the basis that the

payments are avoidable as fraudulent or preferential transfers.  Finally, the Debtor seeks an order

requiring Defendants to provide a full and complete accounting of the Debtor's business that the

Defendants managed, operated and controlled, including, but not limited to, the customer

transactions executed by Defendants purportedly in the name of the Debtor.

### Parties and Jurisdiction

1.      Plaintiff BT Prime is organized under the laws of Bermuda and is wholly owned

by BT Trading, LTD., a Belize corporation ("BT Trading").

2.      Defendant Boston Technologies Powered by Forexware LLC f/k/a Forexware

LLC ("Forexware US") is a Delaware limited liability company with a principal business address

of 7 World Trade Center, 250 Greenwich Street, 32nd Floor, New York, New York 10007.

Forexware US also conducts business at 280 Summer Street, 9th Floor, Boston, Massachusetts

02110 (the "Forexware Boston Office").

3.      Defendant Currency Mountain Holdings Limited f/k/a Forexware Malta Holdings

Ltd. ("Forexware Malta") is a Malta limited liability company with an address at K2, First Floor,

Forni Complex, Valletta Waterfront, Floriana, Malta.  Forexware Malta is an affiliate of

Forexware US (together with Forexware US, "Forexware").

4.      Defendant FXDirectDealer, LLC ("FXDD US") is a Delaware limited liability

company with a principal business address of 7 World Trade Center, 250 Greenwich Street, 32nd

Floor, New York, New York 10007.  Upon information and belief, FXDD US also conducts

business at the Forexware Boston Office.  FXDD US is an affiliate of Forexware.

5.      Defendant FXDD Malta Ltd. ("FXDD") is a Malta limited liability company with an address at K2, First Floor, Forni Complex, Valetta Waterfront, Floriana, FRN 1913, Malta. FXDD is an affiliate of Forexware and FXDD US.

6.      Upon information and belief, the Defendants are commonly owned and controlled.

7.      On March 2, 2015 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing the Chapter 11 bankruptcy case currently pending in the United States Bankruptcy Court for the District of Massachusetts (Eastern Division) entitled In re BT Prime LTD., Case No. 15-10745 (the "Bankruptcy Case").

8.      This Court has jurisdiction over this adversary proceeding as an action arising under title 11, pursuant to 28 U.S.C. § 157 and § 1334.  This action is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(A), (F), (H), and (O).

9.      Venue of this adversary proceeding is appropriate pursuant to 28 U.S.C. § 1409.

## Background

### A.  The Debtor.

10.      In 2007, Mr. Popescu formed Boston Technologies, Inc. ("BTI"), and through BTI developed a computerized trading platform used for trading in the currency markets.  BTI's initial business was to license its platform to third party currency brokers.

11.      Subsequently, Mr. Popescu decided to expand the business of BTI from licensing its software platform to currency traders to providing currency brokerage services.

12.      In furtherance of this expansion of BTI, Mr. Popescu caused the Debtor and Boston Prime Limited ("Boston Prime") to be formed.  The Debtor was formed under the laws of

the British Virgin Islands (and later Bermuda) to provide currency brokerage services to

customers outside the United States.  Boston Prime was formed under the laws of the United

Kingdom to provide regulated currency brokerage services.

13.     The Debtor's and Boston Prime's currency trading businesses were part of a

business enterprise controlled and managed by BTI (collectively with the Debtor and Boston

Prime, the "BTI Group").  The three entities were distinct in name only.

14.     Upon its formation, the Debtor was required to enter into a license agreement with

BTI (the "License Agreement").  A true and correct copy of the License Agreement dated

February 9, 2011 is attached as Exhibit A.  Pursuant to the License Agreement: (a) BTI licensed

its software to the Debtor (see §1); and (b) BTI provided all professional services for the

operation of the Debtor, including assignment of employees, operational support, marketing and

sales services, business and technical consulting services, office space, and telecommunications

and computing services (id., Schedule A, §2).

15.     The Debtor had no employees, and BTI employees controlled the Debtor by

managing all aspects of the Debtor's business and controlling the Debtor's operations, including

all trading activity, accounting services, and maintaining the Debtor's books and records.

16.     In exchange, the Debtor was obligated under the License Agreement to pay BTI

all of its net revenues determined on a monthly basis ("Monthly Net Revenues").  As a

consequence thereof, the Debtor was unable to maintain cash reserves to meet any subsequent

cash flow shortfalls.

17.     As a result of the foregoing, from its inception, the Debtor had no existence

independent of BTI.

18.     Upon its formation Boston Prime also entered into a license agreement with BTI which contained terms substantially identical to the Debtor's License Agreement.  Pursuant to the license agreement BTI employees controlled Boston Prime and made all managerial and operational decisions for Boston Prime.

**B.  BTI's Software Bug and the Forexware Transaction.**

19.     On or about April 20, 2014, a bug in the BTI trading software purportedly caused, over a period of 30 minutes, BTI to negligently place voluminous spot gold and foreign exchange trades in the aggregate amount of several hundred million dollars on behalf of the Debtor's customers.  As a consequence of BTI's negligence, the Debtor suffered losses of several million dollars.

20.     As a result of the foregoing, the Debtor was rendered insolvent and its liabilities to customers substantially exceeded the amount of its available funds.

21.     Consequently, BTI explored a sale of the BTI Group.

22.     These efforts ultimately led to negotiations to sell the BTI Group to Forexware, an existing player in the foreign currency exchange industry.

23.     On June 14, 2014, the BTI Group and certain affiliates entered into a Purchase Agreement with Forexware and certain affiliates (the "Purchase Agreement").

24.     The Purchase Agreement provided for Forexware (and certain affiliates) to acquire the assets of the BTI Group subject to their liabilities for a purchase price of one million dollars in a two-step transaction to allow time for regulatory approval of the Boston Prime acquisition.

25.     In the first step, Forexware US agreed to acquire substantially all of BTI's assets subject to its liabilities, and to form Forexware Bermuda LTD. ("Forexware Bermuda") to

5

acquire substantially all of the Debtor's assets subject to its liabilities (the "First Closing").  In the second step, Forexware Malta agreed to acquire substantially all of the assets of Boston Prime subject to its liabilities (the "Second Closing").

26.    Under the Purchase Agreement, Forexware (through Forexware Bermuda) agreed to assume all of the Debtor's obligations to its customers of approximately $17 million, even though Forexware calculated a shortfall in the Debtor's cash accounts of approximately $4.7 million.

27.    The Agreement further provided a mechanism for adjusting the total purchase price based on the amount of actual shortfall in the Debtor's cash accounts calculated at the time of the Second Closing (the "Working Capital Adjustment").

28.    Prior to the closing of the Purchase Agreement, a shareholder of the Debtor's and Boston Prime's parent company, BT Trading, brought suit disputing Mr. Popescu's right to act on behalf of BT Trading, which delayed consummation of the proposed sale of the Debtor.

29.    As a result thereof, the BTI Group and Forexware, and certain affiliates, executed the Amended and Restated Purchase Agreement dated July 11, 2014 (the "Amended Purchase Agreement").  A true and correct copy of the Amended Purchase Agreement is attached as Exhibit B.

30.    The Amended Purchase Agreement deferred the closing of the sale of the Debtor from the First Closing until the Second Closing to occur at the same time as the acquisition of Boston Prime.

31.    The Amended Purchase Agreement similarly provided for Forexware's assumption of all of the Debtor's liabilities at the time of the Second Closing including, but not

limited to, a shortfall in its customer account balances that Forexware calculated as of the

execution of the Amended Purchase agreement as $4,800,000.

32.     The First Closing under the Amended Purchase Agreement (the "<u>BTI Sale</u>")

occurred on July 11, 2014.

**C.  <u>Forexware Took Complete Control Over the Operation, Management and Assets of the Debtor</u>.**

33.     Following the First Closing, Forexware hired virtually all of BTI's employees and

those who were not hired were terminated.  The License Agreement was assigned to Forexware

US and Forexware US succeeded BTI as licensor.  As a result, Forexware took control of the

Debtor's operations, management and assets just as BTI had before.

34.     From and after the First Closing, Forexware directed and controlled the

operations, management and assets of the Debtor, and maintained the Debtor's books, records,

and customer trading accounts.

35.     While the Debtor's accounts were left in the Debtor's name, the employees who

controlled those accounts became Forexware employees, and Forexware controlled their

activities.  Forexware controlled the Debtor's operation and assets, including the customer funds

the Debtor held on deposit at the time of the First Closing totaling over $12 million, effectively

obtaining for itself all of the benefits of the Amended Purchase Agreement without expressly

having to assume any of the Debtor's liabilities or pay the purchase price required under the

Amended Purchase Agreement.

**D.  <u>Forexware Begins Looting the Debtor</u>.**

36.     After gaining control of the Debtor's operations, management and assets, during

the period July 11, 2014 through January 15, 2015, Forexware took approximately $2.7 million

from the Debtor consisting of the following transfers:

| Payee | Date | USD Amount |
|-------|------|------------|
| Forexware US | 7/28/2014 | $150,000.00 |
| Forexware US | 8/12/2014 | $100,000.00 |
| Forexware US | 8/26/2014 | $23,572.64 |
| Forexware US | 8/27/2014 | $100,000.00 |
| Forexware US | 9/10/2014 | $250,000.00 |
| Forexware US | 9/2/2014 | $250,000.00 |
| Forexware US | 9/16/2014 | $250,000.00 |
| Forexware US | 9/24/2014 | $265,336.92 |
| Forexware US | 9/29/2014 | $41,283.54 |
| Forexware US | 10/8/2014 | $250,000.00 |
| Forexware US | 10/15/2014 | $250,000.00 |
| Forexware US | 11/13/2014 | $250,000.00 |
| Forexware US | 11/24/2014 | $120,000.00 |
| Forexware US | 11/28/2014 | $100,000.00 |
| Forexware US | 12/10/2014 | $100,000.00 |
| Forexware US | 12/11/2014 | $70,722.04 |
| Forexware US | 1/9/2015 | $30,000.00 |
| Forexware US | 1/15/2015 | $90,000.00 |
| Forexware US | 1/15/2015 | $64,883.11 |

(the "Forexware Payments").

37.     Forexware did not provide an invoice, statement or otherwise account to the Debtor for the transfers or account for the basis of the transfers.

38.     To the extent the transfers were purported to be payments due to it under the License Agreement, Forexware has failed to provide the Debtor with any computation of Monthly Net Revenues, or any accounting of the Debtor's monthly revenues and expenses during the period following the First Closing.

39.     Upon information and belief, to the extent payments were called for under the License Agreement, Forexware failed to maintain complete and accurate accounting records of the Debtor from which a determination of the Monthly Net Revenues could be made.

40.     Upon information and belief, the Forexware Payments were made on account of purported obligations that were illusory, incorrectly computed, or otherwise not legitimate obligations of the Debtor to Forexware, or constituted payments in exchange for which the Debtor received inadequate consideration.

**E.  Forexware Requires the Debtor to Transfer its Liquidity Accounts to FXDD.**

41.     At the time of the BTI Sale, the Debtor utilized several "liquidity providers"— entities with which the Debtor deposited its customer funds and placed its customers' currency trades, including Rabobank.  The Debtor maintained a trading (i.e., a margin) account with each liquidity provider, funded with deposits made by the Debtor's customers.

42.     On or about August 28, 2014, Forexware established a trading account for the Debtor with FXDD, an affiliate of Forexware.  Forexware then caused all of the Debtor's trades to be conducted through the FXDD account, thereby furthering its control of the Debtor's assets while charging the Debtor substantial commissions on the trades (the "FXDD Trading Account").

43.     In September 2014, Forexware closed the Debtor's other trading accounts, including the account at Rabobank, and directed Rabobank to transfer $5,063,259.96 to the Debtor.  On September 12, 2014, Forexware transferred $5,063,259.96 from the Debtor to FXDD to fund the FXDD Trading Account (the "Rabobank Transfer").

44.     In addition to the Rabobank Transfer, Forexware made other transfers from the Debtor to the FXDD Trading Account, totaling approximately $5,086,850 million, consisting of the following:

| Payee | Date | USD Amount |
|---|---|---|
| FXDD Malta Limited | 12/5/2014 | $2,000,000.00 |
| FXDD Malta Limited | 1/20/2015 | $1,736,850.00 |

| FXDD Malta Limited | 1/20/2015 | $1,050,000.00 |
| FXDD Malta Limited | 1/20/2015 | $300,000.00. |

45.     The Defendants failed to account for the transferring of these funds from the

Debtor to the FXDD Trading Account.  On information and belief, the transfers were made for

the benefit of Forexware, FXDD and FXDD US and to the detriment of the Debtor of which

Debtor received no or inadequate consideration.

**F.  Forexware's Manipulation of the Debtor and Boston Prime.**

46.     Forexware operated, managed and controlled Boston Prime just as it operated,

managed and controlled the Debtor.

47.     On January 15, 2015, the Swiss government announced that it would unpeg its

currency from the euro, causing an upheaval in the currency market and huge losses sustained by

traders including, on information and belief, Forexware and its affiliates.

48.     Upon information and belief, following the Swiss unpegging, Forexware

manipulated the accounts of Boston Prime and the Debtor and made transfers from their accounts

in whole or in part to cover losses sustained by Forexware, FXDD and FXDD US.

49.     Upon information and belief, Forexware directed the transfers through the Debtor

to conceal that the Defendants were the actual beneficiaries of some or all of the transfers.

50.     These transfers directed by Forexware caused the Debtor to incur liability to

Boston Prime for the benefit of the Defendants and for which the Debtor received no or

inadequate consideration.

51.     Specifically, on January 20, 2015, Forexware transferred $2.5 million from

Boston Prime to the Debtor's TD Bank client fund account.  Immediately upon receipt of the

funds into the Debtor's account, Forexware transferred the funds out of the TD Bank account

into the FXDD Trading Account (the "$2.5 Million Transfer").

52.     On January 22, 2015, Forexware transferred $3 million in funds from Boston

Prime directly to the FXDD Trading Account, purportedly to cover losses in the FXDD Trading

Account.  Forexware, however, has not provided any accounting as to the losses that were

purportedly covered (the "$3 Million Transfer").

53.     Defendants have not provided adequate documentation that would support or

validate these transfers from Boston Prime or an accounting of the losses they were purported to

cover in the FXDD Trading Account.  As a consequence of Forexware's manipulation of the

Debtor and Boston Prime, Boston Prime has asserted a claim against the Debtor for $7.2 million,

which includes the $2.5 Million and $3 Million Transfers, which upon information and belief

were ultimately transferred for the benefit of the Defendants.  As a result, Boston Prime is

scheduled as the largest claim in the Bankruptcy Case.

**G.  Improper Reduction of Debtor's Account Balance.**

54.     The Debtor stopped trading on January 26, 2015.  As of February 3, 2015, the

Debtor had a $1,322,590.02 balance on deposit in its FXDD Trading Account.

55.     On February 3, 2015, the Defendants took $1,300,000 from the FXDD Trading

Account, reducing the balance from $1,322,590.02 to $22,590.02 (the "$1.3 Million Transfer").

56.     No accounting for the $1.3 Million Transfer was provided to the Debtor nor were

Defendants entitled to take this money.

**H.  Forexware's Failure to Account For the Transactions.**

57.     Following the BTI Sale, Forexware maintained possession, custody, and control

of the Debtor's business and financial records.

58.     During the Debtor's Bankruptcy Case, Forexware produced or made available an

incomplete set of the Debtor's business and financial records to the Debtor.

59.     By Stipulation and Agreed Order Regarding Turnover of Debtor's Property and Records dated April 30, 2015 (Adversary Proceeding 15-01043, Dkt. No. 48), Forexware was ordered to produce or make accessible to Debtor's representatives, among other items:

a.   Customer Account Records: all records for each customer having an account with the Debtor, including, but not limited to, "all records … concerning deposits, trades, credits, debits, adjustments, payments, reconciliations, and statements for the period from and after July 11, 2014"; and

b.   FXDD Account Records: "[a]ll records concerning the Debtor's trading account with either or both of [FXDD] and [FXDD US] … including without limitation account applications, account agreements, deposits, trades, credits, debits, adjustments, payments, reconciliations, and statements, for the period from and after July 11, 2014[.]"

60.     Defendants have failed to provide an adequate accounting of the Customer Account Records, including, but not limited to, failing to provide verifications of each customer trade it executed purportedly in the name of Debtor, or a reconciliation of each customer having an account with Debtor.

61.     Defendants have also failed to provide adequate information or a basis for any of the payments or transfers to the Defendants, including, but not limited to, records concerning adjustments or reconciliations concerning the FXDD Trading Account, or a computation of Monthly Net Revenue payments Forexware directed from the Debtor to Forexware.

**I.**   **The Debtor's Financial Condition Worsens Under Defendants' Control.**

62.     During the period of time the Defendants controlled the operations, management and assets of the Debtor, the Debtors' financial condition significantly worsened and the Debtor's insolvency increased by at least $10 million.

63.     While the Debtor's liabilities were significantly increasing, Forexware continued to pay itself and its FXDD affiliates substantial monies from the Debtor.

64.     Forexware is responsible for the losses incurred after the BTI Sale which losses occurred under its operation, management and control of the Debtor's business.

<u>Count I</u>
**(Declaratory Relief - Joint Venture Against Forexware)**

65.     The Debtor repeats each of the foregoing allegations as though fully set forth herein.

66.     Prior to the First Closing, the Debtor's currency trading businesses was part of a business enterprise controlled and managed by BTI.  The Debtor's currency trading business was distinct in name only and operated as part of the BTI Group joint venture with all net revenues from the joint venture flowing to BTI.

67.     The Debtor did not have an existence separate and independent from the BTI joint venture.

68.     BTI employees controlled the Debtor by making all managerial and operational decisions and controlled all aspects of Debtor's operations, including all trading activity, accounting services, and maintaining the books and records.

69.     Upon Forexware's acquisition of BTI, and its assumption of the Licensing Agreement, Forexware succeeded to BTI's position in the joint venture and Forexware continued

to operate the Debtor as part of a single business enterprise to conduct currency trading for customers.

70.     Forexware controlled the Debtor by making all managerial and operational decisions and controlled all aspects of the Debtor, including all trading activity, accounting services, and maintaining the books and records.

71.     As a joint venture participant, Forexware is liable for the liabilities and debts incurred in connection with the operation of the joint venture.

72.     Forexware disputes that it engaged in a joint venture with the Debtor and disputes that it is liable for the liabilities and debts incurred by the business.

73.     As a consequence, there exists an actual and justiciable controversy between the Debtor and Forexware, in need of a declaration as to whether the Debtor and Forexware were engaged in a joint venture making Forexware jointly liable for all debts and liabilities that the business incurred.

74.     Pursuant to 28 U.S.C. § 2201, the Debtor requests a declaration that the Debtor and Forexware were engaged in a joint venture conducting the Debtor's currency trading business, and as such, Forexware is jointly liable for all debts and liabilities of the Debtor.

<u>**Count II**</u>
**(Declaratory Relief – De Facto Merger Against Forexware)**

75.     The Debtor repeats each of the foregoing allegations as though fully set forth herein.

76.     Forexware obtained the assets and assumed the liabilities of BTI, which controlled the operations, management and assets of the Debtor.

77.     Through Forexware's retention of BTI's employees and assumption of the License Agreement, Forexware obtained complete control of the Debtor's revenue; directed and

14

controlled all management and operational activities of the Debtor; maintained the Debtor's books and records; controlled the employees who controlled all of Debtor's accounts; and controlled all of the Debtor's funds and assets.

78.     Forexware's control over the management, operations and assets of Debtor amounted to an uninterrupted continuation of the Debtor's currency trading business following the BTI sale.

79.     The transaction by which Forexware acquired the assets and liabilities of BTI, and acquired complete control over the operation, management and assets of the Debtor, without expressly assuming the Debtor's liabilities, amounts to a de facto merger of the Debtor with Forexware.

80.     As a consequence, Forexware is liable as a successor entity of the Debtor and is liable for all of the debts and liabilities of the Debtor.

81.     Forexware disputes that it is liable as a successor entity of the Debtor and responsible for the Debtor's debts and liabilities.

82.     There exists an actual and justiciable controversy between the Debtor and Forexware, in need of a declaration as to whether Forexware is liable as a successor entity of the Debtor and responsible for the Debtor's debts and liabilities.

83.     Pursuant to 28 U.S.C. § 2201, the Debtor requests a declaration that Defendant Forexware is liable for all debts and liabilities of Debtor.

### Count III
**(Breach of Fiduciary Duty Against Forexware)**

84.     The Debtor repeats each of the foregoing allegations as though fully set forth herein.

85.    Forexware, at all times following the BTI Sale, controlled all aspects of the operation, management and assets of the Debtor and its currency trading business.

86.    As a result of Forexware's complete control of the Debtor, Forexware owed a fiduciary duty to the Debtor.

87.    Forexware's duties to the Debtor included the duties of care and loyalty in the control over the management and operation of the Debtor's currency trading business.

88.    Forexware breached its duties of care and loyalty, among other things, when it operated, managed and controlled the Debtor's business for Forexware's own benefit, transferred money from the Debtor for its own benefit, and used the Debtor's customer funds for its own benefit, all while causing the Debtor's insolvency to deepen.

89.    Forexware additionally breached its duties of care and loyalty by manipulating the Debtor's business, engaging in self-dealing, and causing transfers of the Debtor's cash deposits and other assets to Forexware and its FXDD affiliates for its own advantage and to the detriment of the Debtor.

90.    Forexware breached it duty of care, among other things, when it failed to take steps to ensure that the Debtor had sufficient funds to operate its business and meet its obligations to its customers.

91.    Based on the foregoing, Forexware is liable to Debtor for losses and damages caused by Forexware's breach of fiduciary duty in an amount to be determined at trial.

## Count IV
### (Breach of Contract as Against Forexware US)

92.    The Debtor repeats each of the forgoing allegations as though fully set forth herein.

16

93.     The License Agreement set forth the party's contractual obligations with respect to the operation of the Debtor's currency trading business.  The Debtor had no monetary obligation to Forexware under the License Agreement other than to pay, on a monthly basis, the Debtor's Monthly Net Revenues to Forexware US.

94.     Debtor performed all of its obligations in accordance with the License Agreement.

95.     Forexware US breached the License Agreement by directing payments (including those set forth in paragraph 36) ostensibly due under the License Agreement that were in fact illusory, incorrectly computed, or otherwise not legitimate obligations of the Debtor to Forexware US.  Such payments bore no relationship to the Debtor's actual net revenues.

96.     As a result of Forexware US's breach of the License Agreement, Debtor has suffered harm in an amount to be determined at trial but not less than $2.7 million.

## Count V
### (Avoidance of Fraudulent Transfers – Constructive – to Forexware Pursuant to 11 U.S.C. §§ 548, 550 and 551)

97.     The Debtor repeats each of the foregoing allegations as though fully set forth herein.

98.     The transfers of the Debtor's property, more specifically described above, were transfers to or for the benefit of Forexware for which the Debtor received no or inadequate consideration.

99.     The transfers were made within two years before the date of the filing of the Debtor's petition.

100.    The Debtor was insolvent on the dates the transfers were made.

101.    The above transfers constitute fraudulent transfers pursuant to 11 U.S.C. §§548(a)(1)(B).

17

102.    The Debtor is entitled to avoid these transfers pursuant to §§548(a).

103.    The Debtor is entitled to recover the value of the transfers pursuant to 11 U.S.C.

§§550(a).

## Count VI
### (Avoidance of Fraudulent Transfers – Actual – to Forexware
### Pursuant to 11 U.S.C. §§ 548, 550 and 551)

104.    The Debtor repeats each of the foregoing allegations as though fully set forth

herein.

105.    The transfers of the Debtor's property, more specifically described above, were

transfers to or for the benefit of Forexware with the actual intent to hinder, delay or defraud some

or all of the Debtor's creditors.

106.    The transfers were made within two years before the date of the filing of the

Debtor's petition.

107.    The Debtor was insolvent on the dates the transfers were made.

108.    The above transfers constitute fraudulent transfers pursuant to 11 U.S.C.

§§548(a)(1)(A).

109.    The Debtor is entitled to avoid these transfers pursuant to §§548(a).

110.    The Debtor is entitled to recover the value of the transfers pursuant to 11 U.S.C.

§§550(a).

## Count VII
### (Avoidance of Fraudulent Transfers – Constructive – to FXDD and FXDD US
### Pursuant to 11 U.S.C. §§ 548, 550 and 551)

111.    The Debtor repeats each of the foregoing allegations as though fully set forth

herein.

18

112.    The transfers of the Debtor's property, more specifically described above, were transfers to or for the benefit of FXDD and/or FXDD US for which the Debtor received no or inadequate consideration.

113.    The transfers were made within two years before the date of the filing of the Debtor's petition.

114.    The Debtor was insolvent on the dates the transfers were made.

115.    The above transfers constitute fraudulent transfers pursuant to 11 U.S.C. §§548(a)(1)(B).

116.    The Debtor is entitled to avoid these transfers pursuant to §§548(a).

117.    The Debtor is entitled to recover the value of the transfers pursuant to 11 U.S.C. §§550(a).

### Count VIII
**(Avoidance of Fraudulent Transfers – Actual – to FXDD and FXDD US
Pursuant to 11 U.S.C. §§ 548, 550 and 551)**

118.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

119.    The transfers of the Debtor's property, more specifically described above, were transfers to or for the benefit of FXDD and/or FXDD US with the actual intent to hinder, delay or defraud some or all of the Debtor's creditors.

120.    The transfers were made within two years before the date of the filing of the Debtor's petition.

121.    The Debtor was insolvent on the dates the transfers were made.

122.    The above transfers constitute fraudulent transfers pursuant to 11 U.S.C. §§548(a)(1)(A).

123.    The Debtor is entitled to avoid these transfers pursuant to §§548(a).

124.    The Debtor is entitled to recover the value of the transfers pursuant to 11 U.S.C.

§§550(a).

## Count IX
### (Declaratory Relief – Against Defendants)

125.    The Debtor repeats each of the foregoing allegations as though fully set forth

herein.

126.    As described more fully above in paragraphs 46 – 53, the Defendants manipulated

the Debtor and Boston Prime, and caused funds in the amounts of $2.5 and $3 million to be

transferred from Boston Prime through the Debtor and into the FXDD Trading Account for the

benefit of Defendants.

127.    Upon information and belief, Forexware directed the transfers through the Debtor

to conceal that the Defendants were the actual beneficiaries of some or all of the transfers.

128.    As a consequence of Forexware's manipulation of the Debtor and Boston Prime,

Boston Prime has asserted a claim against the Debtor which claim includes the $2.5 Million and

$3 Million Transfers.

129.    These transfers directed by Forexware caused the Debtor to incur liability or

potential liability to Boston Prime for the benefit of the Defendants and for which the Debtor

received no or inadequate consideration.

130.    To the extent the Debtor is liable to Boston Prime as a consequence of the

foregoing, the Defendants are liable to the Debtor for the extent of any such liability.

131.    The Defendants dispute that they are liable to Debtor for the $2.5 and $3 Million

Transfers, and for any such liability owed by Debtor to Boston Prime.

132.     As a consequence, there exists an actual and justiciable controversy between the Debtor and Defendants, in need of a declaration as to whether the Defendants are liable to the Debtor for any liability owed by Debtor to Boston Prime as a result of the $2.5 Million and $3 Million Transfers directed by Defendants.

133.     Pursuant to 28 U.S.C. § 2201, the Debtor requests a declaration that to the extent the Debtor is liable to Boston Prime as a consequence of the $2.5 Million and $3 Million Transfers, the Defendants are liable to the Debtor for any such liability.

## Count X
**(Preference Pursuant to 11 U.S.C. §§ 547, 550 and 551 Against Forexware)**

134.     The Debtor repeats each of the foregoing allegations as though fully set forth herein.

135.     As described more fully above, each of the payments made to Forexware were on account of an antecedent debt allegedly owed by the Debtor to Defendants before such payments were made.

136.     At the time of each Forexware payment, Forexware was an insider of the Debtor based on Forexware's control over the management, operations and assets of the Debtor.

137.     The payments constituted transfer of an interest of the Debtor in property.

138.     The payments were allegedly made to and for the benefit of Defendants.

139.     The payments were made within one year before the Petition Date.

140.     The payments were made while the Debtor was insolvent.

141.     The payments allowed Defendants to receive more than they would have received if the case were a case under Chapter 7 of the Bankruptcy Code, if the payments had not been made, and if Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

142.    The payments constitute preferential transfers of property within the meaning of 11 U.S.C. §547.

## Count XI
### (Preference Pursuant to 11 U.S.C. §§ 547, 550 and 551 Against Forexware)

143.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

144.    As described more fully above, Forexware required the Debtor to make payments on account of an antecedent debt allegedly owed by the Debtor to Defendants before such payments were made.

145.    The payments constituted a transfer of an interest of the Debtor in property.

146.    The payment was made to and for the benefit of Defendants.

147.    The payment was made within ninety (90) days before the Petition Date.

148.    The payment was made while the Debtor was insolvent.

149.    The payment allowed Defendants to receive more than they would have received if the case were a case under Chapter 7 of the Bankruptcy Code, if the payment had not been made, and if Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

150.    The payment constitutes a preferential transfer of property within the meaning of 11 U.S.C. §547(b).

## Count XII
### (Preference Pursuant to 11 U.S.C. §§ 547, 550 and 551 Against FXDD and FXDD US)

151.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

22

152.    As described more fully above, each of the payments made to FXDD and/or FXDD US were on account of an antecedent debt allegedly owed by the Debtor to Defendants before such payments were made.

153.    At the time of each payment, FXDD and FXDD US were insiders of the Debtor based on their control over the management, operations and assets of the Debtor.

154.    The payments constituted transfer of an interest of the Debtor in property.

155.    The payments were allegedly made to and for the benefit of Defendants.

156.    The payments were made within one year before the Petition Date.

157.    The payments were made while the Debtor was insolvent.

158.    The payments allowed Defendants to receive more than they would have received if the case were a case under Chapter 7 of the Bankruptcy Code, if the payments had not been made, and if Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

159.    The payments constitute preferential transfers of property within the meaning of 11 U.S.C. §547.

## <u>Count XIII</u>
### (Preference Pursuant to 11 U.S.C. §§ 547, 550 and 551 Against FXDD and FXDD US)

160.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

161.    As described more fully above, Forexware required the Debtor to make payments on account of an antecedent debt allegedly owed by the Debtor to Defendants before such payments were made.

162.    The payments constituted transfer of an interest of the Debtor in property.

163.    The payments were allegedly made to and for the benefit of Defendants.

23

164.    The payments were made within ninety (90) days before the Petition Date.

165.    The payments were made while the Debtor was insolvent.

166.    The payments allowed Defendants to receive more than they would have received if the case were a case under Chapter 7 of the Bankruptcy Code, if the payments had not been made, and if Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

167.    The payments constitute preferential transfers of property within the meaning of 11 U.S.C. §547(b).

### Count XIV
### (Turnover Pursuant to 11 U.S.C. §542 Against Defendants)

168.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

169.    Defendants are in possession of assets and funds owned by the Debtor, including but not limited to, the $1,300,000 removed from the Debtor's FXDD Trading Account on February 3, 2015 without cause or explanation.

170.    Under 11 U.S.C. §542 the Debtor is entitled to turnover of property in the possession of Defendants and belonging to the Debtor.

171.    Based on the foregoing, the Debtor is entitled to judgment against Defendants for compensatory damages in an amount no less than $1,300,000, and for such other relief as this Court deems just and proper.

### Count XV
### (Conversion Against Defendants)

172.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

173.    On February 3, 2015, Defendants transferred the sum of $1.3 million from the Debtor's FXDD Trading Account to their own account.

174.    The Defendants wrongfully exercised dominion and control over the property of the Debtor taking it for their own behalf.

175.    The Defendants had no right or basis to make this wrongful transfer from the Debtor's account.

176.    The Defendants have no right in law or equity to remove these amounts, and must repay the value of the amount wrongfully obtained in an amount no less than $1,300,000, and for such other relief as this Court deems just and proper.

### Count XVI
### (Accounting Pursuant to 11 U.S. §543(b) Against Defendants)

177.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

178.    The Debtor is entitled to a full and complete accounting from the Defendants of the Debtor's business that the Defendants operated, managed and controlled, including, but not limited to: (a) all customer transactions executed by Defendants purportedly in the name of the Debtor; (b) all payments from the Debtor to Forexware, FXDD and FXDD US; and (c) a computation of every Monthly Net Revenue payment from the Debtor to Forexware.

179.    Defendants have failed to provide information that would allow Debtor or its representatives to correlate the trades Defendants executed with the identity of any of the Debtor's customers, which would assist in a calculation of net trading profits and losses of Debtor's customers.

180.    The Defendants have also failed to provide an accounting of trading losses that would support the payments Forexware made from the Debtor to offset purported losses in the FXDD Trading Account.

181.    Based on the foregoing, the Debtor is entitled to judgment for a full and complete accounting of the Debtor's business, including but not limited to the customer transactions the Defendants executed, and all payments the Defendants caused the Debtor to make to Forexware, FXDD and FXDD US.

**WHEREFORE,** Debtor BT Prime Ltd. prays that the Court enter judgment as follows:

1.    On Count I, for the Debtor, declaring that the Debtor and Forexware were engaged in a joint venture in conducting the Debtor's business and Forexware is jointly liable for all of the Debtor's debts and liabilities.

2.    On Count II, for the Debtor, declaring that Forexware, by virtue of its obtaining the assets of BTI, which controlled Debtor, and by controlling the operation, management and assets of the Debtor, is liable for all of the Debtor's debts and liabilities.

3.    On Count III, for the Debtor, in an amount equal to the total damages suffered by the Debtor as a result of Forexware's breach of its fiduciary duty owed to the Debtor, plus interest and costs;

4.    On Count IV, for the Debtor, in an amount equal to the total damages suffered by the Debtor and its creditors as a result of Forexware US' breach of the License Agreement, in a total amount to be determined at trial, but not less than $2.7 million plus interest and costs;

5.    On Count V, for the Debtor, avoiding the constructive fraudulent transfers to Forexware, pursuant to 11 U.S.C. §548, 550 and 551, and directing Forexware to pay a sum in a total amount to be determined at trial, plus interest from the date of this Complaint;

6.   On Count VI, for the Debtor, avoiding the actual fraudulent transfers to Forexware, pursuant to 11 U.S.C. §548, 550 and 551, and directing Forexware to pay a sum in a total amount to be determined at trial, plus interest from the date of this Complaint;

7.   On Count VII, for the Debtor, avoiding the constructive fraudulent transfers to FXDD and FXDD US, pursuant to 11 U.S.C. §548, 550 and 551, and directing FXDD and FXDD US to pay a sum in a total amount to be determined at trial, plus interest from the date of this Complaint;

8.   On Count VIII, for the Debtor, avoiding the actual fraudulent transfers to FXDD and FXDD US, pursuant to 11 U.S.C. §548, 550 and 551, and directing FXDD and FXDD US to pay a sum in a total amount to be determined at trial, plus interest from the date of this Complaint;

9.   On Count IX, for the Debtor, declaring that to the extent the Debtor is liable to Boston Prime as a consequence of the $2.5 Million and $3 Million Transfers directed by Defendants, the Defendants are liable to the Debtor for any such liability.

10. On Count X, for the Debtor, avoiding the payments to Forexware as preferential transfers made to an insider within one year of the Petition Date pursuant to 11 U.S.C. §547(b), and directing Forexware to pay a total amount to be determined at trial, plus interest and costs;

11. On Count XI, for the Debtor, avoiding the payments to Forexware as preferential transfers made within ninety (90) days of the Petition Date pursuant to 11 U.S.C. §548, 550 and 551, and directing Forexware to pay a total amount to be determined at trial, plus interest from the date of this Complaint;

12. On Count XII, for the Debtor, avoiding the payments to FXDD and FXDD US as preferential transfers made to an insider within one year of the Petition Date pursuant to 11

U.S.C. §547(b), and directing FXDD and FXDD US to pay a total amount to be determined at trial, plus interest and costs;

13. On Count XIII, for the Debtor, avoiding the payments to FXDD and FXDD US as preferential transfers made within ninety (90) days of the Petition Date pursuant to 11 U.S.C. §548, 550 and 551, and directing FXDD and FXDD US to pay a total amount to be determined at trial, plus interest from the date of this Complaint;

14. On Count XIV, for the Debtor, ordering turnover of property belonging to the Debtor pursuant to 11 U.S.C. §542, plus costs;

15. On Count XV, for the Debtor, ordering repayment of property wrongfully converted from the Debtor, plus costs;

16. On Count XVI, for the Debtor, ordering Defendants to provide a full and complete accounting of the Debtor's business that the Defendant's operated, managed and controlled, including but not limited to: (a) customer trades the Defendants executed; (b) all payments that the Defendants caused the Debtor to make to Forexware, FXDD and FXDD US; and (c) all accounting of all Monthly Net Revenue Payments to Forexware.

17. For such other relief as this Court deems just and proper.

Dated:  October 19, 2016                          BT PRIME LTD.

                                                  By its attorneys,


                                                   /s/ Charles R. Bennett, Jr.
                                                  Harold B. Murphy (BBO #631941)
                                                  Charles R. Bennett, Jr. (BBO #037380)
                                                  Murphy & King, Professional Corporation
                                                  One Beacon Street
                                                  Boston, MA  02108
                                                  (617) 423-0400
                                                  HMurphy@murphyking.com
                                                  CBennett@murphyking.com

*715286*