# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

_____

| | |
|---|---|
| In re: | Chapter 11 |
| BT PRIME LTD. | Case No. 15-10745-FJB |
|     Plaintiff, | |
| | Adversary Proceeding |
|     V. | No. 16-01178 |
| BOSTON TECHNOLOGIES POWERED BY FOREXWARE LLC f/k/a FOREXWARE LLC, CURRENCY MOUNTAIN HOLDINGS LIMITED f/k/a FOREXWARE MALTA HOLDINGS LTD., FXDIRECTDEALER, LLC, and FXDD MALTA LTD. | |
|     Defendants. | |

_____

### MOTION OF THE MALTA DEFENDANTS TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FRCP RULE 12(B)(2), OR IN THE ALTERNATIVE DISMISS PURSUANT TO FRCP RULE 12(B)(6), 9(B) AND FRBP RULE 7012(B)

Pursuant to Section 105(a) of Title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 12(b)(2), 12(b)(6), and 9(b) of the Federal Rules of Civil Procedure (the "**Civil Rules**"), as incorporated by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), FXDD Malta (f/k/a Forexware Malta Holdings Ltd.) and Currency Mountain Holdings Limited (hereinafter "**CMH**"), both foreign entities domiciled in Malta that do not conduct business in the United States, and collectively referred to hereinafter as "**the Malta Defendants**," hereby move (this "**Motion**"), to dismiss the claims asserted against them in Plaintiff's[1] *Complaint* [Adv. Proc. ECF No. 1] (the "**Complaint**")  and seek a determination

---

[1]  Although BT Prime is named as the plaintiff in the *Complaint*, to the extent that this matter is brought in connection with the the *Joint Liquidating Plan of Reorganization of BT Prime Ltd. and the Official Committee of Unsecured Creditors* [ECF No. 98] (the "**Plan**") the *Order Confirming Chapter 11 Plan* [ECF No. 130] (the

and the entry of an Order that the Malta Defendants are not properly named in this proceeding for lack of personal jurisdiction. Or in the alternative, the Malta Defendants seek a determination that the Court dismiss the Counts of Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(B)(6), 9(B) and Federal Rule of Bankruptcy Procedure 7012(B).

In further support of this Motion, FXDD Malta and CMH state as follows:

## I. <u>PRELIMINARY STATEMENT</u>

The Complaint presents an unspecific, broad, and meandering request for relief wherein the Plaintiff seeks to hold the Malta Defendants and several other entities, whether connected to the alleged claims or not, unjustifiably liable for all the many debts and liabilities of the Debtor. In its attempt to shift the losses of the Debtor the Complaint brings in third parties including the Malta Defendants whose minimal roles, have little or no, relation to the claims in the Complaint. The Complaint itself concedes that both CMH and FXDD Malta are located in Malta. *Complaint at ¶¶ 3, 5.* Yet, Plaintiff's Complaint ignores the fact that the Malta Defendants do not conduct any business whatsoever in the United States, and lack sufficient contacts with the United States. In many instances the Complaint intentionally uses the names Forexware and FXDD incorrectly, when these names apply to different entities operating on different continents.  The Complaint separates the Malta Defendants and improperly "lumps" these entities with affiliate entities specifically, FXDD US and Forexware US, in the United States to create the artificial appearance that these entities are one in the same; which has the effect of creating confusion over the roles of the entities and obfuscating which Counts have been plead against which entities. *Id.*

---

"**<u>Confirmation Order</u>**") gives the individual identified in the *Supplement to Joint Liquidating Plan of Reorganization of BT Prime Ltd. and the Official Committee of Unsecured Creditors* [ECF No. 119] as the Liquidating Supervisor the exclusive right and standing to assert Causes of Action as defined in Section 1.14 of . *See* Confirmation Order at ¶ 15; *see also* Plan at § 5.4.  The Liquidating Supervisor is not, however, mentioned anywhere in the *Complaint*. Although it appears that Plaintiff's counsel is bringing the action on behalf of the Liquidation Supervisor, one cannot determine this from the Complaint on its face. This is consistent with the general failure of this Complaint to state a claim for which relief can be granted as required by FRCP 12(b)(6).

The Malta Defendants cannot be properly sued in this Court. Defendant FXDD Malta is not incorporated in the United States and does not have minimum contacts with the United States to establish personal jurisdiction. FXDD Malta is incorporated in the country of Malta and is subject to regulation by the Malta Financial Services Authority (MFSA), and is not permitted to conduct business in the United States.[2] Defendant CMH, is only a holding company and is incorporated in Malta. CMH also does not conduct any business in the United States whatsoever and does not have minimum contacts with the United States to establish personal jurisdiction. In fact as a holding company, CMH does not conduct any business whatsoever. Moreover, both the Malta Defendants have no offices, clients, or employees in the United States.[3] They do not solicit any US clients. The burden is on the Plaintiff to prove that there is personal jurisdiction over the Malta Defendants and it cannot do so.[4] Plaintiff has failed to plead grounds to establish personal jurisdiction over the Malta Defendants.

First, Plaintiff cannot demonstrate that this Court has personal jurisdiction under a theory of general jurisdiction over the Malta Defendants, because it cannot prove that the Malta Defendants are "at home" in the United States as required by the First Circuit to establish personal jurisdiction. *AngioDynamics, Inc. v. BIOLITEC AG*, 780 F.3d 429 (1st Cir. 2015). Plaintiff's Complaint awkwardly attempts to lump these defendants with other entities to conceal there are no clear continuous and systematic contacts that would render them essentially "at home" in this Court; rather than provide any jurisdictional allegations that would establish the Court has general jurisdiction over them. Accordingly, any claim Plaintiff has to general jurisdiction fails as a matter of law.

---

[2] See Complaint ¶ 5.
[3] http://www.fxdd.com/mt/en/about-fxdd/about-us/ ; http://www.fxdd.com/mt/en/support/contact-us/
[4] Contemporaneous with this motion, the Malta Defendants have filed a motion seeking injunctive relief to stay a duplicative proceeding the Plaintiff has noticed its intent to file against the Malta Defendants in Malta.

Second, Plaintiff's Complaint also fails to demonstrate personal jurisdiction exists under a theory of specific jurisdiction over the Malta Defendants. Plaintiff cannot establish a sufficient nexus between the forum and the claims asserted against them, which is necessary to prove specific jurisdiction. *See Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201 (1st Cir. 1994). Therefore, imposing personal jurisdiction over the Malta Defendants who have no systematic and continuous contact with the United States would offend the traditional notions of fair play and substantial justice; and necessarily conflict with the federal constitutional limitations on personal jurisdiction under recent U.S. Supreme Court precedent. *See Daimler Ag v. Bauman*, 134 S. Ct. 746, 571 U.S. 20, 187 L. Ed. 2d 624 (2014). The Complaint must be dismissed as to the Malta Defendants for lack of personal jurisdiction in the first place.

Furthermore, each of the Counts of the Complaint are equally unsupported by law against the Malta Defendants. The naming of the Malta Defendants because of the similarity of their names represents the kind of kitchen sink style of pleading that is specifically discouraged by the Federal Rules of Civil Procedure[5] and must be dismissed. The allegations of the Complaint appear to arise from the asset purchase agreement  (the "**APA**"), dated June 14, 2014, and specific transactions occurring in the months following this date.[6] The Complaint suggests that the transfers alleged to be fraudulent transfers and preferences, somehow arise from this agreement.  However, this is not only false, it does not even make factual sense because FXDD Malta was not a party to the APA. Defendant FXDD Malta is a brokerage firm where the Debtor

---

[5] "Rather, we have found complaints wanting when they present a "vague, confusing, and conclusory articulation of the factual and legal basis for the claim and [take] a general 'kitchen sink'' approach to pleading the case." *Stanard,* 658 F.3d at 798. Such complaints frustrate Rule 8's objective: "fram[ing] the issues and provid[ing] the basis for informed pretrial proceedings." *Id.* at 797 (internal brackets omitted). "[J]udges and adverse parties need not try to fish a gold coin from a bucket of mud," *Garst,* 328 F.3d at 378; dismissal is the appropriate remedy for district courts presented with "a bucket of mud."*Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939 at 947 (7th Cir. 2013).
[6] *See* the Complaint, at Exhibit B for a copy of this agreement.

and the Debtor's affiliates held their trading accounts in question.[7] The money in the Debtor's accounts that the Complaint calls "the assets of the Debtor" was in fact not the Debtor's money. Debtor's account with FXDD Malta was comprised of funds the Debtor collected from Debtor's own the clients. Thus, the Plaintiff cannot succeed on any of the Counts in the Complaint as against the Malta Defendants because all of the causes of action require the relevant transfers to be transfers of assets of the Debtor. The Complaint must be dismissed against the Malta Defendants for the simple reason that these funds were not property of the Debtor.

The Complaint incorrectly labeled the transfers at issue as "fraudulent and/or preferential, clawback transfers." *Complaint* at ¶¶ 41-43; 51-52. Pursuant to the terms of use for these accounts, and the standard in the industry, these transfers constitute what are referred to as a "margin call" payments. A margin call is a brokerage firm's ability to request from a client for additional funds in order to allow that client the ability to trade. Otherwise, without additional funds a client would be prohibited from further trading. The transfers at issue were in fact margin calls that Defendant FXDD Malta made to the Debtor's account as required by the agreement governing the account.[8] Plaintiff is wrong to label the transfers as fraudulent and preferential when the "transfers of funds" were margin calls that are specifically protected by the "Safe Harbor" provisions of the Bankruptcy Code.[9]

Plaintiff is well aware of the relevant Safe Harbor protection and incorrectly classifies transfers that were made for margin call as fraudulent transfers. Plaintiff then contradicts itself

---

[7] A copy of the 341 Meeting held on April 6, 2015 ("April 6 Transcript") is attached as Exhibit A. A copy of the 341 Meeting held on June 1, 2015 ("June 1 Transcript") is attached as Exhibit B.
[8] BT Prime admits that the transfers were made in response to its margin account. *See* April 6 Transcript at 13:9-14:4.
[9] 11 U.S.C. § 546, 11 U.S.C. § 548.

by subsequently admitting in the Complaint that referenced transfers were margin calls.

Complaint at ¶¶ 41-42; 52.[10]

The events at issue transpired on or around January 15, 2015, when the Swiss franc

unpegged itself from the Euro ("SNB Event"). This event crashed the foreign currency markets

world-wide.  This event created a ripple effect that drove many currency institutions into

bankruptcy.[11] In the last 100 years, the SNB Event has been one of the biggest events with

respect to foreign currencies and gravely affected all currency trading institutions, including the

Debtor.[12] As a result of the SNB event, the Debtor's account with FXDD Malta went into a

deficit in excess of 6 million dollars in matter of minutes. This means that as a result of the SNB

Event, Debtor owed FXDD Malta over 6 million dollars. The Debtor demanded of FXDD Malta

to keep trading despite a multi million dollar loss and as a result was required by defendant

FXDD Malta to deliver additional margin to cover Debtor's deficit.  While certainly this event

caused a major and unfortunate loss to the Debtor, this was a loss caused exclusively and solely

by Debtor's own trading activity. Defendant FXDD Malta did not have any ties to Debtor's own

trading activity except that it demanded additional margin from the Debtor in furtherance of

Debtor's demand to continue trading.[13] Plaintiff cannot be allowed to hold the Malta Defendants

responsible for Debtor's own loss; especially, when protecting transfers in these volatile market

situations is precisely what the Safe Harbor laws were intended to do.[14]

---

[10] *See also* April 6 Transcript at 13:19-14:4.

[11] *See e.g.,* Worstall, Tim"Currency Brokers Fall Over Like Dominoes After SNB Decison On Swiss Franc",
http://www.forbes.com/sites/timworstall/2015/01/16/currency-brokers-fall-over-like-dominoes-after-snb-decison-on-swiss-franc/#31d7bfce6057 and, "Surge of Swiss Franc Triggers Hundreds of Millions in Losses "Brokerage
FXCM Gets Rescue Package; Deutsche Bank and Citigroup Suffer Big Hits)", http://www.wsj.com/articles/swiss-franc-move-cripples-currency-brokers-1421371654.

[12] (*Complaint* at ¶ 47)

[13] See Complaint. at ¶¶ 41-42; 52; see also April 6 Transcript at 13:19-14:4.

[14] "Without these safe harbors, markets might suffer serious shocks—perhaps even a systemic liquidity crisis,
causing markets to collapse—when debtors enter bankruptcy. Counterparties to financial contracts would find
themselves subject to the automatic stay for extended periods. They would be unable to liquidate volatile contracts
and thereby limit their exposure to market movements. . . . Losses from indefinite exposure to market movements

Finally, the Complaint also tries to establish that the APA was the basis for the Malta

Defendants alleged "control and dominion" over the Debtor. As stated previously FXDD Malta

was not even a party to the APA. FXDD Malta provided Debtor an opportunity with a self-

trading account. Other than providing a self-trading account to the Debtor there is absolutely no

other relationship between FXDD Malta and Debtor.  Self-trading accounts, are in the true spirit

of their nature, solely directed by clients.  As a client of FXDD Malta, the Debtor was in

exclusive and sole control over its own account. As such the only "control and dominion" that

took place here was that of the Debtor and the Debtor's executives.  On the same topic, while

CMH was a party to the APA, this holding company with no employees clearly was not involved

in any form of management, operation, or contracted for services related to the APA. It is absurd

to allege control and dominion on the part of a holding company. And it follows by the same

token, the Malta Defendants could not have, as the Complaint alleges, stripped the Debtor of its

assets or left the Debtor without the financial ability to pay its obligations. *See* Complaint at ¶1.

The APA between Boston Technologies and Forexware US had two "Closing" steps. In the

"First Closing", Forexware US purchased the assets of Debtor's affiliate Boston Technologies

Inc. ("BTI").  This was only an asset purchase, which had no direct ties to the Malta Defendants

other than shortly after the First Closing, the Debtor opened a self-trading account with FXDD

Malta.[15] The Second Closing did not happen. *Complaint* ¶¶ 25-32. To reiterate, the First Closing

was an asset deal only, and had no reference, ties or directive that pointed to the Malta

---

and from cherry-picking could produce financial distress in the counterparty itself, forcing it to default on its own contracts with other parties. As one distressed party infects another, a domino effect could ensue, undermining the entire financial market." Edward R. Morrison & Joerg Riegel, Financial Contracts and the New Bankruptcy Code, 13 AM. BANKR. INST. L. REV. 641, 642 (2005) (footnotes omitted). As that article notes, that is the premise that "was cited repeatedly" by Congress when it expanded the safe harbors in 2005. Id.

[15] BT Prime admits that FXDD Malta acted as a liquidity provider, which is another way to stating that FXDD Malta provided Debtor with a trading account. See at ¶¶ 41-42; 52; see also April 6 Transcript at 13:19-14:4

Defendants' dominion or control over the Debtor. Therefore, the Plaintiff falsely classified the transfers as preferential or fraudulent. Further, the Plaintiff also alleges a de facto merger without any reference to contractual or actual events that would indicate such an event took place. [16]

The fact that is conspicuously missing from the Complaint is who truly had control over the Debtor and its accounts. The true control and dominion was in fact held by George Popescu, CEO of the Debtor, a majority shareholder of the Debtor, and the only individual who had sole control over Debtor's operations.[17] (*Complaint* at ¶¶ 34; 19-20). Popescu had at all times access to all of the trading activities including control of all of the transfers Plaintiff seeks to avoid.[18]

For these reasons and the supporting arguments that follow, Plaintiff cannot succeed in arguing causes of action for a *de facto* merger, preferential transfers, and fraudulent transfers against the Malta Defendants.

## II.  JURISDICTION, VENUE AND BASIS FOR RELIEF REQUESTED

This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the statutory predicates for the relief requested are Section 105(a) of the Bankruptcy Code, Civil Rule 12(b)(6) and Bankruptcy Rule 7012(b).[19]

---

[16] *See* the Complaint, at Exhibit B for a copy of this agreement.
[17] At the June 341 Meeting, George Popescu testified to controlling Boston Technologies ("BTI"), BT Prime, and Boston Prime. See June 1 Transcript, at 20: 21-25, 21:1
[18] *See* June 1 Transcript; 341 Meeting.

[19]  Pursuant to Bankruptcy Rule 7012(b), the Malta Defendants  do not consent to the entry of final orders or judgment by the Court. *See* Wellness Int'l Network, Ltd. v. Sharif, No. 13-935, 135 S.Ct. 1932, 1937 (May 26, 2015) (holding the parties may consent to a bankruptcy court's constitutional jurisdiction, but that consent must be knowing and voluntary).

To the extent that this matter arises out of the underlying Bankruptcy Case and Plan, pursuant to Article X of the Plan, and pursuant to Paragraph 21 of the Confirmation Order, the Court retained jurisdiction to consider this Motion. (ECF# 98)[20]

## III.    STANDARD FOR MOTION TO DISMISS

Pursuant to F.R.C.P. 12(b)(6) and Bankruptcy Rule 7012(b),

"a court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993). To avoid dismissal of a claim under Rule 12(b)(6), a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). It is not enough to speculate as to the facts or simply allege the elements of a claim. Id. A court is "not bound to accept legal conclusions couched in fact." *In re Di Vittorio*, 430 B.R. 26, 44 (Bankr.D.Mass.2010). Nor should a court give credence to any "fact" which has been "conclusively contradicted by plaintiffs' concessions or otherwise." *Chongris v. Bd. of Appeals of Town of Andover*, 811 F.2d 36, 37 (1st Cir.1987).

*In re Silveira*, No. 11-44812 -MSH, 2013 WL 1867472, at *5 (Bankr. D. Mass. May 3, 2013).

Furthermore, as is the case here, a Motion to Dismiss can and should be granted when there is a valid affirmative defense. *See Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006) (citations omitted).  Dismissing a case on the basis of an affirmative defense "requires that '(i)

---

[20] All citations to "Plan" and "Confirmation Order" refer to items in the underlying Chapter 11 proceeding 15-10745.

the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude.'" *Id.* (quoting *Rodi v. S. New Engl. Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 1991)).

One such defense is personal jurisdiction which is discussed at length below. Additionally, the affirmative defenses afforded to the recipients or beneficiaries of transfers challenged under Sections 547 and 548 of the Bankruptcy Code may serve as the bases for motions to dismiss under Civil Rule 12(b)(6) and Bankruptcy Rule 7012(b). *See, e.g.*, *In re Midway Games Inc.*, 428 B.R. 303, 323-324 (Bankr. D. Del. 2010) (granting motion to dismiss claim asserted under Section 547(b) based on affirmative defense available under Section 547(c)). 11 U.S.C. 547, 548.

In deciding a motion to dismiss the Court may consider "facts extractable from the documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice." *Butler v. Anderson (In re C.R. Stone Concrete Contractors, Inc.)*, 434 B.R. 208, 219 (Bankr. D. Mass. 2010) (quoting *Jorge v. Rumsfeld*, 404 F.3d 556, 559 (1st Cir. 2005)); *accord Watterson*, 987 F.2d at 3-4. The Court may also consider matters of public record, which include its own docket and proceedings before other courts. *Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990) (*cited in In re McLaughlin*, No. 11-12459-JNF, 2011 WL 5025335, at *4 (Bankr. D. Mass. Oct. 21, 2011)); *Butler*, 434 B.R. at 219 (citations omitted).

## IV.    ARGUMENT

### I.    Plaintiff's Complaint Should Be Dismissed for a lack of Personal Jurisdiction

#### A.    Plaintiff Fails to Plead that the Court has General Jurisdiction Over the the Malta Defendants.

The Plaintiff fails to establish basis for general jurisdiction against the Malta Defendants. Moreover, Plaintiff's allegations of facts are insufficient to establish any forum based contacts

for this Court to find personal jurisdiction over the Malta Defendants. A foreign company cannot be subject to jurisdiction in a forum simply because its affiliate conducts business in that forum. See *Daimler Ag v. Bauman*, 134 S. Ct. 746, 571 U.S. 20, 187 L. Ed. 2d 624 (2014); *see also Goodyear Dunlop Tires, S.A. v. Brown,* 564 U.S. 915, 929 (2011). Under Fed.R.Civ.P. 12(b)(2), the plaintiff bears the burden of showing that a basis for asserting jurisdiction exists. See *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n.*, 142 F.3d 26, 34 (1st Cir. 1998); *Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 83 (1st Cir. 1997); *see also Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir. 2002). The Due Process Clause of the Fourteenth Amendment precludes a court from asserting jurisdiction over a defendant unless "the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). There is no reason that the Malta Defendants would anticipate being sued in the United States Bankruptcy Court.

The initial inquiry when assessing whether personal jurisdiction exists is "whether the defendant purposefully established 'minimum contacts' in the forum state." *Burger King*, 471 U.S. at 474. The question of minimum contacts is fact specific and involves an assessment and factual analysis of the mix of contacts that appear in each case. *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994). A defendant cannot be subjected to a forum state's jurisdiction based on random, fortuitous, or attenuated contacts. *Burger King*, 471 U.S. at 475. The defendant must, by some act, purposefully avail itself of the "privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v.* Denckla, 357 U.S. 235, 253 (1958) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Typically, a corporate defendant will be subject to general jurisdiction in its state of incorporation.

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).  Here, the facts are undisputed that the Malta Defendants did not do business activity in the United States. The Malta Defendants did not purposefully or in any way avail themselves to any activities in the United States. If there were any ties between the Debtor, a Bermuda company, and the Malta Defendants, these ties were exclusively and solely established in the country of Malta.

In *World-Wide Volkswagen Corp. v. Woodson*, the court held that the mere unilateral activity of those who claim some relationship with a defendant cannot satisfy the requirement of contact with the forum state. 444 U.S. 286 (1980). Further, courts have long held that foreseeability alone is not a sufficient benchmark for personal jurisdiction under the Due Process Clause of the Fourteenth Amendment. *Id*. at 295, 296. Mere purchases, even if at regular intervals, is not sufficient to warrant a forum's assertion of general jurisdiction over a nonresident corporation in a cause of action not related to those purchases. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 418 (1984).

In this case the relationship of the Debtor to FXDD Malta was entirely unilateral. The Debtor had a trading account with Defendant, FXDD Malta, which was opened and papered in the country of Malta, under Maltese law. All of the trading activities between Debtor and Defendant, FXDD Malta took place exclusively and solely in the country of Malta. Not once during the course of their relationship did a single trade or any activity between these entities take place on US soil.   Similarly, Defendant CMH and the Debtor did not have any commercial or business relationship outside of the APA. By being a party to the APA, amongst many other corporate entities enumerated there, does not in any way create or impose the intent for Defendant CMH to do business in the United States. The APA did not direct Defendant CMH to

purchase any assets of the Debtor, and even if it, (which did not), that would not create any nexus of a Maltese holding company to the United States soil.[21]

The U.S. Supreme court in *Goodyear* head that jurisdiction over foreign defendants can be established if their affiliations are so "continuous and systematic" to render them "essentially at home". *Goodyear Dunlop Tires, S.A. v. Brown*, 131 S. Ct. 2846 (2011). The Debtor fails to establish any continuous and systematic affiliation with the Malta Defendants. There were none. If such continuous and systematic affiliation were to exist, then as an entity doing business outside of the United States, the Debtor would be in violation of the Commodity Exchange Act.[22] If the Debtor had any ties to the Malta Defendants in the United States, the the Debtor would have been required to be registered in the capacity of a Retail Foreign Exchange Dealer under the Commodity Exchange Act as amended.[23] Therefore, if this Court would impose jurisdiction over the Malta Defendants, it would simultaneously cause the Debtor significant regulatory issues in the Unites States.[24]

The U.S. Supreme Court in *Daimler AG*, held that a party cannot be sued in a state when the claim arose from conduct of its subsidiary and that such conduct took place entirely outside of the United States. 134 S.Ct. 746, U.S. 20, 187 L. Ed. 2d 624 (2014). The agency theory is not a mechanism to establish personal jurisdiction when the subsidiary's conduct occurs on foreign soil. In *Daimler AG*, the Supreme Court further held that a personal jurisdiction determination involves looking at the corporation's activities as a whole; otherwise, a corporation will be subject to jurisdiction in every state where it conducts business. *Id.* at 762.

---

[21] See Complaint, at Exhibit B.
[22] See 7 U.S. Code § 1.
[23] See https://www.nfa.futures.org/nfa-registration/rfed/index.HTML
[24] As previously noted, FXDD Malta is regulated by the Malta Financial Services Authority ("MFSA"), not the Commodity Futures Trading Commission ("CFTC").

Here, the Malta Defendants, as previously noted, have never conducted any business in the United States.  All of the margin transfers that occurred between the Debtor and Defendant FXDD Malta took place exclusively and solely outside of the United States.  If there was any business conduct that took place in the United States, this conduct took place between the Debtor and the Malta Defendants' affiliates based in the United States, also named in this Complaint. These affiliates have distant corporate affiliation to the Malta Defendants, and such distant affiliation by itself will not trigger the jurisdictional ground to have the Malta Defendants dragged before this Court or any other United States forum. In line with the *Daimler* decision, the Malta Defendants cannot be sued for the conduct of its United States based distant affiliates.

The court must have personal jurisdiction over the defendants. In the First Circuit, two criteria must be met to establish general personal jurisdiction, "1) "continuous and systematic general business contacts must exist between the defendant and the forum; and 2) the exercise of jurisdiction must be reasonable as demonstrated by certain "Gestalt factors." *United States v. Swiss American Bank, Ltd.* 274 F. 3d 610, 619 (1st Cir. 2001) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)).[25]  The standard for this showing is high. *See Helicopteros*, 466 U.S. at 414.  The five Gestalt factors are 1) the defendant's burden of appearing; 2) the forum state's interest in adjudicating the dispute; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the judicial system's interest in obtaining the most effective resolution of the controversy and 5) the common interests of all sovereigns in promoting substantive social policies.  *Sawtelle v. Farrelli,* 70 F.3d 1381, 1394 (1st Cir. 1995); *Donatelli v. National Hockey League*, 893 F.2d 456. 465 (1st Cir. 1989). For the following reasons, Debtor has failed to plead personal jurisdiction over the Malta Defendants'.

---

[25]In *U.S. v. Swiss American Bank, Ltd.*, the Supreme Court laid out five criteria, known as the Gestalt factors, for assessing the overall reasonableness of an exercise of personal jurisdiction. 274 F.3d 610, 635.

A) **The Gestalt Factors**

1) **The Defendant's Burden of Appearing**

The Court in *Pritzker v. Yari* addressed the issue of a defendant's burden of appearing.

*Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994)  The Court stated "the concept of burden is

inherently relative, and, insofar as staging a defense in a foreign jurisdiction is almost always

inconvenient and/or costly, we think this factor is only meaningful where a party can

demonstrate some kind of special or unusual burden." *Id.* .[26]  Distance from the "center of

gravity" appears to be the central point for this issue. *Id.* at 64. The 9th Circuit cases discussed in

the footnote all involved substantial travel from the corporation's home and the forum state.

However, in *Pritzker*, the Court stated "in the modern era, the need to travel between New York

and Puerto Rico creates no especially ponderous burden for business travelers." *Pritzker*, 42 F.3d

at 64.

The first *Gestalt* factor is not established. Firstly, FXDD Malta is incorporated in Malta.

FXDD Malta does not do business in the United States and is not subject to regulation by the

Commodity Futures Trading Commission ("CFTC"). Secondly, FXDD Malta conducts its

business outside the United States. In *Pritzker*, the court held the distance between New York

and Puerto Rico does not create an onerous burden. 42 F.3d at 64 (1st Cir. 1994). Malta is

located in the Mediterranean, and the distance between the United States and Malta is much

greater than that between New York and Puerto Rico. As held by the Court in *Pritzker*, the

greater distance from the 'center of gravity' creates an inconvenient burden of both time and

---

[26] *See also Ticketmaster-New York, Inc., v. Alloto*, 26 F. 3d 201,210 (1994) "most of the cases that have been
dismissed on grounds of unreasonableness are cases in which the defendant's center of gravity, be it place of
residence or place of business, was located at an appreciable distance from the forum. Citing *Asahi Metal Indus. Co.
v. Superior Court*, 480 U.S. 102, 114 (1987) (Japanese defendant sued in California); *Core-Vent Corp. v. Nobel
Indus. AB*, 11 F.3d 1482, 1488-1490 (9th Cir. 1993) (Swedish defendant sued in California); *Amoco Egypt Oil Co. v.
Leonis Navigation Co.*, 1 F.3d 848, 852 (9th Cir. 1993) (Filipino sued in Washington); *Casualty Assur. Risk Ins.
Brokerage Co. v. Dillon*, 976 F.2d 596, 600 (9th Cir. 1992) (D.C. defendant sued in Guam).

expense on any representatives of FXDD Malta that may have to appear for depositions or trial.

*Id.* Thus, it would be against the notion of fair play and justice to subject a Maltese entity to

litigation in the United States.

### 2) Forum State's Adjudicatory Interest

"The purpose of [this] inquiry is not to compare the forum's interests to that of some

other forum, but to determine the extent to which the forum has an interest." *Sawtelle v. Farrell*

70 F.3d 1381, 1395 (1st Cir. 1995).  In cases where the defendants have allegedly committed

torts in the forum state, courts have held that the forum has an interest in adjudicating those

disputes.  *See Keeton v. Hustler Magazine, Inc.* 465 U.S. 770, 776 (1984); *Ticketmaster-New*

*York, Inc. v. Alloto*, 26 F.3d 201, 211 (1st Cir. 1994).

The facts in this case clearly fail to satisfy the second prong of the *Gestalt* test. The

United States is not the appropriate forum to adjudicate this dispute. The trading agreement

between the Malta Defendants and the Debtor was not formed on United States soil or subject to

its laws. Furthermore, the accounts at issue were not in the United States. Therefore, arguably,

the United States lack a valid interest in settling this dispute.

### 3) The Plaintiff's Interest in Obtaining Convenient Relief

The First Circuit has repeatedly held that a plaintiff's choice of forum must be accorded a

degree of deference with respect to the issue of the plaintiff's own convenience.  *Sawtelle v.*

*Farrell*, 70 F.3d 1381, 1395 (1st Cir. 1995); *Pritzker,* 42 F.3d at 64; *Ticketmaster*, 26 F.3d at

211.

Plaintiff has not satisfied the third prong of the *Gestalt* test either. Debtor, BT Prime, is

incorporated in Bermuda. Although it has availed itself of the relief of the United States

Bankruptcy Court, BT Prime is not an entity conducting business in the United States. Feasibly,

a Bermuda forum or Maltese forum is better suited to the plaintiff's own convenience.[27]

Therefore, the United States is an inappropriate forum to litigate this complaint.

### 4) The Judicial System's Interest in Obtaining the Most Effective Resolution of the Controversy

In *Pritzker*, the Court determined that judicial economy would counsel against splitting

the action up among the several jurisdictions involved in that case. *Pritzker*, 42 F.3d at 64.

*Pritzker* involved contracts between parties in New York and Puerto Rico, the Court determined

that judicial economy required the actions to be heard in one court rather than split across

jurisdictions. *Id.*

A forum in Malta or Bermuda retain the highest interest for an effective resolution of the

controversy. Here, the Malta Defendants conduct business outside of the United States. Debtor is

incorporated outside of the United States and a majority of the Debtor's creditors are reside

outside the United States.[28] It is not beneficial for the United States economy to spend resources

and time in litigating an issue that has no connection to this country. The purpose of personal

jurisdiction is to prevent forum shopping. It defeats the purpose of personal jurisdiction to

litigate a case in a country where both the defendants and plaintiff have no ties to that forum.

### 5) The Common Interests of All Sovereigns in Promoting Substantive Social Policies (policy reasons)

The most prominent policy implicated is the ability of a state to provide a convenient

forum for its residents to redress injuries inflicted by out-of-forum actors. See *Burger King*, 471

U.S. at 473, 105 S.Ct. at 2182. This policy is not implicated here. The public policy does not

support allowing the Debtor to bring this case in the United States when the Debtor is a Bermuda

Company. Again, the public policy is against allowing litigants to bring actions into the United

---

[27] Also demonstrated by the fact that the Plaintiff has notified its intent to bring a duplicative action in Malta.
[28] See ECF

States when there is not sufficient contact there. To do so would unnecessarily burden the United

States Courts and potentially create the need for duplicative litigation for the correct forum state

to apply to protect its own public policy interests.

In accordance with the aforementioned reasons, the *Gestalt* factors have not been met,

and this case should be dismissed against the Malta Defendants for a lack of personal

jurisdiction.

### B. Plaintiff Failed to Plead that the Court has Specific Jurisdiction Over the Malta Defendants.

If the Court does not have general jurisdiction over the defendants, the Court may

exercise "specific" jurisdiction over the matter. Specific jurisdiction can only be exercised when

there is a demonstrable nexus between a plaintiff's claims and a defendant's forum based

activities, such as when the litigation itself is founded directly on those activities. *Helicopteros*

*Nacionales de Colombia, S.A. v. Hall*, 466 U.S 408, 15 (1984).  The First Circuit has established

a three part test to determine whether there is a sufficient nexus to exercise specific jurisdiction

without violating due process.  The three prongs of the test are: 1) the claim underlying the

litigation must directly arise out of, or relate to, the defendant's forum state activities; 2) the

defendant must purposefully avail himself of the privilege of conducting activities in the forum

state, thereby invoking the state law's benefits and protections and making the defendant's

involuntary presence before the state's court foreseeable; and 3) the exercise of jurisdiction must,

in light of the Gestalt factors, be reasonable. *Pritzker v. Yari*, 42 F.3d 53, 60-61 (1st Cir. 1994).

### 1) Related Conduct

The first factor of the First Circuit's specific jurisdiction test questions whether the

conduct at issue is related to the defendant's activities in the forum state.  The Court in

*Ticketmaster* latched on to the disjunctive "or" proffered in the test for specific jurisdiction.  The

Court states "We believe that this added language portends added flexibility and signals a relaxation of the applicable standard." *Ticketmaster* 26 F.3d at 206.[29]  According to the *Ticketmaster* Court, the relatedness test serves two functions.

> First, relatedness is the divining rod that separates specific jurisdiction cases from general jurisdiction cases.
>
> Second, it ensures that the element of causation remains in the forefront of the due process investigation.  Even if the facts are such that a court may not dismiss a given case for lack of relatedness *per se,* the relatedness requirement, in serving its second function, authorizes the court to take into account the strength (or weakness) of the plaintiff's relatedness showing in passing upon the fundamental fairness of allowing the suit to proceed.

*Id*. at 207.

In *Phillips Exeter Academy v. Howard Phillips Fund, Inc.* the Court addressed the relatedness test by asking whether the defendant's contacts with the forum were "instrumental either in the formation of the contract or in its breach." *Phillips Exeter Academy v. Howard Phillips Fund, Inc.,* 196 F.3d 284, 289 (1st Cir. 1999).  The existence of a contract alone is not sufficient because an agreement is "but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *U.S. v.  Swiss Am. Bank, Ltd.,* 274 F. 3d 610, 621 (1st Cir. 2001).

The Supreme Court, in *Burger King Corp. v. Rudzewicz* developed the "contract plus" analysis for the relatedness inquiry.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985).  The "contract plus analysis" looks to "prior negotiations and contemplated future consequences,

---

[29] The *Ticketmaster* Court goes on to cite the following cases as agreeing with the proposition that the disjunctive "or" signals a loosening of the standard for "relatedness" in discussing the test for specific jurisdiction.  *City of Virginia Beach v. Roanoke River Basin Ass'n*, 776 F2d 484,487 (4th Cir. 1985); *Southwire Co. v. Trans-World Metals & Co.*, 735 F.2d 440,442 (11th Cir. 1984); *Thos P. Gonzalez Corp. v. Consejo Nacional de Produccion*, 614 F.2d 1247, 1252 (9th Cir. 1980); *see also In re Oil Spill by the Amoco Dadiz*, 699 F.2d 909, 915 (7th Cir. 1983).

along with the parties' actual course of dealing. *Swiss Am. Bank, Ltd.*, 274 F.3d at 621. The fact

that the defendant did not appear in the forum state is not dispositive. When physical presence is

lacking, we look for some other indication that the defendant reached into the forum, such as

mail or telephone contacts. *See Burger King, 471 U.S.* at 476.

As noted CMH was a party to the APA. However, there was not alleged any facts that

would satisfy the required "contract plus analysis" and indicate a course of dealings between the

Debtor and CMH. Nor could there be because CMH is a holding companies that does not

conduct any business. There is nothing alleged in the Complaint that establishes this factor as

related to FXDD Malta. Thus, the Complaint has not alleged any facts that establish physical

presence of the Malta Defendants, so we must move on to purposeful availment.

### 2) Purposeful Availment

The function of the purposeful availment prong is to assure that personal jurisdiction is

not premised solely upon defendant's "random, isolated, or fortuitous" contacts with the forum

state. *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 774 (1984); see also *Nowak v. Tak How

Invs*., 94 F.3d 708, 716 (1st Cir.1996). When no direct contacts have been established, the

Supreme Court has looked to the "effects" of out of state activities in the forum state. *Calder v.

Jones*, 465 U.S. 783 (1984). In *Calder*, two reporters from Florida, working for the National

Enquirer wrote an article about a California entertainer. *Id.* at 784-785. The article was sourced

on phone calls to residents of California. *Id.* at 785. The Supreme Court held that California

could assert personal jurisdiction over the reporters based on the effects of the Floridians'

conduct that were caused in California. *Id.* at 789. *Calder* has been limited by other opinions, so

that it does not create jurisdiction for all foreign acts with foreseeable effects in the forum state.

*Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000). [30]

Unlike the facts of the case in *Calder*, the Malta Defendants did not engage in activity that resulted in conduct or effects in the United States. The Complaint did not plead that FXDD Malta or CMH did have any conduct that caused effects in the United States. By conjecture one can assume that Plaintiff may argue, (although it has failed to do so) the Debtor's Bankruptcy was an effect caused by the Malta Defendants in the United States. However, the Malta Defendants certainly did not cause this effect, and even if they had this would certainly not have been foreseeable. As previously noted the Malta Defendants did not conduct business with entities in the United States and could not have anticipated that the Debtor would file bankruptcy there. Therefore, because the Malta Defendants did not purposefully avail themselves to personal jurisdiction in the United States. In fact, because FXDD Malta is not registered with the CFTC, FXDD Malta can only conduct business outside of the United States.

### 3) Reasonableness

Because the Plaintiff cannot satisfy the first two factors of the *Gestalt* test it follows that the Court cannot find it reasonable to exercise its personal jurisdiction over the Malta Defendants and no further analysis is required for this test. The Complaint must be dismissed against the Malta Defendants for lack of Personal Jurisdiction.

---

[30]*See* Noonan F.3d at 90.

## II. Even if the Court finds Personal Jurisdiction, the Plaintiff's Counts V, VII, X, XII, and XIII Should Be Dismissed For Failure to State a Claim Under FRCP 12(b)(6), Pursuant to Section 548(a)(1) as well as the "Safe Harbor" provisions of Section 546(e) of the Federal Rules of Bankruptcy.

Counts V, VII, X, XI, XII and XIII of the Complaint claim that the transfers described in the Complaint (together, the "Transfers"), *see supra* at ¶ 8, are preferential transfers or constructive fraudulent conveyances and therefore avoidable by Plaintiff under Sections 547(b) and 548(a)(1)(B) of the Bankruptcy Code. Such counts must be dismissed, however, since these type of Transfers are specifically protected from avoidance and recovery by the Safe Harbors protections set forth in Sections 546 and 548 of the Bankruptcy Code.

### A. Section 548 (a)(1)

A fraudulent transfer action involves a transfer of property of debtor's estate. 11 U.S.C. §548(a)(1). There cannot be a fraudulent transfer of funds if the funds were never an asset of the Debtor to begin with. The Complaint fails to address this important issue, but the Plaintiff cannot reverse any of these transfers for the simple reason that the funds in its trading account were not the Debtor's, but rather belonged to the Debtor's clients.

Furthermore, FXDD Malta had no beneficial interest in the Transfers. The Transfers were pursuant to margin call requirements, and essential to allow the Debtor to continue trading in furtherance of Debtor's owns demands to do so after the SNB Event. In order for FXDD Malta to be liable for a fraudulent transfer they would have to be a transferee and they are not. Although the Bankruptcy Code does not define "transferee," case law establishes the term does not include a party who acts only as a conduit in a transfer and acquires no beneficial interest in the property. Thus a financial institution, such as FXDD Malta, is protected by the Bankruptcy Code in receiving a check, which is endorsed to it, but destined for its depositor's account. *Brandt v. Hicks, Muse & Co.* (*In re Healthco Intl., Inc.*), 195 B.R. 971, 982 (Bankr. D. Mass.

1996). Therefore, the transfers were clearly done for the benefit of Defendant and its clients not

FXDD Malta.

This Court has held that a party who exercises no control over the transferred property

and claims no beneficial interest in it should not be held responsible for having received a

fraudulent transfer. *Id.* This is consistent with the principle of agency law which protects an

agent who receives property paid under mistake and later, in good faith, delivers the property to

his principal. The rationale for interpreting "transferee" restrictively is also similar to that of the

earmarking doctrine in preference law. The earmarking doctrine states funds loaned to a debtor

but earmarked for a particular creditor are not treated as property of the debtor. *Id.* As such,

FXDD Malta was a transferee, without control over the Debtor, and could not be liable for a

fraudulent transfer, had one been made as the Complaint alleges.

## B. Section 546(e), "Safe Harbor"

Pursuant to Section 546(e) of the Federal Bankruptcy Code, a trustee is prevented from

clawing back a margin call payment made by or to a commodity broker, stock broker, securities

clearing agency, or forward contract merchant. *11 U.S.C. § 546(e)*. In drafting this provision,

Congress determined that these protections were necessary to prevent "the insolvency of one

commodity or security firm from spreading to other firms" and "threaten[ing] the collapse of the

affected industry." H.R. REP. 97–420, at 2 (1982). The Eleventh Circuit recognized the potential

for even narrowly-tailored avoidance powers to create wider uncertainty, when it found (with

respect to a different type of financial transaction) that "even granting trustees avoidance powers

under limited circumstances in the LBO context has the potential to lessen confidence in the

commodity market as a whole." *Matter of Munford, Inc.*, 98 F.3d 604, 610 n.4 (11th Cir. 1996);

see *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 477 (S.D.N.Y. 2001). Plaintiff's attempt

to allege such massive avoidance of Transfers in violation of the Safe Harbor protections risks setting a precedent which could produce exactly that result.

The Complaint wrongly alleges Transfers as fraudulent and preferential. The Transfers were merely a transfer of margin specifically protected by the safe harbors. Therefore, neither of those transfers were fraudulent in nature or avoidable by the Plaintiff as the Complaint alleges and cannot be recovered or avoided by the Plaintiff.

Moreover, courts have recognized that the mere pendency of massive claims such as these can lead to inappropriate coerced settlements.[31] The Court should promptly dismiss Plaintiff's scattershot claims as a matter of law, rather than leaving them to the delay and costs of discovery and trial. Continued litigation of this case would be, in itself, a substantive victory for the Plaintiff. If one thing is clear from the legislative history, it is that Congress intended the safe harbors to provide certainty. *See*, *e.g.*, Swap Hearing at 62 (statement of Frank G. Sinatra) ("The volatile nature of the financial markets and the need for certainty and speed in quantifying exposure of its participants provide further public policy goals" supporting the safe harbors.)

To achieve Congress's purpose, the protected Safe Harbors establish clear and objective standards that market participants can rely on in making decisions in tumultuous markets. Unless the debtor has actually intended to defraud other creditors the Transfers are protected by Safe Harbor, and the Court should grant this motion to dismiss. See *Advanced Cardio. Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1160 (9th Cir. 1993) "The purpose of [Rule 12(b)(6)] is to

---

[31] The acute burden of litigation itself also underlies the Supreme Court's recent decisions in *Bell Atlantic v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 574 F.3d 820 (2d Cir. 2009). The Seventh Circuit has explained those holdings in a way that highlights their individual relevance here:

> The [Twombly] Court held that in complex litigation (the case itself was an antitrust suit) the defendant is not to be put to the cost of pretrial discovery—a cost that in complex litigation can be so steep as to coerce a settlement on terms favorable to the plaintiff even when his claim is very weak—unless the complaint says enough about the case to permit an inference that it may well have real merit. *Smith v. Duffey*, 576 F.3d 336, 340 (7th Cir. 2009).

allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and trial activity." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Accordingly, when a complaint asserts a cause of action that is barred by a Safe Harbor protection, the court should, enforce those protections on a motion to dismiss, rather than waiting for a later stage of the litigation. This case, in which a defective complaint has been filed, should be promptly dismissed.

III.    **Even if the Court Finds Personal Jurisdiction Over the Malta Defendants' The Malta Defendants' Did Not Acquire Any Control, Equity, or Ownership in the Debtor, and the Plaintiff's Counts I, II, III , IX, XIV, XV, and XVI Should be Dismissed.**

Count I of the Complaint seeks a judgment declaring that the Debtor and "Forexware" were engaged in a joint venture and as such, "Forexware" is jointly liable for " all the debts and liabilities of the Debtor". Complaint at ¶¶ 65-74. The Complaint fails to establish any of the factors required to prove the existence of a joint venture. To establish a Joint Venture requires a finding that the participants shared in joint profits, assets, or control of performance. *See Patriot Gen. Life Ins. Co. v. CFC Inv. Co.*, 11 Mass. App. Ct. 857, 859-860 (1981). In other words a joint venture requires a partnership. The facts in the Complaint state the opposite, that the Debtor did not share in profits or control, but rather, the Complaint falsely alleges that Debtor was in fact controlled by the Defendants. *See* Complaint at ¶¶ 66; 68. As indicated previously the only person in control of the Debtor was its CEO George Popescu.

Count II of the Complaint seeks to establish a *de facto* merger between Defendant FXDD Malta and Debtor by asserting that the existence of a margin call on the Debtor's account was sufficient to demonstrate complete dominion and control of one entity by another. Complaint at ¶¶ 66; 68. The Plaintiff fails to sufficiently establish any control by the Malta Defendants and success on this claim would set incorrect precedent. A brokerage company, like FXDD Malta,

does not exert control over their clients. Debtor was free to make their own decisions as well as any other decisions pertinent to Debtor's operations.

FXDD Malta required the Debtor to maintain adequate margin in order to allow Debtor to trade in its own accounts. This is the same requirement FXDD Malta has for all its clients. In the event clients have margin deficits FXDD Malta contacts its clients requiring them to deposit additional funds. Only clients are in control over providing FXDD Malta with adequate margin payments. If they fail to do so they are prohibited from further trading. FXDD Malta does not exercise control or dominion over their own clients margin payments as such responsibility falls solely on the clients, and in this case was the responsibility of the Debtor.[32] Without having any control or dominion over margin call payments the Complaint wrongfully draws the conclusion that a *de facto* merger took place.

In determining whether a *de facto* merger occurred, Massachusetts courts "generally consider" four factors:

> "....[W]hether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted

---

[32] BT Prime admits that transfers were made in response to margin call payments. *See April 6 Transcript at 13:19-14:4.*

continuation of normal business operations of the seller corporation.
*Cargill, Inc. v. Beaver Coal & Oil Co.*, 424 Mass. 356, 360. (1997). [33]

Massachusetts courts will look at the factors as whole; one factor does not bear more weight than the other. It is important to reiterate that FXDD Malta was not a party to the APA. Therefore, FXDD Malta cannot be in any way considered be to be a party under the *de facto* merger argument. The de facto merger argument stops short against any party that was not intended to be the purchaser in the first place. As previously stated, FXDD Malta's role was only to provide a brokerage account for the Debtor.  This was FXDD Malta's only purpose in its limited relationship with the Debtor.  Clearly the *de facto* argument against FXDD Malta fails.

The Complaint further fails to establish proof that the four prongs of the Cargill case are met against CMH.  The Cargil holding is specifically looking at all four prongs as a whole, otherwise the de facto argument can inadvertently many potential business deals that do not end up materializing or actually closing. The key factor here is whether CMH intended to assume Debtor's obligations ordinarily necessary for the uninterrupted continuation of Debtor's normal business operations.  This was not the case here, neither contractually nor in principal. The APA did not discuss CMH taking over Debtor's obligations necessary for Debtor to continue doing business. Furthermore, as a holding company without employees, CMH did not extend control or dominance over Debtor's activities. In certain circumstances, courts have found substantive consolidation of entities "(a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in

---

[33]Since property interests are created and defined by state law, courts have held that state law must be used to resolve questions involving property rights in the bankruptcy estate's assets, "unless some federal interest requires a different result." *Butner v. United States*, 440 U.S. 48, 55 (1979).

a common enterprise with substantial disregard of the separate nature of the corporate entities, or

serious ambiguity about the manner and capacity in which the various corporations and their

respective representatives are acting". *My Bread Baking Co.*, 353 Mass. 614 (1968); See *W.W.*

*Britton Inc.* v. *S.M. Hill Co.* 327 Mass. 335, 338-339. In such circumstances, courts can impose

liability on either of the corporations. *Id*. Clearly a holding company, such as CMH, could not

have had any active or direct participation over the Debtor. CMH did not engage in any common

enterprise with the Debtor. Lastly, CMH has never engaged in the foreign exchange trading

market. Therefore, CMH could not have been implicated into a *de facto* merger with the Debtor.

Additionally, Counts IX, XIV, XV, and XVI all also requests relief on the grounds that

all the Defendants exercised control over the Debtor and thereby caused the Debtor to incur

Debts for their own benefit. *See* Complaint at ¶¶ 125-133. As established by the previous

arguments there is no basis upon which to find control by the Malta Defendants over the Debtor.

Therefore, Plaintiff cannot use this theory to impute liability to FXDD Malta or CMH the parent

of FXDD Malta and Counts I, II, III, IX, XIV, XV, and XVI all  must be dismissed as to the

Malta Defendants.[34]

## IV. Even if Counts V, VI, VII and VIII Met the Pleading Requirements of FRCP 12 (b)(6) These Counts Should Also Be Dismissed Pursuant to and the Higher Standard Required For Pleading Fraud Under FRCP 9(b).

Rule 9(b) applies to all fraud claims. A typical fraud claim, of course, requires the

plaintiff to plead the fraudulent intent of the defendant. Counts V and VII of the Complaint

attempt to assert causes of action under Sections 548(a)(1)(B) and 550(a) of the Bankruptcy

Code to avoid and recover Transfers as constructive fraudulent transfers. Counts VI and VIII

---

[34] Notably, Plaintiff removes its lumping of CMH with Forexware US and simply names Defendant Forexware US for Count IV its breach of contract claim, because CMH was not a party to the License Agreement to which it refers. This further demonstrates that CMH was a completely separate and distinct entity from Forexware US and should not be held liable simply on the basis of association by the Plaintiff and lacking any specific description of any conduct engaged in by CMH.

attempt to 548(a)(1)(A) and 550(a) of the Bankruptcy Code to avoid and recover those Transfers from the Malta Defendants as actual fraudulent transfers. *See* Complaint at ¶¶ 97-124. In Counts I, II, III, V, VI, XI of the Complaint Plaintiff continues to conflate Forexware US and CMH, referring to them as one entity "Forexware", even though CMH had no involvement in the Transfers. Similarly, on several occasions the Complaint refers to "FXDD and/or FXDD US" rather than specifically identifying the entity it is stating a claim against. *See e.g.* Complaint at ¶¶ 112, 119, and 152.

Civil Rule 9(b) "is not satisfied by allegations that lump a defendant together with other defendants in common activity, unless there is particularized support for the specific defendant's role in the common activity". *See In re Jeweled Objects LLC)*, No. 10-11831 (RDD), 2012 WL 3638006, at *8 (Bankr. S.D.N.Y. Aug. 22, 2012). There is no support for the Malta Defendants' roles in common activity with the other Defendants in this case. Thus, the standard of Rule 9(b) had not been met and the Complaint must be dismissed.

Further, Plaintiff attempts to sidestep the safe harbor by alleging an "actual intent" fraudulent transfer under Section 548(a)(1)(A). While it is true that the safe harbor does not apply to such transfers, actual intent claims are subject to additional safeguards, which Plaintiff's complaint ignores. The uncontrolled expansion of actual-intent claims would undermine the safe harbors by allowing debtors to proceed, as Plaintiff does here, on the basis of flimsy and illogical allegations.

Actual-intent fraudulent transfer claims are subject to the pleading specificity requirements of Bankruptcy Rule 7009(b). See *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). That rule ensures that financial market participants will not even be subjected to discovery and litigation unless the plaintiff can allege, at the outset, specific facts showing the

debtor's actual intent to defraud. Where the plaintiff can allege no more than a lack of reasonable

value in exchange, the suit cannot proceed if it relates to a transfer in connection with a protected

agreement.  As explained above, litigation is itself a significant threat, even if the defendant

expects ultimately to win on the merits. By limiting market participants' liability to claims

subject to Rule 7009(b), the safe harbors sharply reduce the risk that an estate will use avoidance

litigation to pressure a settlement. Throwaway allegations that someone—Plaintiff's complaint

does not even identify who—acted with fraudulent intent are not particular enough to meet that

standard.

Case law is clear that in actual-intent fraudulent conveyance cases, fraudulent intent must

be possessed by the debtor, not the transferee. Plaintiff would virtually eliminate that

requirement with an expansive theory of "imputed intent," by which any transfer tied to an ill-

defined "economic coercion" by a creditor would be treated as if the debtor intended it to defraud

creditors. That approach finds no support in the case law and makes little sense. Plaintiff does

not adequately allege that it had actual intent to defraud creditors.

The reference to "actual intent" in Section 548(a)(1) refers to the intent of the debtor

transferor, here Plaintiff. *See*, *e.g.*, *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 444

(S.D.N.Y. 2001) ("There is no reference at all in the text to any requirement implicating the

debtor's transferee. The only inquiry concerning actual intent that matters is that of the debtor:

whether the debtor causing the transfer or incurring the obligation intended to hinder, delay or

defraud its creditor."). Plaintiff does not allege that it acted with fraudulent intent. Further, the

clear import of the Complaint is that it was the Debtor that "required" the transfers (Complaint at

¶53).

The intent was not there because the Debtor did not "know" that bankruptcy "would result," or was "certain, or substantially certain, to result," from the challenged contracts (Opp. 65, 67 (quoting Dean v. Davis, 242 U.S. 438, 444 (1917) and RESTATEMENT (SECOND) OF TORTS § 8A cmt. b (1965)). Debtor's entry into the APA was designed to avoid exactly that result. When "the debtor's motivation is to protect credit standing, to continue in business, and to rehabilitate financially, the transfer or obligation has often been held not to be fraudulent in fact despite the insolvency at the time of the transaction." 5 Collier's ¶ 548.04[2][b], at 548–48.

The Bankruptcy Code recognizes the critical distinction between hard bargaining by a creditor and a transferee's collusion in the efforts by the debtor to secrete assets from creditors. The only transfers that are not safe-harbored are those with actual intent to defraud creditors. Such transfers are typified by a debtor's attempts to retain the benefit of assets while nominally removing them from the estate. Thus, for example, "[t]he transfer of property by the debtor to his spouse while insolvent, while retaining the use and enjoyment of the property, is a classic badge of fraud. The shifting of assets by the debtor to a corporation wholly controlled by him is another badge of fraud." *In re Kaiser*, 722 F.2d 1574, 1583 (2d Cir. 1983) (citation omitted); see also *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 640 (2d Cir. 1995) (finding possibility of fraud where "this arrangement effectively transferred substantial assets from the corporation to" corporate insiders); *In re Nemeroff*, 74 B.R. 30, 31 (E.D. La. 1987) ("The Bankruptcy Judge was justified in finding that the trusts were a sham since the debtors appointed themselves as trustees and retained possession and enjoyment of the property.").

The allegations here look nothing like that paradigm case. By contrast, allegations that the debtor "hastily" or without consideration transferred assets to a creditor must be addressed under the rubric of preferences (from which swap, repo, and security agreements, again, are

protected). <u>Compare</u> *New York Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*,

2008 WL 2115225, at \*5 (S.D.N.Y. May 16, 2008) (finding fraudulent intent where debtor "has

repeatedly transferred his personal assets as well as the assets of KW Construction to family

members or close business associates for little to no consideration").

A creditor's mere success in obtaining property at less than fair value is remediable only

under Section 548(a)(1)(B) or (b), and those are precisely the sections that Congress chose to

render inapplicable to financial contracts. Hence, the Enron court found the securities settlement

payment safe harbor applicable where "Enron apparently [went] into the market place and over

pa[id] for the product it purchased to, among other things, protect its credit rating." *In re Enron

Corp.*, 341 B.R. 451, 459 (Bankr. S.D.N.Y. 2006). Cf. *Matter of FBN Food Servs., Inc.*, 82 F.3d

1387, 1394 (7th Cir. 1996) (reversing finding of actual-intent transfer where lower courts

"equated financial pressure [by a creditor] with 'fraud'"). Thus, even if it were correct that any of

the Defendants lacked a contractual basis and that its collateral demands were not exempt for the

independent reason that they secured antecedent debts, the resulting deficiencies in the transfers

would not imply that the Debtor actually intended to defraud its creditors, and would not

implicate Section 548(a)(1)(A).

In essence, Plaintiff's novel badges of fraud would expand Section 548(a)(1)(A) to cover

any transfer by an insolvent debtor that lacks adequate consideration: Plaintiff either would

render the debtor's actual intent irrelevant to an actual-intent transfer claim, or would hold that

such intent can be inferred from insolvency and lack of consideration. Insolvency and "less than

a reasonably equivalent value," however, are exactly the requirements of Section

548(a)(1)(B)(ii)(I), the part of the statute that is foreclosed by the safe harbors. The actual-intent

claim in subsection (a)(1)(A) must require something more, or else subsection (B)(ii)(I) would be

superfluous, and the safe harbors likewise would be superfluous as they do not circumscribe

subsection (a)(1)(A).

**V. Counts XIV, XV, Should Also Be Dismissed Pursuant to and the Standard Required For Pleading Under FRCP 8(a).**

Count XIV, seeks a judgment pursuant to Section 542 of the Bankruptcy Code directing

all defendants to turn over the $1.3 Million Transfer. *See* Complaint at ¶¶ 168-171. Count XIV

and the allegations therein, fail to satisfy the pleadings requirements of Civil Rule 8(a). The

Count states on February 3, 2015, "the Defendants took $1.3 million from the FXDD Trading

Account[.]" *See id.* at ¶ 55. Notably, neither Paragraph 55 nor any other part of the Complaint

identifies which of Forexware US, FXDD US, CMH or FXDD Malta "took" the funds from the

FXDD Trading Account; moreover, Paragraphs 169 and 170 merely allege that the sought-after

funds are "in the possession of the Defendants." *See id.* at ¶¶ 169-170. This is not sufficient.

Bankruptcy courts have required that these types of claims must be set forth specifically against

each individual defendant to meet the standard of Rule 8(a)(2). *See Forman v. Salzano (In re*

*Norvergence, Inc.)*, 405 B.R. 709, 737 (Bankr. D.N.J. 2009)

Count XV of the Complaint is equally deficient under the rule. Count XV attempts to

assert a cause of action sounding in conversion against the Malta Defendants. *See* Complaint at

¶¶ 172-176. As is the case with Count XIV, this count should be dismissed because it fails to

satisfy the pleading standard of Civil Rule 8(a) by not identifying which of Forexware US and

FXDD US either made the $1.3 Million Transfer or "exercised dominion or control" over the

funds in question. Additionally, Count XV should be dismissed because it fails to set forth the

required elements for a conversion cause of action or any facts in support of certain of those

elements.

The elements for conversion under Massachusetts law are, " (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused."  *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993).  An action for conversion also requires proof that the defendant "either did some positive wrongful act with the intention to appropriate the property to himself or deprive the rightful owner of it."  *Kelly v. LaForce*, 288 F.3d 1, 12 (1st Cir. 2002)." *Republic Bank, Inc. v. Nickless (In re Haverhill Technology Group, Inc.)*, Adv. No. 06-4197, 2008 WL 4066432, at *5 (Bankr. D. Mass. Aug. 26, 2008). Even had Plaintiff pleaded this in compliance with Rule 8(a), the Malta Defendants need not discuss all of these elements because they have established herein that they did not exercise any control or dominion over the Debtor or its assets. Thus, Counts XIV and XV must be dismissed for failure to meet the standard of Civil Rule 8(a).

## V.  LOCAL RULE 9013-1(b) CERTIFICATION

Before filing this Motion, FXDD Malta and Currency Mountain Holdings made a reasonable and good-faith effort to determine whether or not this Motion is unopposed. Specifically, on January 18, 2017, FXDD Malta and CMH through their counsel, contacted BT Prime, through its counsel named on the Complaint, advised of their intention to file this Motion and asked whether this Motion would be unopposed.  The response was that this Motion would in fact be opposed.

## VI.  CONCLUSION

For all of the foregoing reasons, and for any other reasons that FXDD Malta and Currency Mountain Holdings may state on the record at any hearing held in respect of this Motion, FXDD Malta and Currency Mountain Holdings respectfully request that the Court grant this Motion in its entirety, enter an order dismissing the Complaint as to FXDD Malta and Currency Mountain Holdings with prejudice, and such other and further relief as the Court deems just and proper.

Dated:  January 18, 2017

SHIPKEVICH, PLLC

/s/ Irene Costello
Irene M. Costello (PENDING ADMISSION PHV)
65 Broadway, Suite 508
New York, NY 10006
Telephone:  (646) 588-2795
Email:  icostello@shipkevich.com

-and-

MIRICK, O'CONNELL, DEMALLIE & LOUGEE, LLP

/s/ Paul W. Carey
Paul W. Carey, BBO #566865
John O. Mirick, BBO #349240
100 Front Street
Worcester, MA  01608
Telephone: 508-791-8500
Email: pcarey@mirickoconnell.com

Counsel to FXDD Malta
and Currency Mountain Holdings Limited