# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>BT PRIME LTD.,<br><br>               Debtor | Chapter 11<br>Case No. 15-10745-FJB |
| BT PRIME LTD.,<br><br>               Plaintiff<br><br>v.<br><br>BOSTON TECHNOLOGIES POWERED<br>   BY FOREXWARE LLC, f/k/a<br>   FOREXWARE LLC,<br>CURRENCY MOUNTAIN HOLDINGS<br>   LIMITED, f/k/a FOREXWARE<br>   MALTA HOLDINGS LTD.,<br>FXDIRECTDEALER, LLC, and<br>FXDD MALTA LTD.,<br><br>               Defendants | Adversary Proceeding<br>No. 16-1178 |

## MEMORANDUM OF DECISION ON MOTIONS TO DISMISS

### I.     INTRODUCTION

By its 16-count complaint in this adversary proceeding, plaintiff and reorganized chapter 11

debtor BT Prime Ltd. ("BT Prime," "the Debtor," or "the plaintiff"), formerly a currency trading business,

seeks against the four defendants, each an affiliate of BT Prime, to avoid and recover fraudulent and

preferential transfers, recover damages for breach of contract, conversion, and breach of fiduciary duty,

and related relief. The adversary proceeding is before the Court on two motions to dismiss. The first is

brought jointly by FXDD Malta Ltd. ("FXDD Malta") and Currency Mountain Holdings, Ltd. ("CMH Malta")

(FXDD Malta and CMH Malta collectively, "the Malta Defendants"), both Maltese entities; their motion

seeks dismissal for lack of personal jurisdiction, failure to state a claim on which relief can be granted, and failure to plead fraud with particularity.  The second, brought jointly by Boston Technologies Powered by Forexware LLC, f/k/a Forexware LLC ("Forexware") and FXDirectDealer, LLC ("FXDD US") (together, "the U.S. Defendants"), both domestic entities, seeks dismissal for failure to state a claim on which relief may be granted.

## II.    PROCEDURAL HISTORY

The Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on March 2, 2015. The Debtor and the Official Committee of Unsecured Creditors filed a joint liquidating chapter 11 plan (as supplemented and then confirmed, "the Plan"), and on May 11, 2016, the Court confirmed the Plan. The Plan vested all assets of the Debtor, including all its causes of action, in the Debtor as reorganized; effected the resignation of all the Debtor's then-existing officers and directors; created the position of Liquidating Supervisor, an individual authorized and obligated to (among other things) liquidate the Debtor's assets and distribute them in accordance with the Plan; and appointed a Liquidating Supervisor.

On October 19, 2016, BT Prime, now as the Reorganized Debtor, filed the complaint commencing the present adversary proceeding. The complaint states some sixteen counts, many against multiple defendants. Ten arise under the Bankruptcy Code: four under each of §§ 547 and 548 of the Bankruptcy Code to avoid and recover preferential and fraudulent transfers, one under § 542 for turnover of property of the estate, and one under § 543(b) for an accounting. The remainder arise under state law: for breach of contract, breach of fiduciary duty, conversion, and declaratory relief to the effect that the defendants (one or more) are joint venturers with the Debtor or successors to or effectively merged with the Debtor, such that each is jointly liable with the Debtor for its debts.

The defendants responded with the present motions to dismiss. The Debtor filed oppositions to both and, in support of its oppositions, filed also the affidavit of one George Popescu ("Popescu" and

2

"Popescu Affidavit") and what appear to be certain corporate records of the Malta Defendants. The

Malta Defendants promptly moved to strike the Popescu Affidavit. After a hearing on the motions to

dismiss, the Court denied the motion to strike but noted that the Debtor had agreed and clarified that

the Popescu Affidavit had been offered and should be considered solely with respect to the Malta

Defendants' motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), not with

respect to the Malta Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) or with

respect to the other defendants' motion to dismiss. The Court also permitted the Malta Defendants to

submit an affidavit of their own and to submit further briefing, to which the Debtor could reply.

Accordingly, the Malta Defendants filed, in support of the personal jurisdiction portion of their motion, a

further brief and the affidavit of Emil Assentato ("Assentato Affidavit"), and the Debtor filed a

supplemental brief on personal jurisdiction and a further affidavit, of Andrea MacIver ("MacIver

Affidavit"). Later, the Debtor moved for leave to file the sworn statement of one Joseph Botkier in

support of its opposition to dismissal on the basis of personal jurisdiction, together with a supplemental

brief. The Malta Defendants opposed this relief, and the Court, agreeing with the Malta Defendants that

the sworn statement was not admissible, denied the requested leave to file.

### III.    JURISDICTION, AUTHORITY, AND STANDING

The various counts arise in a bankruptcy case, and some arise under the Bankruptcy Code; for

both reasons, they fall within the jurisdiction given the district courts in 28 U.S.C. § 1334(b).  By the

District Court's standing order of reference, the matter is referred to the bankruptcy court pursuant to

28 U.S.C. § 157(a). *See* L.R. 201 (D. Mass.). The counts arising under §§ 542, 543, 547, 548, and 550 of

the Bankruptcy Code are core proceedings. 28 U.S.C. § 157(b)(2)(E), (F), (H), and (O). The remaining

counts, which do not arise under the Bankruptcy Code and which might have been brought by the

Debtor before the bankruptcy case was commenced, are not core proceedings. The Court will await the

Defendants' answers to determine its authority to enter final judgment as to the various counts.  *See*

Fed. R. Bankr. P. 7012(b) ("A responsive pleading shall include a statement that the party does or does not consent to entry of final orders or judgment by the bankruptcy court.").

IV.     **PERSONAL JURISDICTION**

   a.   **The Standard and Method of Application**

Where, as here, a defendant asserts that the complaint should be dismissed both for failure to state a claim and for want of jurisdiction, the jurisdictional question must be resolved first. *Bell v. Hood*, 327 U.S. 678, 682 (1945). I therefore begin with the Malta Defendants' challenge to personal jurisdiction under Rule 12(b)(2), Fed R. Civ. P.,  made applicable here by Rule 7012(b), Fed R. Bankr. P.

The plaintiff bears the burden of proving the existence of personal jurisdiction. *Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 142 F.3d 26, 34 (1st Cir. 1998). "Faced with a motion to dismiss for lack of personal jurisdiction, a district court 'may choose from among several methods for determining whether the plaintiff has met [its] burden.'" *Id*. The most common method is the *prima facie* approach, under which the court accepts the specific facts that the plaintiff alleges so far as the record evidence supports them. The prima facie method "requires no differential fact finding; rather, this method requires only that a plaintiff proffer evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction." *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016). "For the purpose of examining the merits of such a jurisdictional proffer [the court] take[s] the facts from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version of genuinely contested facts," *id.*, citing *Sawtelle v. Farrell*, 70 F.3d 1381, 1385 (1st Cir. 1995), and construing the plaintiff's properly documented evidentiary proffers in the light most favorable to [its] jurisdictional claim. *A Corp. v. All American Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016). However, a court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). The court also accepts the

facts that the defendants offer, but only to the extent that they are uncontradicted. *Cossaboon v. Maine Medical Center*, 600 F.3d 25, 31 (1st Cir. 2010). I apply the *prima facie* approach here; no party has urged otherwise.

This adversary proceeding arises in a bankruptcy case, which is a federal proceeding.  And for the most part—albeit not in every count against the Malta Defendants—it arises under a federal law, the Bankruptcy Code, 11 U.S.C. §§ 542, 543, 547, 548, and 550. The applicable rules provide for nationwide service of process for adversary proceedings in bankruptcy cases.  Fed. R. Bankr. P. 7004(d) ("The summons and complaint . . . may be served anywhere in the United States."). And they further extend the personal jurisdiction of federal courts in bankruptcy proceedings to the extent permitted by the Constitution:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service . . . is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code.

Fed. R. Bankr. P. 7004(f). "When the personal jurisdiction of a federal court is invoked based upon a federal statute providing for nationwide or worldwide service, the relevant inquiry is whether the respondent has had sufficient minimum contacts with the United States." *Application to Enforce Admin. Subpoenas Duces Tecum of S.E.C. v. Knowles*, 87 F.3d 413, 417 (10th Cir.1996). "Specific contacts with the district in which enforcement is sought . . . are unnecessary." *Id*. As the Court of Appeals for the First Circuit has explained:

> Because the instant case is premised on a federal question, it is distinguishable from cases that address personal jurisdiction in the context of diversity jurisdiction, 28 U.S.C. § 1332 (1988)—a context in which the focal point is, of necessity, the Fourteenth Amendment. The distinction is of potential consequence. When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment. [Citations omitted.]  Inasmuch as the federalism concerns which hover over the jurisdictional equation in a diversity case are absent in a federal question

> case, a federal court's power to assert personal jurisdiction is geographically expanded. In such circumstances, the Constitution requires only that the defendant have the requisite "minimum contacts" with the United States, rather than with the particular forum state (as would be required in a diversity case).

*United Elec. Radio and Mach. Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1085 (1st Cir.1992) (internal citations omitted). *See Baldiga v. Joint Stock Co. et al. (In re Cyphermint)*, 445 B.R. 11, 17-18 (Bankr. D. Mass. 2011), *aff'd*, 459 B.R. 488 (D. Mass. 2011).

The parties have largely framed their arguments in terms of law derived from diversity cases, framing the test as one of sufficiency of contacts with the forum district. Their arguments are off the mark—the proper focus is on sufficiency of contacts with the United States. However, with respect to the facts, the Malta Defendants deny that they have sufficient contacts not just with the forum state of Massachusetts but with the United States as a whole, so the controversy survives the error.

Personal jurisdiction may be based on either general jurisdiction or specific jurisdiction. *See Harlow v. Children's Hospital*, 432 F.3d 50, 57 (1st Cir. 2005).  The plaintiff need not prove the existence of both types of jurisdiction; either one, standing alone, is sufficient. *Id*. In order to establish personal jurisdiction under either theory, the plaintiff must establish that the defendant had sufficient "minimum contacts" with the forum, that those contacts were purposeful, and that the exercise of jurisdiction is reasonable under the circumstances. *Id*. General jurisdiction exists even when the plaintiff's claims are unrelated to the defendant's forum-state contacts (the forum "state" here being the United States as a whole), provided the defendant's contacts with the forum state have been "so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011). As such, general jurisdiction is "dispute blind." *Harlow*, 432 .3d at 65. In contrast, specific jurisdiction exists only where the plaintiff's claim is related to the defendant's contacts with the forum state. *Id*. at 61. Here, the plaintiff alleges both general and specific personal

jurisdiction. For the sake of thoroughness, I address both. I further define the standard and its operation below.

### b.   The Facts

To establish the Court's personal jurisdiction over the Malta Defendants, the Debtor relies on facts derived from the Complaint and from the Popescu Affidavit (including authenticated documents attached thereto). The following facts are from the complaint, augmented (where so indicated) by additional facts from the Popescu Affidavit.

### Formation of the Debtor and Related Entities

1.      In 2007, George Popescu formed Boston Technologies, Inc. ("BTI") and through it developed certain software, specifically a computerized trading platform (the "Platform") for trading in the currency markets. BTI's initial business was to license the Platform to third-party currency brokers.

2.      BTI was originally a Delaware LLC. In 2009 it was converted to a Delaware corporation. Popescu was its chief executive officer and bought out its other members to become its sole shareholder.  (Popescu Affidavit, ¶ 5)

3.      From its inception, BTI's place of business was in Boston, Massachusetts.  All of its employees were located in Boston, and all of its records were maintained in Boston.

4.      Popescu subsequently decided to expand the business of BTI into the provision of currency brokerage services.

5.      Popescu made this decision in 2010.  (Popescu Affidavit, ¶ 7)

6.      In furtherance of this expansion, Popescu caused two entities to be formed:  BT Prime (the Debtor) and Boston Prime Limited ("Boston Prime").  BT Prime was formed under the laws of the British Virgin Islands, and later organized under the laws of Bermuda, to provide currency brokerage services to customers outside the United States.  Boston Prime was formed under the law of the United Kingdom to provide regulated currency brokerage services.

7.     The Debtor was an unregulated currency broker.  (Popescu Affidavit, ¶ 7)

8.     The currency trading businesses of BT Prime and Boston Prime were part of a business enterprise controlled and managed by BTI (with the Debtor and Boston Prime, the "BTI Group").  The three entities were distinct in name only.

9.     Upon the Debtor's formation, the Debtor entered into a license agreement with BTI (the "License Agreement").  Pursuant to the License Agreement: (a) BTI licensed its software to the Debtor; and (b) BTI provided all professional services for the operation of the Debtor, including assignment of employees, operational support, marketing and sales services, business and technical consulting services, office space, and telecommunications and computing services.

10.     Pursuant Section 2.1 and Schedule A to the License Agreement, BTI provided to BT Prime "Professional Services which included office space, telecommunication and computer capabilities, utilities, furniture and tenant improvements, marketing and sales force, employees, hardware, business and technical consulting service." BTI also provided BT Prime with access to and use of servers, computers, laptops, phones, website resources, internet access and other hardware, along with general technical and business consulting services." Thus, BT Prime had no employees and was totally dependent upon BTI for operating its business. (Popescu Affidavit, ¶ 9)

11.     Boston Prime entered into a similar License Agreement with BTI. (Popescu Affidavit, ¶ 10)

12.     The Debtor had no employees, and BTI employees controlled the Debtor by managing all aspects of the Debtor's business and controlling the Debtor's operations, including all trading activity, accounting services, and maintenance of the Debtor's books and records.

13.     In exchange, the Debtor was obligated under the License Agreement to pay BTI all of its net revenues determined on a monthly basis.  As a consequence thereof, the Debtor was unable to maintain cash reserves to meet any subsequent cash flow shortfalls.

14.    As a result of the foregoing, from its inception, the Debtor had no existence independent of BTI.

15.    Upon its formation, Boston Prime also entered into a license agreement with BTI which contained terms substantially identical to the Debtor's License Agreement.  Pursuant to this license agreement between Boston Prime and BTI, BTI employees controlled Boston Prime and made all managerial and operational decisions for Boston Prime.

**BTI's Software Bug and the Forexware Transaction**

16.     On or about April 20, 2014, a "bug" in the BTI trading software platform purportedly caused BTI to negligently place voluminous "spot" gold and foreign exchange trades in the aggregated amount of several hundred million dollars on behalf of the Debtor's customers.  As a consequence of BTI's negligence, the Debtor suffered losses of several million dollars.

17.    As a result of the foregoing, the Debtor was rendered insolvent. Its liabilities to customers substantially exceeded the amount of its available funds.

18.    Consequently, BTI explored a sale of BTI, the Debtor, and Boston Prime.

19.    These efforts ultimately led to negotiations to sell the BTI Group to Forexware, an existing player in the foreign currency exchange industry.

20.    Popescu, as representative of BTI, BT Prime, and Boston Prime, entered into negotiations with Emil Assentato, Shawn Dilkes, and Joseph Botkier for the acquisition of the assets and assumption of the liabilities of BTI, the Debtor, and Boston Prime. Popescu understood that Assentato, Dilkes, and Botkier were representing a group of companies engaged in various aspects of currency trading, consisting of Forexware, FXDD, CMH Malta, and FXDD Malta (the four defendants herein; collectively, "the Forexware Group"). These individuals all resided in New York or New Jersey, and the Forexware Group's place of business was in New York City. (Popescu Affidavit, ¶ 15)

21.     All negotiations relating to the acquisition occurred within the United States. There

were numerous telephone conferences in the United States between all of the parties to discuss the

terms and conditions of the acquisition, numerous exchanges of email, and some in-person meetings,

which occurred in either Boston or New York.

22.     In connection with the negotiations of the Purchase Agreement, various documents

were executed, all indicating that Forexware Group's principal place of business was New York, New

York. For example, the Mutual Nondisclosure Agreement between BTI, BT Prime and others and

Forexware and FXDD recites Forexware's offices were located at 7 World Trade Center, New York, New

York; the Purchase Agreement provides that all notices, requests, demands, claims and other

communications were to be sent to Forexware at 7 World Trade Center, New York, New York; and the

Request from the Registry for transfer of shares from Boston Technologies Japan KIC (a BT Prime affiliate

being sold pursuant to the Purchase Agreement) states Forexware's address as 7 World Trade Center

New York, New York.  (Popescu Affidavit, ¶ 17)

23.     On June 14, 2014, the BTI Group and certain affiliates entered into a purchase

agreement with Forexware and certain affiliates ("Purchase Agreement").

24.     The Purchase Agreement was to be governed by the laws of the State of New York.

(Popescu Affidavit, ¶ 17)

25.     The Purchase Agreement provided for Forexware and certain affiliates to acquire the

assets of the BTI Group subject to their liabilities for a purchase price of one million dollars in a two-step

transaction. In the first step, at a first closing, Forexware would acquire all of BTI's assets subject to its

liabilities and, through an entity that it would form, Forexware Bermuda LTD. ("Forexware Bermuda"),

would acquire substantially all of the Debtor's assets subject to its liabilities.  In the second step, at a

second and later closing, Forexware Malta would acquire substantially all of the Asset of Boston Prime,

subject to its liabilities. This was intended to allow time for regulatory approval of the Boston Prime acquisition.

26.     The acquisition of Boston Prime was subject to approval by United Kingdom regulatory authorities.  (Popescu Affidavit, ¶ 18)

27.     Under the Purchase Agreement, Forexware agreed to assume (through Forexware Bermuda) all of the Debtor's obligations to its customers, which totaled approximately $17 million, even though Forexware calculated a shortfall in the Debtor's cash accounts of approximately $4.7 million. The Agreement further provided a mechanism for adjusting the total purchase price based on the amount of actual shortfall in the Debtor's cash accounts, calculated at the time of the second closing ("Working Capital Adjustment").

28.     Before the first closing, a shareholder of BT Trading, the parent company of both the Debtor and Boston Prime, brought suit disputing Popescu's right to act on behalf of BT Trading. This delayed consummation of the contemplated sale of the Debtor.  As a result, the BTI Group and Forexware and certain affiliates amended their purchase agreement by entering into a certain Amended and Restated Purchase Agreement of July 11, 2014 ("Amended Purchase Agreement," or "APA"), which deferred the closing of the sale of the Debtor from the first closing to the second, to occur at the same time as the acquisition of Boston Prime.  The APA provided for Forexware to assume all of the Debtor's liabilities—notwithstanding a shortfall in its customer account balances that Forexware calculated as of the execution of the APA as $4.8 million—at the time of the second closing.

29.     The first closing under the APA occurred on July 11, 2014.

30.     At the first closing, BTI assigned to Forexware LLC certain contracts, including the License Agreement between BTI and BT Prime and the identical license agreement between BTI and Boston Prime. (Popescu Affidavit, ¶ 20)

31.     Forexware succeeded BTI as licensor under the License Agreement.

11

**Forexware Takes Control**

32.      Following the first closing, Forexware hired virtually all of BTI's employees, and those BTI employees whom it did not hire it terminated.  While the Debtor's accounts were left in the Debtor's name, the employees who controlled those accounts became Forexware employees, and Forexware controlled their activities.

33.      The former employees of BTI who became employees of Forexware continued to be located in Boston. Those employees continued to perform the same duties as they had performed for BTI prior to the closing and assignment of the License Agreement.  The former employees of BTI, now employees of Forexware, answered to and were directed by Messrs. Assentato, Dilkes, and Botkier, all of whom worked from the New York offices of Forexware Group.  The only substantive change was at the top levels of management. Popescu was no longer the chief executive officer but was head of strategy, reporting directly to and directed by Assentato. (Popescu Affidavit, ¶ 21)

34.      From and after the first closing, Forexware, by succeeding to BTI's rights under the License Agreement, directed and controlled the operations, management, and assets of the Debtor, including the customer funds totaling over $12 million the Debtor held on deposit at the time of the first closing, and it maintained the Debtor's books, records, and customer trading accounts.  Forexware thus effectively obtained for itself all of the benefits of the APA without expressly having to assume the Debtor's liabilities or pay the purchase price required by the APA.

**The Nineteen Forexware Payments**

35.      During the period from July 28, 2014 through January 15, 2015, Forexware took approximately $2.7 million from the Debtor in a series of nineteen transfers from the Debtor to Forexware.

36.      Forexware did not provide an invoice, statement, or otherwise account to the Debtor for the transfers or the basis for them.

37.     For purposes of computation of payments that may have been due from the Debtor to Forexware under the Licensing Agreement, Forexware has failed to provide the Debtor with a computation of monthly net revenues or an accounting of the Debtor's monthly revenues and expenses during the period of these transfers.

38.     Forexware has failed to maintain complete and accurate accounting records of the Debtor from which a determination of the monthly net revenues could be made.

39.     The nineteen payment were made on account of purported obligations of the Debtor to Forexware that were illusory, incorrectly computed, or otherwise not legitimate.

40.     The Debtor received inadequate consideration for each of the nineteen payments.

**Forexware Requires Transfer of Liquidity Accounts to FXDD Malta**

41.     Just prior to Forexware's acquisition of BTI, the Debtor utilized several "liquidity providers"—entities, including Rabobank, with which the Debtor deposited its customer funds and placed its customers' currency trades. The Debtor maintained a trading (*i.e.*, margin) account with each liquidity provider, funded with deposits made by the Debtor's customers.

42.     At the time of the July 11, 2014 closing, the Debtor maintained its liquidity account with Rabobank. The Debtor would trade with Rabobank, and Rabobank would charge or pay the Debtor, depending on losses or gains. Specifically, Rabobank would stream prices of each currency and allow the Debtor to trade on those prices. Rabobank also made prices from other banks, such as JP Morgan, available so that the Debtor could make trades on those prices as well.  (Popescu Affidavit, ¶ 22)

43.     On or about August 28, 2014, Forexware established a trading account (the "FXDD Malta Trading Account") for the Debtor with FXDD Malta, an affiliate of Forexware.

44.     Forexware then caused all of the Debtor's trades to be conducted through the FXDD Malta Trading Account, thereby furthering its control of the Debtor's assets while charging the Debtor substantial commissions on the trades.

13

45.    In late August-early September 2014, Popescu was directed by Mr. Assentato to move the Debtor's liquidity account from Rabobank to FXDD Malta. In order to accomplish this transfer, Assentato provided Popescu with precompleted documents for opening the account with FXDD Malta. Popescu signed these documents in Assentato's New York office. (Popescu Affidavit, ¶¶ 23-24)

46.    In September 2014, Forexware closed the Debtor's other trading accounts, including the account at Rabobank, and directed Rabobank to transfer $5,063,259.96 to the Debtor.  On September 12, 2014, Forexware transferred $5,063,259.96 from the Debtor to FXDD Malta to fund the FXDD Trading Account (the "Rabobank Transfer").

47.    Because the FXDD Malta account was a margin account, money had to be deposited into the account before trading could begin. Once the account was open with FXDD Malta, Marina Borisova, who reported to Assentato, was directed to transfer the Debtor's funds from Rabobank to an account belonging to the Debtor at TD Bank in Boston. Borisova was then directed to transfer the funds from the Debtor's account at TD Bank to an FXDD Malta account at Bank of America in New York to establish a trading account with FXDD Malta. (Popescu Affidavit, ¶ 25)

48.    FXDD Malta differed from Rabobank in that the Debtor could only see and trade on the currency prices of FXDD Malta. Beyond that, the transferring of the liquidity account from Rabobank to FXDD Malta did not substantively change the procedures by which the Debtor's trades were consummated. All the trades were done electronically through the BTI trading platform. All of the software and servers were located in the United States, primarily in New York or New Jersey, close to the servers of the various financial institutions with whom the Debtor traded. Those servers were maintained and configured by employees in New York, and FXDD Malta's capital markets team, which monitored risk and adjusted trading, was also located in New York.  (Popescu Affidavit, ¶ 26)

49.    In addition to the Rabobank Transfer, Forexware made four other transfers from the Debtor to the FXDD Malta Trading Account, totaling $5,086,850, in December 2014 and January 2015.

The defendants failed to account for the transferring of these funds from the Debtor to the FXDD Malta

Trading Account.  The transfers were made for the benefit of Forexware, FXDD, and FXDD Malta and to

the detriment of the Debtor, which received no or inadequate consideration for them.

**The Forexware Group**

50.      Forexware Group maintained a sales team and an account management team in New

York that served the Debtor as well as several other clients of the Forexware Group. In addition to the

Debtor, FXDD Malta was the liquidity provider for other Forexware Group clients, and trading with those

clients occurred in the same manner laid out above. All of the individuals whose responsibility it was to

maintain the trading platform, monitor the trades, and transfer funds were located in New York or

Boston. (Popescu Affidavit, ¶ 27)

51.      Specifically, the trading platform utilized by FXDD Malta and other affiliates of the

Forexware Group was monitored by a mission control team in Boston that was made up of

approximately fifteen Forexware Group employees. Two of the managers for the team were Mike

Oreper and Hongyi Feng. After the BTI acquisition, this mission control team was responsible for not

only BTI, BT Prime and Boston Prime operations, but also the operations of other Forexware Group

clients. (Popescu Affidavit, ¶ 28)

52.      There were five primary companies involved in the Forexware Group: Forexware, which

was a Delaware entity based in New York; Currency Mountain Holdings LLC, a Delaware entity based in

New York; FXDD, a Delaware entity based in New York; CMH Malta, a corporation formed in Malta with

an address in Malta; and FXDD Malta, also a Malta company with an address in Malta. The principal of

all these companies was Mr. Assentato, and all of the activities for these entities was directed by

Messrs. Assentato, Botkier, and Dilkes, all of whom were located in New York. (Popescu Affidavit, ¶ 30)

53.      FXDD Malta was established by Mr. Assentato because the regulatory requirements,

including the capital requirements, were more favorable in Malta than in the United States. Accordingly,

the strategy being employed while Popescu was with the Forexware Group was to wind down the

operations of FXDD, a United States regulated entity.  FXDD Malta was to be used as the primary

liquidity account for the Debtor. (Popescu Affidavit, ¶ 31)

54.     CMH Malta had only a few token employees, if any, and was essentially a shell

company. Similarly, FXDD Malta was a shell entity with a few low-level employees. Posecu never spoke

to any employees of the Forexware Group located in Malta. (Popescu Affidavit, ¶ 32)

55.     FXDD Malta had four bank accounts:  two in Malta, one in Switzerland, and one at Bank

of America in New York.  The Bank of America account was it principal account.  (Popescu Affidavit, ¶

35)

56.     The center of all business activity for CMH Malta, FXDD Malta, Forexware LLC, and CMH

US was located in New York; all of the principal employees were in New York; all the books and records

were maintained in New York; and the entities acted as one integrated entity. (Popescu Affidavit, ¶ 37)

**The Unpegging of the Swiss Franc**

57.     Forexware operated, managed, and controlled Boston Prime just as it operated,

managed, and controlled the Debtor.

58.     On January 15, 2015, the Swiss government announced that it would "unpeg" the Swiss

franc from the Euro; that is, it would no longer hold the Swiss franc at a fixed exchange rate to the Euro.

This caused upheaval in the currency markets and huge losses for currency traders, including Forexware

and its affiliates.

59.     Following the Swiss unpegging, Forexware manipulated the account of Boston Prime

and the Debtor and made transfers from their accounts in whole or in part to cover losses sustained by

Forexware, FXDD Malta, and FXDD. Forexware directed the transfers through the Debtor to conceal that

the Defendants were the actual beneficiaries of some or all of the transfers.

60.     These transfers caused the Debtor to incur liability to Boston Prime for the benefit of the Defendants, and for these transfers the Debtor received no or inadequate consideration.

61.     Specifically, on January 30, 2015, Forexware transferred $2.5 million from Boston Prime to the Debtor's TD Bank client fund account.  Then, immediately upon receipt of the funds into the Debtor's account, Forexware transferred the funds out of the TD Bank account into the FXDD Malta Trading Account (the "$2.5 Million Transfer").

62.     Also, on January 22, 2015, Forexware transferred $3 million in funds from Boston Prime direct to the FXDD Malta Trading Account (the "$3 Million Transfer"), purportedly to cover losses in the FXDD Malta Trading Account. Forexware has not accounted for the losses that this transfer purportedly covered.

63.     The $2.5 Million Transfer and the $3 Million Transfer were directed by Assentato and initiated by a Forexware employee located in the United States.  (Popescu Affidavit, ¶ 35)

64.     As a consequence of Forexware's manipulation of the Debtor and Boston Prime, Boston Prime has asserted a claim against the Debtor in this bankruptcy case for $7.2 million, the largest claim in the bankruptcy case; this sum includes the $2.5 Million and $3 Million Transfers, of which the Defendants were the ultimate beneficiaries.

65.     The Debtor stopped trading on January 26, 2015.

66.     On February 3, 2015, when the Debtor had a $1,322,590.02 balance on deposit in its FXDD Trading Account, the Defendants, without entitlement, took $1,300,000 from the account ("the $1.3 Million Transfer"); the Defendants have provided no accounting for this withdrawal.

**Debtor's Financial Condition Worsens under Defendants' Control**

67.     While the Defendants controlled the operations, management, and assets of the Debtor, the Debtor's financial condition significantly worsened, and the Debtor's insolvency increased by at least $10 million.

68.     While the Debtor's liabilities were significantly increasing, Forexware continued to pay itself and its FXDD affiliates substantial monies from the Debtor.

69.     Forexware is responsible for the losses incurred after the BTI Sale, which losses occurred under its operation, management, and control of the Debtor's business.

**Other Indicia of Relation of Malta Defendants to United States**

70.     In Exhibits B through D to its opposition to the defendants' motions to dismiss [doc. #67], the Plaintiff has submitted certain corporate records of the Malta Defendants to demonstrate their relationship with the United States.

71.     The "Memorandum of Association" and "Articles of Association" of defendant CMH Malta [included in Exhibit B] state that the administration and management of the company shall be vested in a board of directors composed of two directors, who are Joseph Botkier of New York and Emil Assentato of New York; that Emil Assentato is the chairman of the board of directors; that the legal and "judicial" representatives of CMH Malta are also Assentato and Botkier; and that the majority shareholder (holding eighty percent of authorized shares) of CMH Malta is Max Q Investments LLC, a United States entity. Assentato signed these corporate documents on behalf of Max Q Investments, LLC.

72.     CMH Malta's Financial Statement for year end 12/31/2014 [Exhibit C] is a consolidated financial statement for CMH Malta (as parent company) and its subsidiaries, including defendant FXDD Malta, as of December 31, 2014.  This financial statement states that the principal activity of the parent company is to hold investments in other companies; that the average number of its employees in 2014 (excluding directors) was 13; that defendant FXDD Malta is a subsidiary and one of the companies in which CMH Malta holds investments; that CMH Malta holds 99.9 percent of the ordinary shares of FXDD Malta; that the group [CMH Malta and its subsidiaries] had shifted all of its trading book risk to defendant FXDD US, identified as "a U.S. firm"; that "a downfall on [FXDD US] brand image will have an immediate effect on the brand image and reputation of the group"; that CMH Malta's parent company

is Max Q Investments LLC, whose registered address is in New York; that FXDD US is a related party and

has the same ultimate ownership as CMH Malta; that during 2013 CMH Malta had entered into a global

liquidity brokerage agreement with FXDD US; and "[t]he ultimate controlling party of the group is

Assentato, resident of the United States of America."

73.     The FXDD Malta Memorandum of Association and Articles of Association [together,

Exhibit D] state that FXDD Malta has six directors, three of whom reside in the United States, they being

Lubomir Kaneti of New York, Botkier of New York, and J. Timothy Garland of Connecticut; that the legal

and "judicial" representative of the company are Botkier and/or Kaneti, both New York residents; and

that the shareholders of FXDD Malta are CMH Malta, which holds 22,099,999 ordinary shares and

422,728 preferred shares, and Assentato, who holds 1 ordinary share.

74.     The FXDD Malta Financial Statement for year end 12/31/2015 [Exhibit E] states that

Assentato had been a member of FXDD US's board of directors prior to his resignation on November 17,

2015; that the average number of employees (excluding directors) of FXDD Malta in 2015 was 14 and in

2014 was 13; that FXDD Malta has four banks, two in Malta, one in Switzerland, and one in New York;

that FXDD Malta had loaned money to "Currency Mountain Holdings, LLC, a US firm which has the same

ultimate ownership";  that FXDD Malta had shifted all of its trading book risk to defendant FXDD US,

identified as "a U.S. firm"; that FXDD Malta shifted all its trading book risk to FXDD US for the purpose of

executing and clearing foreign exchange transactions; that "strategic risk arises due to the fact that

business performance of FXDD Malta depends upon [FXDD US]" and that "this strategic risk can trigger

other risk factors such as reputational risk, as a downfall on [FXDD US] brand image will have an

immediate effect on the brand image and reputation of FXDD Malta"; that FXDD Malta's immediate

parent company is CMH Malta, and its ultimate parent company is Max Q Investments LLC, which is

registered in New York; that FXDD US is another related party and has the same ultimate ownership as

FXDD Malta; that "[FXDD Malta] has entered into a global brokerage agreement with FXDD, LLC"; and

that "[t]he ultimate controlling party of the group[1] is Emil Assentato, resident of the United States of America."

### The Assentato Affidavit

75.     The Malta Defendants supported their motion to dismiss for lack of personal jurisdiction with the affidavit of Emil Assentato. The Court must accept as true the allegations and supplemental evidence submitted by the plaintiff, and in view of this stricture, the Assentato Affidavit adds little to the facts on which I must decide the personal jurisdiction issue.  I need address only a few points.

76.     Assentato avers that CMH Malta "does not engage in any business activities whatsoever." However, he concedes that CMH Malta is a holding company, and he does not deny, and for purposes of this motion I must accept as true, that it holds shares in other entities, including FXDD Malta, which it almost wholly owns, and that it controls its subsidiaries in the interest of its own equity holders, as holding companies exist to do.

77.     Assentato avers CMH Malta does not solicit business activities in the United States or have assets or investments in the United States. However, he does not deny, and for purposes of this motion I must accept as true, that CMH's subsidiary, FXDD Malta, did business with the Debtor, that the Debtor's operations were in the United States, that FXDD Malta used a United States bank to conduct that business, or that the business relationships among the Debtor, FXDD US, and FXDD Malta were established at the behest of United States-based individual or individuals that controlled all three and CMH Malta, which was a link in the chain of common ownership and purpose.

78.     Assentato avers, and I accept for purposes of this motion, that FXDD Malta is a separate and distinct entity from FXDD US, but the Debtor does not contend otherwise.

79.     Assentato avers that "FXDD Malta does not negotiate any agreement in the United States." This averment is contradicted by the Debtor's contention, which for purposes of determining

---

[1] In this document, "the group" is not a defined term, and it is unclear which entities the group comprises.

personal jurisdiction I must accept as true, that the establishment of a liquidity account for the Debtor at

FXDD Malta, and the channeling of all of the Debtor's business through that account, in exchange for

fees, were directed by Assentato in New York. It is further contradicted by the Debtor's contention that

FXDD Malta established a banking relationship with Bank of America in the Unites States to enable FXDD

Malta to conduct business with the Debtor and with others of its clients. I accordingly I give this

averment by Assentato no weight in the jurisdictional analysis.

        **The MacIver Affidavit**

        80.    With its supplemental brief, the Debtor submitted an affidavit of Andrea MacIver,

reporting on the result of a Google search she conducted in 2017. I give the affidavit no weight, not only

because it is submitted in a reply brief (to which no response is contemplated) and without leave, but

also because the date of the search and of the finding it yielded renders the result remote in time and

therefore of unclear relevance to the events at issue.

        **c.    Analysis**

        Personal jurisdiction may be based on either general jurisdiction or specific jurisdiction. *See*

*Harlow v. Children's Hospital*, 432 F.3d 50, 57 (1st Cir. 2005) ("The plaintiff need not prove the existence

of both types of [personal] jurisdiction; either one, standing alone, is sufficient."). In order to establish

personal jurisdiction under either theory, the plaintiff must establish that the defendant had sufficient

"minimum contacts" with the forum state and that those contacts were purposeful. *Id*. General

jurisdiction exists even when the plaintiff's claims are unrelated to the defendant's forum-state

contacts, provided the defendant's contacts with the forum state have been "so 'continuous and

systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Ops., S.A.*

*v. Brown*, 564 U.S. 915, 919 (2011). General jurisdiction is thus "dispute blind." *Harlow*, 432 F.3d at 65.

In contrast, specific jurisdiction exists only where the plaintiff's claim is related to the defendant's

contacts with the forum state. See *id.* at 61.  Here, the plaintiff alleges both general and specific

personal jurisdiction, so I address each.

> ### i.    General Personal Jurisdiction

In the case of *Daimler AG v. Bauman*, 571 U.S. 117, 134 S.Ct. 746, 754 (2014), the Court noted

that a corporation may have sufficient contacts in a state other than the location of its principal place of

business or its place of incorporation as to render it subject to being sued in that state. In order to do so,

the foreign corporation must have continuous and systematic conduct in that state.  The plaintiff asserts

that there is sufficient evidence to meet this rigorous standard, such that the Malta Defendants are

subject to suit in the United States.

The plaintiff argues two separate theories in support of its assertion of general jurisdiction.

First,  plaintiff argues that the Malta Defendants acted as part of a joint venture with the other parties in

the Forexware Group so that they "should reasonably [have] anticipate[d] being hailed into court" in the

United States. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Plaintiff relies on

the case of *Hill v. Shell Oil Co.*, 149 F.Supp.2d 416 (N.D. Ill. 2001) as support for this argument. Second,

the plaintiff alleges that each of FXDD Malta and CMH Malta had continuous and systematic operations

in the United States, and specifically in Massachusetts, sufficient to establish personal jurisdiction. I

address them and the Malta Defendants' oppositions in order.

In *Hill*, the court denied the defendant companies' motions to dismiss for lack of personal

jurisdiction because it found that the entities operated as a joint venture and, for that reason, the

contacts of one entity could be attributed to the others. *Id*.  Under the joint venture theory the contacts

of one co-venturer are attributable to all other members of the joint venture, such that personal

jurisdiction over one amounts to jurisdiction over all. *Id*. at 418. *See Bensmiller v. E.I. Dupont de

Nemours & Co.*, 47 F.3d 79, 81 (2d Cir. 1995); *Finegan v. Autotransportes S.A. de C.V.*, 2009 WL 331349

(D. Az. 2009) (gathering cases applying joint venture approach to personal jurisdiction). So the issue is

whether the defendants in fact formed a joint venture.

The Malta Defendants argue that the defendants never formed a joint venture and that

Massachusetts law is determinative on that issue.  In Massachusetts, the formation of a joint venture

depends on the parties' manifest intent. *Shain Inv. Co. v. Cohen*, 15 Mass.App.Ct. 4, 443 N.E.2d 126, 129

(1982).  A written agreement is not necessary for the creation of a partnership or a joint venture.

*Kansallis Fin., Ltd. v. Fern*, 40 F.3d 476, 479 (1st Cir.1994); *Mass. Prop. Ins. Underwriting Ass'n v.*

*Georgaklis*, 77 Mass.App.Ct. 358, 931 N.E.2d 995, 999 (2010). Courts may consider a number of factors

in determining the parties' intent, including:

> (1) an agreement by the parties manifesting their intention to
> associate for joint profit not amounting to a partnership or
> corporation; (2) a contribution of money, property, effort,
> knowledge, skill, or other assets to a common undertaking; (3) a
> joint property interest in all or parts of the subject matter of the
> venture; (4) a right to participate in the control or management of
> the enterprise; (5) an expectation of profit; (6) a right to share in
> profits; (7) an express or implied duty to share in losses; and (8) a
> limitation to a single undertaking (or possibly a small number of
> enterprises.)"

*Cohen*, 443 N.E.2d at 130.  *See Petricca Dev. L.P. v. Pioneer Dev. Co.*, 214 F.3d 216, 220 (1st Cir. 2000).

The Supreme Judicial Court has made clear that the foregoing are factors to be considered in

determining whether the parties intended to enter a joint venture; they are not elements that *must* be

present for a joint venture to be found. *Gurry v. Cumberland Farms, Inc.*, 406 Mass. 615, 623-24 (1990).

While no specific factor must be present, "the SJC has set out several factors to look for when

determining whether the necessary intent to associate exists: (1) an agreement jointly to share profits

and losses, (2) contributions from each party of 'money, assets, talents, etc., to a common undertaking,

(3) a joint property interest in the object of the joint enterprise, and (4) retained rights by both parties

to participate in the control of the enterprise." *Schilling v. Chatham Five Star LLC*, 186 F.Supp.3d 58, 65

(D. Mass. 2016) (citing *Gurry v. Cumberland Farms, Inc.*, 406 Mass. 615, 623-24 (1990).

The Malta defendants do not question that there is personal jurisdiction over Forexware LLC and FXDD US. The question is whether the Malta Defendants can be said to be joint-venturers with the U.S. Defendants. The plaintiff offers the Popescu Affidavit. Under the applicable law cited above I am required to give credence to the plaintiff's version of genuinely contested facts set forth in the pleadings and in other materials filed in the record. In addition, I must construe the plaintiff's properly documented evidentiary proffers in the light most favorable to the plaintiff's jurisdictional claim.

Applying that standard I note that the U.S. Defendants and the Malta Defendants operated as an integrated enterprise after the closing. All of the business activities of the plaintiff were accomplished by employees of Forexware LLC in Boston. The business activities of the Malta Defendants were ultimately conducted under the senior management of the Forexware Group in the United States. Each of the Forexware Group entities contributed their talents and efforts to the enterprise. All members of the group were engaged in the common enterprise of a currency exchange business, each benefited from the efforts of the others. The corporate records demonstrate interlocking management and ownership of the Malta Defendants with the U.S. Defendants. The shareholder and ultimate owner of the Malta Defendants resides in the United States. And the Malta Defendants have no senior management in Malta; rather, its senior managers are all in the United States. The business relations among these entities support a finding that together they intended to form and did form a joint venture.

The Malta Defendants contest this by focusing on one attribute of a joint venture: shared profits and losses. It is inescapable from the structure of the business that these entities met that requirement. Still, under Massachusetts law, the finding of a joint venture is a holistic matter with an amalgam of facts supporting a finding that the parties intended to form a joint venture. That intent is easily found on these facts, even without specific evidence of actual sharing of profits and losses.

Second, the plaintiff argues that even if no joint venture was ever formed, each of the Malta Defendants had sufficient contacts with Massachusetts to establish general jurisdiction over each of

them. Plaintiff argues that FXDD Malta had sufficient continuous and systematic contacts with the United States to render it "at home" in this country.  Plaintiff is correct.  According to the testimony of Popescu in his affidavit, when the APA closed, Forexware Group employees and managers directed BT Prime to transfer its liquidity accounts from Rabobank to FXDD Malta and to conduct all of its currency trading through FXDD Malta. The servers that made these transactions possible were all in the United States, and those servers were maintained by the Forexware Group employees in New York. Forexware Group employees, including FXDD Malta's capital markets team, monitored risk and adjusted trading, all from New York. FXDD Malta maintained one of its four bank accounts at Bank of America in New York. Popescu also testified in his affidavit that he was directed by Assentato, in New York, to open an account at FXDD Malta into which the BT Prime liquidity account was transferred. According to the Debtor's allegations, Forexware caused all of the Debtor's trades to be conducted through the FXDD Malta Trading Account; FXDD Malta accordingly regularly received business from the Debtor in Boston, for which the Debtor was charged substantial commissions that inured to FXDD Malta. Assentato provided Popescu with the papers needed to open the account with FXDD Malta, and Popescu signed the papers, all in New York. Finally and importantly, I have previously described and need not repeat here the many Forexware Group managers that were involved with the formation, corporate governance, and ownership of FXDD Malta.  All of these contacts support a finding that the relationship of FXDD Malta to the United States is sufficient for that entity to be hailed into court in the United States.

They also support the same finding as to CMH Malta. CMH Malta argues that it did no business whatsoever and had no contacts of its own with the United States. This argument overlooks the fact that CMH Malta owned and controlled FXDD Malta for the ends of the Forexware Group as a whole and existed to channel its profits upstream to common United States ownership. FXDD Malta was not a wholly independent entity from the Forexware Group. It was linked by ownership and control to the rest of the Group, and that link took the form of CMH Malta.  For purposes of this analysis, at least, CMH

Malta can fairly be viewed as having the connections, activities, and links of its subsidiary, FXDD Malta, and its equity holders.

### ii.   Specific Personal Jurisdiction

"Specific jurisdiction allows a court to hear a particular case as long as 'that case relates sufficiently to, or arises from, a significant subset of contacts between the defendant and the forum.' " *Baskin-Robbins*, 825 F.3d at 35 (quoting *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 288 (1st Cir. 1999)). In order to find the existence of specific jurisdiction, this court must find Plaintiff has established three conditions:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must ... be reasonable.

*Philips v. Prairie Eye Ctr.*, 530 F.3d 22, 27 (1st Cir. 2008).

### A.   Relatedness

"Relatedness requires that 'the action . . . directly arise out of the specific contacts between the defendant and the forum state.' " *Baskin-Robbins*, 825 F.3d at 35 (quoting *Sawtelle*, 70 F.3d at 1389). The relatedness requirement is a "flexible and relaxed standard." *Id.* at 36. The First Circuit has found it satisfied in a variety of situations involving contractual disputes. In *Baskin-Robbins*, the parties had entered a franchise agreement, and the defendant subsequently renewed the agreement twice by sending renewals to the plaintiff's forum state address. The court found those letters and the established relationship between the parties, including the work the plaintiff did in the forum state consistent with its obligations under the parties' agreement, satisfied the relatedness requirement because the plaintiff's suit arose from a dispute over the significance of the letters. *Id.* at 35-36.

In *Baldiga v. Joint Stock Co. (In re Cyphermint, Inc.)*, 445 B.R. 11 (Bankr. D. Mass. 2011), the court denied the defendant's motion to dismiss for lack of personal jurisdiction where the defendant had a

bank account in the United States, there was evidence of common ownership of the defendant and the

plaintiff, there were interlocking officers and directors, and there were regular communications

between the parties.

The First Circuit also found the relatedness requirement satisfied in *C.W. Downer & Co. v.

Bioriginal Food & Science Corp.*, 771 F.3d 59 (1st Cir. 2014). In that case, the plaintiff sought damages

from an alleged breach of contract. *Id.* The First Circuit concluded the "ongoing connection" the

defendant had with the forum state, in the form of communications between the parties related to the

plaintiff's performance of its obligations under the contract, satisfied the relatedness requirement. *Id.* at

66; *Adams v. Adams*, 601 F.3d 1, 5 (1st Cir. 2010) (defendant's acceptance of funds from a forum

resident and execution of an agreement to repay those funds were sufficient for the First Circuit to

assume relatedness in a dispute arising out of the defendant's failure to repay).

The relatedness requirement is plainly met here because there is a demonstrable nexus

between the plaintiff's claims and the Malta Defendants' forum-based activities. *Turpin v. Mori

Seiki Co.*, 56 F. Supp. 2d 121, 126 (D. Mass. 1999). All of the claims arise out of the APA and the actions

of the Forexware Group members, as directed by Assentato, in taking control of BT Prime and its cash.

All of the negotiations leading to the APA were conducted in the United States. No negotiations are

alleged to have been conducted in Malta.

The liquidity accounts of BT Prime were moved from Rabobank to the other Malta Defendant,

FXDD Malta, at the direction of Assentato. Assentato provided Popescu with pre-completed documents

and those documents were signed in New York. This transfer is at the crux of the acts that gave rise to

the complaint. The relationship of the contacts to the alleged actionable conduct is established.

Assentato is alleged to be the controlling person as to all of the Forexware Group entities. Through

CMH Malta, he controlled FXDD Malta as part of the Forexware Group.

**B.    Purposeful Availment**

"The purposeful availment inquiry asks whether a defendant has 'deliberately target[ed]' its behavior toward the society or economy of a particular forum [such that] the forum should have the power to subject the defendant to judgment regarding that behavior." *Baskin-Robbins*, 825 F.3d at 36 (quoting *Carreras v. PMG Collins, LLC*, 660 F.3d 549, 555 (1st Cir. 2011)) (alterations in original). Voluntariness and foreseeability are the main ingredients. *Id.* In order to satisfy the voluntariness requirement, a defendant's forum contacts must be the result of the defendant's own, voluntary actions. *Id.* "Foreseeability requires that the contacts with the forum state be of a nature that the defendant could 'reasonably anticipate being haled into court there.' " *Adams*, 601 F.3d at 6 (quoting *Adelson v. Hananel*, 510 F.3d 43, 50 (1st Cir. 2007)).

In cases involving contracts, courts look to the negotiations of the agreement and the expected future performance of the terms of the agreement to assess whether the defendant has purposefully availed itself of the forum.  Here, the defendants' execution of the APA in New York, by Assentato, and Assentato's knowledge that the very purpose of the transaction was to have the Forexware Group operate the BTI Group assets was a voluntary and purposeful availment of the United States as a forum. All of the negotiations took place in the United States.  The principals of the Forexware Group, Assentato, Dilkes and Botkier, represented the Forexware Group, including the Malta Defendants. Those individuals live and work in the United States.

**C.    The Gestalt Factors**

Finally, I must assess the extent to which the exercise of jurisdiction over the Malta Defendants is fair and reasonable. This analysis involves five factors, which the First Circuit has dubbed the Gestalt factors. *Baskin-Robins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 40 (1st Cir. 2016). "They comprise (1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the

judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the

common interests of all sovereigns in promoting substantive social policies." *Id*. These factors are used

to illuminate whether it would be equitable to find personal jurisdiction in the United States.

    **i.**        **Burden of appearing.**

The Malta Defendants argue that because they are centered in Malta it would be highly

inconvenient for them to appear in this district. They argue that the center of gravity is in the United

States and that their witnesses would have to appear in Boston for deposition or trial. They argue that it

would be against the notion of fair play and justice to subject a Maltese entity to litigation ion the

United States.

The plaintiff responds, and I agree, that there would be little or no burden on the Malta

Defendants because all of the essential employees, shareholders, directors, legal representatives, and

judicial representatives of the Malta Defendants reside and have their offices in the New York area.  The

Malta Defendants have pointed to no witnesses in Malta that are expected to have a role in this

litigation, and the place of incorporation has no bearing on the burden of appearance.  Litigation is

always inconvenient, so the defendants must show some unusual burden in order for this factor to be

found in their favor. *Nowak v. Tak How Investments, Ltd*., 94 F.3d 708, 718 (1st Cir. 1996). The Malta

Defendants have not made such a showing here.

    **ii.**        **Interest in the Forum**

The forum has an interest in offering its citizens a location in which to adjudicate disputes.

*Burger King*, 471 U.S. at 473.  But that is not the best reason to find this factor in the plaintiff's favor.

This bankruptcy case is properly pending in this district.  As such, this forum has a strong interest in

adjudicating the claims raised in the complaint.  The arguments against this conclusion are that the

plaintiff BT Prime is incorporated in Bermuda and FXDD Malta is incorporated in Malta.  But again, we

are now considering practicalities of whether it is fair to adjudicate the claims here.  Place of

incorporation is irrelevant.  This factor also cuts in favor of adjudication in this district.

### iii.    The Plaintiff's Convenience

Under the applicable law in this circuit, the court must afford deference to the plaintiff's choice

of forum.  The plaintiff is in a chapter 11 case here, and it appears that all of the witnesses for both sides

are in the Unites States.  The Malta Defendants have not identified any witnesses that they believe are

located outside the United States.  While the Malta Defendants make a passing argument that neither

the plaintiff nor the Malta Defendants are incorporated in the United States, that argument misses the

point entirely. This factor cuts decidedly in favor of the plaintiff.

### iv.    The Administration of Justice

Judicial economy and the proper administration of justice also plays into the Gestalt analysis.

*Nowak*, 94 F.3d at 718.  This chapter 11 case has been pending in the United States for a very long time.

This court has adjudicated several substantial issues and confirmed a chapter 11 plan in this district.  It

would be grossly inefficient for another judge in another forum to take part of this dispute while this

court completes its work here.  And again the Malta Defendants fall back in their now tired argument

that the plaintiff and Malta Defendants are incorporated out of the United States.  That argument is

unpersuasive.

### v.    Policy Reasons for the Forum

The final Gestalt factor is whether there are public policy reasons that the matter should not be

entertained in the forum selected by the plaintiff. Indeed, disputes that are unrelated to the United

States should not be brought here for adjudication. In this case the APA was signed in the United States,

the relevant accounts at FXDD Malta were opened here, the APA and its amendment were negotiated

here, and the bankruptcy case is in this district. No other sovereign has a greater interest in the

adjudication of this dispute. The final Gestalt factor again cuts in favor of respecting the choice of forum

made by the plaintiff.

### iii.   Conclusions as to Specific and General Personal Jurisdiction

For the foregoing reasons, I conclude that there exists both general and specific personal jurisdiction as to both Malta Defendants. The Malta Defendants' motion to dismiss for lack of personal jurisdiction will accordingly be denied.

## V.   THE RULE 12(b)(6) MOTIONS

The remainder of the relief sought by the defendants is dismissal for failure to state a claim on which relief can be granted.  To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), as made applicable in adversary proceedings by Fed. R. Bankr. P. 7012(b), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. "[A] court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). Facts so distilled may be augmented by reference to (i) documents annexed to the complaint or fairly incorporated into it and (ii) matters susceptible to judicial notice. *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006). A motion to dismiss may "be premised upon the inevitable success of an affirmative defense." *Id*. (citations omitted). Dismissing a case on the basis of an affirmative defense "requires that '(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude.'" *Id*. (quoting *Rodi v. S. New Engl. Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 1991)).

Before addressing the various counts, it is necessary to address the choice-of-law issue as to the six counts that do not arise under the Bankruptcy Code.[2] No party has expressly addressed this issue.[3] The moving parties have framed their arguments entirely under Massachusetts law, and the Debtor has responded in kind. Each party has thus implicitly taken the position that the counts in issue are governed by Massachusetts law.  In view of the parties' positions and agreement on the issue, and because it appears from the alleged facts that the Commonwealth of Massachusetts has been the center of the Debtor's activities (conducted first through BT Prime and later through Forexware) at all relevant times, I hold that Massachusetts law governs as to Counts I-IV, IX, and XV.

I turn now to the individual counts. The two motions before me overlap considerably, so I will proceed on a count-by-count basis.

**Count I**

In Count I, against Forexware alone, the Debtor seeks a declaration that, from and after Forexware's acquisition of BTI's license rights *vis à vis* the Debtor, the Debtor and Forexware were engaged in a joint venture conducting the Debtor's currency trading business, as a consequence of which Forexware is jointly liable for those debts and liabilities of the Debtor that were incurred in the operation of the joint venture.[4] Forexware contends that the complaint fails to state a claim for the existence of a joint venture because it does not allege that the parties intended to enter into a joint

---

[2] Jurisdictions having connections of which the Court has been made aware include Massachusetts, New York, Delaware, Malta, Bermuda, the British Virgin Islands, the United Kingdom, and Japan. The License Agreement, which is attached to and incorporated by reference into the Complaint, provides that its validity, construction, and performance shall be governed by Massachusetts law. The APA, also attached to and incorporated by reference into the Complaint, states that it shall be governed and construed in accordance with New York law.

[3] The U.S. Defendants state that they are *assuming* for purposes of their present motion that Massachusetts law governs, but also that they reserve the right to argue that a different state's laws apply to any cause of action that might survive this motion. I doubt the efficacy of this reservation but need not address it at this juncture.

[4] In defending this count, the Debtor characterizes the scope of the joint venture alleged in this count to include all four defendants. As pled, however, Count I asks no more than that the Court find a joint venture between the Debtor and Forexware and grant relief against Forexware. I limit my analysis accordingly.

venture.  And Forexware further argues that the Licensing Agreement cannot supply the necessary intent because several courts have held that a license agreement does not give rise to a joint venture.

The law of joint venture in Massachusetts is set forth above and need not be reiterated.  At root the issue is one of specific intent on both sides to form a joint venture, with a number of factors relevant to discernment of this intent. The allegations state enough to articulate a plausible basis for this claim. In particular, they state that prior to the APA, the Debtor's currency trading business was part of a business enterprise controlled and managed by BTI; that its member entities were distinct in name only; that upon the Debtor's formation, the Debtor entered into the License Agreement with BTI, under which BTI not only licensed its software to the Debtor but, more importantly for present purposes, provided all professional services for the operation of the Debtor, and, in exchange, the Debtor was obligated under the License Agreement to pay BTI all of its net revenues determined on a monthly basis; that the Debtor had no employees and was totally dependent upon BTI for operating its business; that BTI employees controlled the Debtor by managing all aspects of the Debtor's business and controlling the Debtor's operations, including all trading activity, accounting services, and maintenance of the Debtor's books and records; and that, pursuant to the APA among Forexware, BTI, and the Debtor (among others), Forexware acquired and succeeded to the rights of BTI under the Licensing Agreement; that, by exercise of those rights, Forexware directed and controlled the operations, management, and assets of the Debtor, including the customer funds the Debtor held on deposit at the time of the closing, and it maintained the Debtor's books, records, and customer trading accounts; and that Popescu, who was a principal of both the Debtor and BTI, also became an employee of Forexware. These facts show intent to share profits (all net profits were to go to Forexware) and thoroughgoing control of the Debtor by Forexware, both through the License Agreement and through Popescu's employment by Forexware.

Forexware argues that the claim, so stated, is dependent on the License Agreement, and that certain cited cases hold that a license agreement does not give rise to a joint venture.  The Court agrees

that the License Agreement is critical to this count, and further agrees that the licensure of BTI's

software might not alone suffice to state a claim for the existence of a joint venture.  But the License

Agreement was much more a simple license agreement.  Its terms went beyond simple licensing to

define the relationship between the licensor and the licensee entities. It provided not just for

compensation for use of the license but for transfer of *all net income* to the licensor, such that the

licensee existed solely for and as an instrumentality of the licensor; and it placed the licensor in control

of the operations and business of the licensee. None of the cases cited by the movants stands for the

proposition that the packaging of these features with and into a license agreement somehow serves to

insulate the resulting arrangement from a determination that it constitutes a joint venture.  The claim

articulated in Count I is plausible on its face.

**Count II**

In Count II, against Forexware alone, the Debtor seeks a declaration that the transaction by

which Forexware acquired the assets and liabilities of BTI, and thereby acquired complete control over

the operation, management, and assets of the Debtor, without expressly assuming the Debtor's

liabilities, amounted to a *de facto* merger of the Debtor with Forexware, as a consequence of which

Forexware is liable as a successor entity of the Debtor and is liable for all the Debtor's debts and

liabilities.  Forexware argues that this count fails to state a claim on which relief can be granted for lack

of three essentials: (i) the complaint does not allege that the Debtor was acquired by Forexware; (ii) the

complaint does not allege that the Debtor ceased its business; and (iii) the complaint does not allege a

continuity of shareholders from the Debtor and BTI to Forexware.  The Debtor responds that the factors

courts consider when determining whether a *de facto* merger has occurred—especially cessation of the

transferor's business and continuity of ownership and control—"are mere indicia [] of the ultimate issue

to be decided, which is whether the parties achieved what amounts to a merger in a way which was

inequitable to the seller's creditors." *Nat'l Gypsum Co. v. Cont'l Brands Corp.*, 895 F. Supp. 328, 342 (D.

Mass. 1995). Each case must be decided on its specific facts and circumstances, *Cargill, Inc. v. Beaver

Coal & Oil Co.*, 424 Mass. 356, 362 (1997), and no one "factor [] is essential to a finding of liability." *Nat'l

Gypsum Co.*, 895 F. Supp. at 342.

      While the Debtor accurately states the governing law, it remains the case that the usual indicia

of a *de facto* merger are that the original entity goes out of business, leaving its existing creditors

without a source of payment, and a successor entity, under the same or "continuous" ownership, takes

up the original's business with the original's assets. Here, as Forexware points out, there is no allegation

that the Debtor ceased to do business in its own name and no allegation of continuity of ownership.

Rather, the Debtor alleges that the APA created a change of ownership.  So the alleged facts do not fit

the mold.  Still, the Debtor has alleged that, through the APA, Forexware in fact (if not in law) acquired

the operations and assets of the Debtor and treated them as its own without regard to the prior right of

the Debtor's existing creditors to the transferred value. The test is whether "the parties achieved what

amounts to a merger in a way which was inequitable to the seller's creditors." *Nat'l Gypsum Co.*, 895 F.

Supp. at 342.  On that test and at this early juncture, I cannot say that the Debtor has not pled sufficient

facts to state a claim for relief under a theory of *de facto* merger.

**Count III**

      In Count III, against Forexware alone, the Debtor contends that as a result of Forexware's

complete control over the Debtor, it owed fiduciary duties to the Debtor of care and loyalty and that it

breached those duties, causing the Debtor losses and injury, for which the Debtor is now entitled to

damages.  Forexware argues that it owed the Debtor no fiduciary duties, and therefore Count III should

be dismissed. The Debtor argues that, as it articulated in Count I, the first closing created a joint venture

between the Debtor and Forexware; and, under Massachusetts law, a joint venture creates fiduciary

duties between the parties, requiring the utmost good faith and loyalty.  *Petricca Dev. Ltd. P'ship v.*

*Pioneer Dev. Co.*, 40 F. Supp. 2d 49, 52-53 (D. Mass. 1999), *aff'd*, 214 F.3d 216 (1st Cir. 2000). The Court

agrees and for this reason finds that Count III states a plausible basis for the relief it seeks.[5]

**Count IV**

In Count IV, the Debtor seeks a determination that Forexware breached the License Agreement

by directing payments—the nineteen Forexware payments that are described in ¶¶35-40 of the above

recitation of facts, aggregating approximately $2.7 million—from the Debtor to itself to which it had no

right under the License Agreement.  Forexware argues that this count fails to state a claim on which

relief can be granted because (i) the Complaint is silent as to what the Debtor's Monthly Net Revenues

actually were and  (ii) "Popescu himself set up the relationship between BTI and the Debtor in the

fashion about which the Debtor now complains . . . and Forexware and the Debtor acted in precisely the

manner contemplated by the License Agreement."

This count states a simple claim for breach of contract, specifically of the License Agreement.  As

and because the License Agreement so provides, it is governed by Massachusetts law. The infirmities

that Forexware would have me find are not infirmities at all. The Complaint alleges that Forexware was

entitled to a certain amount but took more than it was entitled to. The Debtor need not quantify at this

stage precisely how much Forexware was entitled to. It is irrelevant that Popescu may have established

the license relationship between BTI and the Debtor that Forexware stepped into.  And Forexware's

contention that it took precisely what the License Agreement contemplated is simply a factual

disagreement with the complaint.  For purposes of a Rule 12(b)(6) motion, I must accept the facts as

pled.  Count IV does not fail to state a claim on which relief can be granted.

---

[5] The Debtor makes an alternate argument for the existence of a fiduciary relationship based on the simple fact of Forexware's control over the Debtor's assets. As it is clear that Count III will survive this motion, I need not address that separate basis now.

**Count V**

In Count V, against Forexware alone, the Debtor seeks to avoid under 11 U.S.C. § 548(a)(1)(B)

and recover under 11 U.S.C. § 550(a) each of the numerous transfers described in the complaint.

Forexware argues that this count fails to state a claim on which relief can be granted for seven reasons:

(i) each and every transfer is protected by the safe harbors in 11 U.S.C. §§ 546(g) and 548(d)(2); (ii) the

operative allegations are stated in the complaint only "on information and belief"; (iii) the operative

allegations group all the Defendants together without specifying precisely what Forexware in particular

(as opposed to another defendant) did or how it benefitted; (iv) the complaint does not satisfy the

requirement that the fraud alleged in this count be pled with particularity[6]; (v) the funds transferred as

part of the challenged Transfers were property not of BT Prime but of its customers, of Boston Prime, or

of Boston Prime's customers; (vi) the complaint does not contain sufficient facts in support of the

required element that the Debtor was insolvent at the time of each of the challenged transfers or

became insolvent as a result thereof; and (vii) it is clear from the complaint that each transfer made to

or for the benefit of Forexware was made to satisfy antecedent or present debt—such as obligations

imposed by the License Agreement and under the applicable margin requirements to enable the Debtor

to continue trading on margin—and therefore the Debtor received reasonably equivalent value, which

effectively nullifies an essential element of a claim under § 548(a)(1)(B). I address these in order.

Forexware first argues that each and every transfer is protected by the "safe harbors" set forth

in 11 U.S.C. §§ 546(g) and 548(d)(2)(D).  Subsection 546(g) creates a safe harbor for certain transfers.  It

states:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this
> title, the trustee may not avoid a transfer made by or to (or for the
> benefit of) a swap participant or financial participant, under or in
> connection with any swap agreement and that is made before the

---

[6] The Malta Defendants, too, oppose Counts V and VI for failure to plead fraud with particularity, but as Counts V
and VI do not purport to seek relief against the Malta Defendants, their arguments are moot, and they lack
standing to oppose Counts V and VI.

commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(g). This is an affirmative defense to avoidance under § 548(a)(1)(B) (also under § 547 but not under 548(a)(1)(A)). It requires the defendant to prove, as to each challenged transfer, that it was made by, to, or for the benefit of a swap participant or financial participant, under or in connection with any swap agreement and that it was made before the commencement of the case. As with any affirmative defense, it may form the basis of a Rule 12(b)(6) motion only if "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude.'" *Nisselson v. Lernout*, 469 F.3d at 150 (quoting *Rodi v. S. New Engl. Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 1991)). These conditions are satisfied as to the requirement that the transfers have been made before the commencement of the case, but they are not remotely satisfied as to the other requirements. Subsection 546(b) therefore cannot form the basis for dismissal on the present motion.[7]

Subsection 548(d)(2)(D) is also an affirmative defense to avoidance under § 548. It states that, in § 548, "a swap participant or financial participant that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer[.]" 11 U.S.C. § 548(d)(2)(D). It requires proof of virtually the same elements as does § 546(g), and it fails here as a justification for dismissal for the same reason as does § 546(g): the facts establishing the defense are not definitively ascertainable from the complaint and the other allowable sources of information and do not suffice to establish the defense with certitude.

Forexware next faults this count on the basis that is based in part on facts alleged "on information and belief." Forexware does not indicate why a complaint's dependence on information and

---

[7] For the same reason, it cannot form the basis for dismissal of each of the five other counts (Counts VII, X, XI, XII, and XIII) as to which the U.S. Defendants now invoke this defense.

belief is cause for dismissal under Rule 12(b)(6).  I know of no authority for that proposition, Forexware

cites none, and therefore I reject this argument as a basis for dismissal.

Forexware next contends that the complaint is deficient in that the operative allegations group

all the Defendants together without specifying precisely what Forexware in particular (as opposed to

another defendant) did or how *it* benefitted. In particular, Forexware contends that the Complaint (for

example in ¶¶ 3, 45, 51-52, and 55) refers to Forexware and CMH by the same name, Forexware.

By terms defined in ¶ 3, the Complaint refers to Forexware as "Forexware U.S." and to

Forexware U.S. and CMH together as "Forexware." The potential for confusion is evident. It appears

likely, but not certain, that at points in the Complaint, the Debtor used the name Forexware where, by

its own definitions, it should have used (and probably meant to use) Forexware U.S.  However, those

instances are relatively few, and the resulting confusion is easily controlled through interrogatories. In

many instances, where allegations are made against multiple defendants, it is because clearly the

Plaintiff means to make the allegations against each of the multiple defendants. If anything, the problem

here is one of stating too many claims, not of failing to state a claim; and if it is a problem at all, it is one

for CMH, not for Forexware, which, by virtue of its alleged control of the Debtor, is an obviously

intended defendant.  I find no cause here to dismiss any portion of Count V.

Forexware next argues that Fed. R. Civ. P. 9(b) (requiring that in alleging fraud, a party must

state with particularity the circumstances constituting fraud), made applicable by Fed. R. Bankr. P. 7009,

requires that the fraud alleged in this count be pled with particularity, that the Complaint fails to do so,

and that this failure results in failure to state a claim for relief. The Court disagrees with the premise.

Although § 548(a)(1)(B) appears in a section entitled "fraudulent transfers," this particular subsection

deals with transfers that are only constructively fraudulent. They do not require proof of actual intent to

hinder, delay, or defraud (as does subsection (a)(1)(A)) or of "fraud." The required elements are clearly

stated in the statute. Fraud is not an element, so there is no need to state with particularity circumstances constituting fraud.

Forexware next argues that the challenged transfers were of funds belonging not to BT Prime but to its customers, to Boston Prime, or to Boston Prime's customers; and because they were not the Debtor's, they cannot satisfy the requirement in § 548(a)(1) that the transfers have been "of an interest of the debtor in property." This argument raises a dispute of fact.  The complaint alleges that the funds in issue were the Debtor's.  That is sufficient to satisfy a Rule 12(b)(6) challenge.

Forexware next argues that the complaint does not contain sufficient facts in support of the requirement in § 548(a)(1)(B)(ii) that the Debtor either have been insolvent at the time of each challenged transfer or been made insolvent by the transfer. The complaint alleges insolvency and (though it need not have done so) adduces facts that support a determination of insolvency. It does not fail to state this necessary element.

Forexware lastly argues that "it is clear from the complaint" that each transfer made to or for the benefit of Forexware was made to satisfy antecedent or present debt—such as obligations imposed by the License Agreement and under the applicable margin requirements to enable the Debtor to continue trading on margin—and therefore the Debtor received reasonably equivalent value, which effectively nullifies an essential element of a claim under § 548(a)(1)(B). The short answer to this argument is that the Debtor's receipt of reasonably equivalent value is not clear from the complaint.

For these reasons, Count V does not fail to state a claim on which relief can be granted.

**Count VI**

In Count VI, against Forexware alone, the Debtor seeks to avoid under 11 U.S.C. § 548(a)(1)(A) and recover under 11 U.S.C. § 550(a) each of the numerous transfers described in the complaint.  It alleges that each was a transfer to or for the benefit of Forexware and made with actual intent to hinder, delay, or defraud some or all of the Debtor's creditors. Forexware challenges this count on the

same grounds as it challenged Count V. Most are unavailing as to Count VI for the same reason they were unavailing as to Count V.  In addition, the affirmative defense under subsections 546(f) is unavailing for the further reason that this exception is, by its express terms, not applicable to avoidance actions under § 548(a)(1)(A).

The argument regarding failure to plead fraud with particularity needs to be addressed differently here.  Unlike Count V, Count VI sounds in part in fraud. In order to state a claim under § 548(a)(1)(A), a plaintiff must allege and establish specific intent "to hinder, delay, or *defraud*." These are alternative requirements. The Debtor alleges all three. Hindrance and delay, being clear in meaning, need not be pled with particularity. This is enough to conclude that Count VI does not fail to state the necessary specific intent. Fraud, however, can take many forms, and so Rule 9(b) requires that, when fraud is alleged, the circumstances constituting the fraud be pled with particularity. When the element of fraud is not the whole of the cause of action but merely characterizes intent, and that intent is the driving factor in an alleged fraudulent transfer, the nature of the alleged intent is usually fairly obvious: it consists in a purpose to put assets beyond the reach of creditors. Certainly that is the sense of this complaint. Forexware surely knows this and, unless the Debtor amends its complaint to state otherwise, may assume the same for purposes of this adversary proceeding. I find no deficiency in pleading and no failure to state fraudulent intent with the necessary particularity.

## Count VII

In Count VII, against both FXDD Malta and FXDD US, the Debtor seeks to avoid under 11 U.S.C. § 548(a)(1)(B) and recover under 11 U.S.C. § 550(a) each of the numerous transfers described in the complaint.  FXDD US argues that this count fails to state a claim on which relief can be granted for each of the seven reasons advanced by Forexware against Count V. I reject those arguments for the same reason as articulated in the context of Count V.  (Counts V and VII concern the same transfers and the same basis of avoidance, § 548(a)(1)(B).)

FXDD Malta also argues that this count fails to state a claim against it for three reasons. The first is that there cannot be a fraudulent transfer of funds if the funds were never an asset of the debtor to begin with, but in this instance the funds at issue belonged not to the Debtor but to its clients. FXDD Malta is correct about the premise: a transfer of an interest in funds is not avoidable under § 548(a)(1) if that interest was not an interest of the debtor in the funds. But FXDD Malta is incorrect about the Complaint: it does not fail to address this important issue but alleges that the funds in issue belonged to the Debtor. The Complaint does not fail to articulate plausibly that the interests in question constituted interests of the Debtor in property.

Second, FXDD Malta contends that that it is not properly a "transferee" of the funds in issue (presumably for purposes of § 550(a)—FXDD Malta does not say) because it lacked control over the transferred funds and acquired no beneficial interest in them but served merely as a conduit. I need not address the law underlying this defense as it is hardly evident from the Complaint—much less established by the Complaint with certainty—that FXDD Malta lacked control over the transferred funds and acquired no beneficial interest in them.

Third, FXDD Malta argues that it qualifies for the "safe harbor" that is the affirmative defense in § 546(e) because the payment in issue were margin call payments to which that subsection applies.  I need not address the merits of this argument.  It is an affirmative defense and may not be a basis for Rule 12(b)(6) dismissal because (i) the facts establishing the defense are not definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts do not suffice to establish the affirmative defense with certitude.[8]

For these reasons, I find no cause to dismiss Count VII as against either FXDD or FXDD Malta.

---

[8] As to Count VII, FXDD Malta also seems to argue, in the heading to section IV of its brief, that this count should be dismissed for the further reason that it fails to satisfy the requirement in Fed. R. Civ. P. 9(b), made applicable by Fed. R. Bankr. P. 9, that fraud be pled with particularity.  The argument announced in the section heading, however, is not given any specific substance as to Count VII in the section that follows the heading. The challenge is illusory.

**Count VIII**

In Count VIII, also against both FXDD Malta and FXDD US, the Debtor seeks to avoid under §

548(a)(1)(A) and recover under § 550(a) each of the numerous transfers described in the complaint.  It

alleges that each was a transfer to or for the benefit of FXDD Malta and/or FXDD US and made with

actual intent to hinder, delay, or defraud some or all of the Debtor's creditors. FXDD Malta and FXDD US

challenge this count on the same grounds as they challenged Count VII. Most are unavailing as to Count

VIII for the same reasons they were unavailing as to Count VII. In addition, the affirmative defenses

under subsections 546(e) and (f) are unavailing here for the further reasons that these exceptions are,

by their express terms, not applicable to avoidance actions under § 548(a)(1)(A). See 11 U.S.C. § 546(e)

and (f) (neither mentions § 548(a)(1)(A) in its initial "notwithstanding" clause, and each closes with

"except under section 548(a)(1)(A) of this title"). The argument regarding failure to plead fraud with

particularity, advanced by both FXDD US and FXDD Malta, needs to be addressed differently here, but it

too fails for the same reason as articulated above as to Count VI. FXDD Malta further argues that Rule

9(b) is not satisfied for the further reason that this count improperly lumps FXDD Malta together with

other defendants in a common activity without the necessary particularized support for FXDD's role in

the common activity. The Court finds in the complaint the necessary particularized support, both

through the allegations supporting the joint venture, and by virtue of the specific allegations as to FXDD

Malta's conduct.

**Count IX**

In Count IX, against all defendants, the Debtor seeks declaratory relief, a judgment to the effect

that the Defendants are liable to the Debtor for and to the extent of any liability the Debtor has incurred

to Boston Prime by virtue of their transfers of $2.5 and $3 million of monies belonging to Boston Prime

through the Debtor and ultimately into the FXDD Trading Account for the benefit of the Defendants.  In

support of this count, the Complaint alleges that as a consequence of Forexware's manipulation of the

Debtor and Boston Prime, the Debtor incurred liability or potential liability to Boston Prime, and Boston

Prime has asserted a claim against the Debtor, which claim includes the $2.5 and $3 million transfers.

The U.S. Defendants argue that this count fails to state a claim on which relief can be granted

because, as yet, there has been no adjudication of the liability of BT Prime to Boston Prime, and

therefore there presently exists no actual controversy justifying the entry of declaratory relief under 28

U.S.C. § 2201(a). I find no merit in this argument. An actual controversy exists if the Debtor has liability

to Boston Prime arising from the transfers in issue—it is not necessary that the liability have been

adjudicated.  The complaint alleges (albeit in the alternative) that the Debtor has incurred such liability.

The Complaint therefore does not fail to allege the existence of an actual controversy.[9]

The Malta Defendants argue that Count IX fails to state a claim on which relief can be granted

against them because, they contend, the complaint states no basis on which to find control by the Malta

Defendants over the Debtor or grounds to impute liability to the Malta Defendants. This challenge to

Count IX is perfunctory and undeveloped, relies heavily on unspecified "previous arguments," and fails

even to recognize that Count IX seeks liability not just on the basis of the Defendants' control of the

Debtor but also on the basis of their benefit from the transfers in issue.  The argument warrants no

answer, and indeed no answer could be fashioned that was not based on speculation at what is being

argued.  I am satisfied that the Defendants have shown no infirmity in Count IX.

---

[9] It is possible that by this argument, the U.S. Defendants challenge not the sufficiency of the complaint—that is, whether it properly pleads the existence of an actual controversy—but, as a matter of fact, the existence of an actual controversy. The latter would require recourse to materials outside the pleadings, but the motion is not supported by any such materials, so I construe the motion as limited to a challenge to the sufficiency of the complaint. I see no evident lack of an actual or justiciable controversy.  The claims register in this case shows that Boston Prime (In Special Administration) has filed a proof of claim in this case for $7.2 million for liability arising from payment of monies from Boston Prime to BT Prime and that no objection has been filed to that proof of claim. When a proof of a claim is filed under 11 U.S.C. § 501, the claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a).

**Count X**

Counts X through XIII, all under 11 U.S.C. § 547(b), are for avoidance of transfers as preferential. In Count X, against Forexware alone, the Debtor seeks to avoid under § 547(b) and recover under § 550(a) each of the payments to Forexware that are described in the complaint; the Debtor alleges that Forexware is an insider of the Debtor; and the count relies on the extended one-year look-back that applies to insiders. Forexware argues that this count fails to state a claim on which relief can be granted for the five reasons.

Forexware first argues that the transfers in question are protected by the affirmative defense in § 546(g). Forexware's reliance on § 546(g) is unavailing here for the same reasons it was deemed unavailing as to the counts under § 548(a)(1)(B).

Forexware next argues that the transfers in question are protected by the affirmative defenses in § 547(c)(1), (2), and (4). The affirmative defenses in § 547(c)(1), (2), and (4) are likewise unavailing on this motion to dismiss.  The facts on which these defenses rely are not definitively ascertainable from the complaint and the other allowable sources of information and do not suffice to establish the defense with certitude.

Forexware next argues that evidence extraneous to the complaint establishes that certain of the funds at issue belonged not to the Debtor but to its customers, to Boston Prime, or Boston Prime's customers.  This is a reiteration of an argument that Forexware made with respect to Count V.  It fails here for the same reason it did there:  it simply raises a dispute of fact. The complaint alleges that the funds in issue were the Debtor's.  That is sufficient to satisfy a Rule 12(b)(6) challenge.

Forexware next argues that the complaint fails to sufficiently plead that the Debtor was insolvent at the time of the challenged transfer. The Court disagrees.  The complaint adequately alleges insolvency, and, for transfers occurring within 90 days of the bankruptcy filing, § 547(f) creates a presumption of insolvency.

Forexware next argues that § 547(b) does not apply extraterritorially and that at least three of the transfers were made outside the United States and therefore cannot be avoided under § 547(b). This argument too fails on the basis that it turns in part on a dispute of fact that is not resolved with certitude by the complaint.  As the factual premise of the argument is unestablished, I need not address the legal question of extraterritorial application at this juncture.

For these reasons, Forexware has not established that Count X does not fail to state a claim on which relief can be granted.

## Count XI

In Count XI, also against Forexware alone, the Debtor seeks to avoid under § 547(b) and recover under § 550(a) each of the payments to Forexware that are described in the complaint; this count differs from Count X only in that, in Count XI, the Debtor does not allege that Forexware is an insider of the Debtor or seek to use the extended one-year look-back that applies to insiders. It is limited to transfers occurring within 90 days of the bankruptcy filing.  Forexware makes the same arguments against this count as it made against Count X.  The arguments for dismissal fail as to Count XI for the same reasons they failed against Count X.

## Count XII

In Count XII, against both FXDD Malta and FXDD US, the Debtor seeks to avoid under § 547(b) and recover under § 550(a) each of the payments to these defendants that are described in the complaint. The Debtor alleges in this count that FXDD Malta and FXDD US were insiders of the Debtor and uses the extended one-year look-back that applies to insiders.

In opposition to this Count, FXDD US advances the same arguments as Forexware made in opposition to Count X.  The arguments fail as to this count for the same reasons as they did in Count X.

In opposition to this Count, FXDD Malta advances the same three arguments as it made in opposition to Count VII.  They fail here for the same reasons they failed there.

**Count XIII**

In Count XIII, against both FXDD Malta and FXDD US, the Debtor seeks to avoid under § 547(b) and recover under § 550(a) each of the payments to these defendants that are described in the complaint.  In this count, the Debtor does not allege that FXDD Malta and FXDD US was an insider of the Debtor or employ the one-year look-back. FXDD Malta and FXDD US advance the same arguments against this count as they did against Count XII. For the same reasons, they are also unavailing here.

**Count XIV**

In Count XIV, against all four defendants, the Debtor states that the Defendants are in possession of assets and funds that are owned by the Debtor, and under 11 U.S.C. § 542, the Debtor demands turnover of those funds. In opposition to this count, Forexware and FXDD US argue that this count fails to state a claim against either of them because it fails to state which defendant is in possession of the funds. The Malta Defendants make essentially this same argument, stating that for failure to specify the defendant in possession of the funds, this count fails to satisfy the standard required by Fed. R. Civ. P. 8(a) (requiring a short and plain statement of the claim showing that the pleader is entitled to relief). The Court disagrees as to all four defendants. The complaint alleges that all four are in possession. The Debtor is free to plead in the alternative, and it is likewise free to show that two or more defendants are jointly in possession of particular funds.

The Malta Defendants argue that this count fails to state a claim against them because "there is no basis upon which to find control by the Malta Defendants over the Debtor." Whatever the merits of that proposition, it does not undercut Count XIV. Section 542(a) requires, as a condition of the obligation to turnover property, that the defendant have been in possession of property of the estate— which would include property that belonged to the debtor as of the date of the bankruptcy filing, see 11 U.S.C. § 541(a)(1); it does not require proof of control of the debtor itself.

The defendants have not established that Count XIV fails to state a claim on which relief can be granted.

**Count XV**

In Count XV, against all four defendants, the Debtor alleges that on February 3, 2015, the Defendants wrongfully transferred $1.3 million from the Debtor's FXDD Trading Account to their own account, and that this constitutes conversion. In their oppositions, the defendants make two arguments.

The first reiterates one argument against Count XIV: it fails to satisfy the pleading standard of Fed. R. Civ. P. 8(a) by not identifying which of the defendants either made the $1.3 million transfer or exercised dominion or control over the funds in question. The Court disagrees. This count makes the necessary allegations against all four defendants. Each is on notice that the count seeks relief against it. The Debtor is free to plead in the alternative, and it is likewise free to show that two or more defendants acted jointly.

The defendants also argue that this count fails to allege an element that Massachusetts would deem necessary to make out a claim for conversion where a defendant's possession is not wrongful in its inception: that the plaintiff made demand for return and the defendant refused. I need not set out Massachusetts law on the subject because the Debtor does not contend that the possession gained by the transfer in question was not wrongful in its inception.

The defendants have stated no cause to dismiss Count XV.

**Count XVI**

In Count XVI, against all four defendants, the Debtor demands, under 11 U.S.C. § 543(b)(2), a full and complete accounting of (i) all customer transactions executed by the defendants purportedly in the name of the Debtor, (ii) all payments from the Debtor to Forexware, FXDD US, and FXDD Malta, and (iii) the computation of every Monthly Net Revenue Payment from the Debtor to Forexware.  Subsection 543(b)(2) obligates a "custodian" to "file an accounting of any property of the debtor, or proceeds,

product, offspring, rents, or profits of such property, that, at any time, came into the possession,

custody, or control of such custodian." 11 U.S.C. § 543(b)(2). "Custodian" in this section (as throughout

the Bankruptcy Code) is a defined term:

> The term "custodian" means--
> (A) receiver or trustee of any of the property of the debtor, appointed in
> a case or proceeding not under this title;
> (B) assignee under a general assignment for the benefit of the debtor's
> creditors; or
> (C) trustee, receiver, or agent under applicable law, or under a contract,
> that is appointed or authorized to take charge of property of the debtor
> for the purpose of enforcing a lien against such property, or for the
> purpose of general administration of such property for the benefit of
> the debtor's creditors.

11 U.S.C. § 101(11). The U.S. Defendants argue that this count fails to state a claim on which relief can

be granted because neither Forexware US nor FXDD US (nor, for that matter, the Malta Defendants) is

or at any time was a custodian; nor does the Complaint even allege that either Forexware or FXDD US

was a custodian.

The Court agrees that the complaint does not expressly or in substance allege that one or more

of the defendants was a custodian within the meaning of the Bankruptcy Code definition of that term, or

a receiver, trustee, or assignee of the Debtor's assets for the benefit of creditors. The Debtor has not

alleged facts on which Forexware, FXDD US, FXDD Malta, or CMH Malta might constitute a custodian

under § 543(b). Recognizing this fact, the Debtor does not attempt to defend this count. Rather, the

Debtor argues that the accounting demanded by this count is justified under Massachusetts law, and the

Debtor states that it intends to amend the complaint to that end. At present, however, I must address

the complaint in its present form, in which Count XVI fails to state a claim for relief against any

defendant.[10]

---

[10] In so ruling, I do not hold that the Debtor may not obtain from the Defendants the accounting it seeks through
discovery in this action, only that the Defendant are not obligated to produce that accounting by § 543(b)(2)..

## VI.      CONCLUSION

For the reasons set forth above, the Defendants Motions to Dismiss shall be granted only as to Count XVI, which shall be dismissed as against all Defendants for failure to state a claim on which relief can be granted, and denied as to all other counts.

Date:  March 29, 2019

_____
Frank J. Bailey
United States Bankruptcy Judge