UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

| | |
|---|---|
| In re:<br><br>BT PRIME LTD.<br><br>      Debtor.<br>_____ | )<br>)<br>)  Chapter 11<br>)<br>)  Case No. 15-10745-FJB<br>)<br>) |
| BT PRIME LTD.<br><br>      Plaintiff,<br><br>      v.<br><br>BOSTON TECHNOLOGIES POWERED BY<br>FOREXWARE LLC f/k/a FOREXWARE LLC,<br>CURRENCY MOUNTAIN HOLDINGS LIMITED<br>f/k/a FOREXWARE MALTA HOLDINGS LTD.,<br>FXDIRECTDEALER, LLC, FXDD MALTA LTD.,<br>CURRENCY MOUNTAIN HOLDINGS LLC,<br>NUKKLEUS, INC., NUKKLEUS BERMUDA<br>LIMITED, CURRENCY MOUNTAIN HOLDINGS<br>BERMUDA, LTD.<br><br>      Defendants<br>_____ | )<br>)<br>)<br>)<br>)<br>)  Adversary Proceeding<br>)  No. 16-01178<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>AMENDED COMPLAINT</u>

BT Prime Ltd. ("<u>BT Prime</u>" or the "<u>Debtor</u>"), brings this action against Boston

Technologies Powered by Forexware LLC f/k/a Forexware LLC ("<u>Forexware</u>"), Currency

Mountain Holdings LLC ("<u>CMH</u>"), Currency Mountain Holdings Limited f/k/a Forexware Malta

Holdings Ltd. ("<u>CMH Malta</u>"), FXDirectDealer, LLC ("<u>FXDirect</u>"), FXDD Malta Ltd. ("<u>FXDD</u>

<u>Malta</u>"), Nukkleus, Inc. ("<u>Nukkleus</u>"), Nukkleus Bermuda Limited ("<u>Nukkleus Bermuda</u>"), and

Currency Mountain Holdings Bermuda, Ltd. ("<u>CMH Bermuda</u>") (collectively, "Defendants")

seeking a determination that Defendants are liable for all of the debts and liabilities of the Debtor.

Defendants Forexware, CMH, CMH Malta, FXDD Malta and FXDirect (collectively, "Forexware Defendants") operated as a single business entity under the direction and control of Forexware through Emil Assentato, who owned and controlled, directly or indirectly, each of the Forexware Defendants. Upon their acquisition of Boston Technologies, Inc., the Forexware Defendants gained control over the management, operation and assets of the Debtor without compensating the Debtor, effectively stripping the Debtor of its assets and leaving the Debtor without the financial ability to pay its obligations. Forexware breached its fiduciary duty to the Debtor through its manipulation and control of the Debtor for the financial advantage of the Forexware Defendants and to the detriment of the Debtor. The Debtor also seeks recovery from the Defendants of payments made to or for the benefit of the Defendants on the basis that the payments are avoidable as fraudulent or preferential transfers. The Debtor further seeks a determination that to the extent that any of the Forexware Defendants are liable to the Debtor, all of the Forexware Defendants are jointly and severally liable to the Debtor for the extent of any such liability.

After the commencement of the Debtor's bankruptcy case, the Defendants engaged in a series of transactions intended to strip assets from Forexware. Following those transactions, the Defendants, which are still owned and controlled, directly or indirectly, by Emil Assentato, continued to operate as a single entity under the Forexware brand. The Debtor seeks a determination that to the extent that any of the Forexware Defendants are liable to the Debtor, all of Nukkleus, Nukkleus Bermuda, and CMH Bermuda are jointly and severally liable to the Debtor for the extent of any such liability.

Lastly, the Debtor seeks an order requiring the Forexware Defendants to provide a full and complete equitable accounting of the Debtor's business that the Defendants managed, operated and controlled, including, but not limited to, the customer transactions executed by Defendants purportedly in the name of the Debtor.

### Parties and Jurisdiction

1.     Plaintiff BT Prime is organized under the laws of Bermuda and is wholly owned by BT Trading, LTD., a Belize corporation ("BT Trading").

2.     Defendants are all owned and controlled, directly or indirectly, by Emil Assentato, who is the majority member of Max Q Investments LLC ("Max Q").

3.     Defendant Forexware is a Delaware limited liability company with a place of business at 525 Washington Boulevard, Jersey City, New Jersey 07310. Forexware also conducted business at 280 Summer Street, 9th Floor, Boston, Massachusetts 02110 ("Forexware Boston Office").  As of May 2016, Forexware was owned by CMH Bermuda.

4.     Defendant CMH is a limited liability company formed under the laws of the State of Delaware with a place of business at 7 World Trade Center, 250 Greenwich Street, 32nd Floor, New York, New York 10007. CMH's majority shareholder is Max Q, of which Emil Assentato is the majority member.  Upon information and belief, CMH's sole business purpose is to act as a holding company.

5.     Defendant CMH Malta is a Malta limited liability company with a business address at K2, First Floor, Forni Complex, Valletta Waterfront, Floriana, Malta. CMH Malta's majority shareholder is Max Q, of which Emil Assentato is the majority member.  Upon information and belief, CMH Malta's sole business purpose is to act as a holding company.

6.      Defendant FXDirect is a Delaware limited liability company with a place of business at 525 Washington Boulevard, Jersey City, New Jersey 07310. Upon information and belief, FXDirect also conducted business at the Forexware Boston Office. FXDirect is an affiliate of Forexware and a wholly owned subsidiary of Defendant CMH.

7.      Defendant FXDD Malta is a Malta limited liability company with a business address at K2, First Floor, Forni Complex, Valetta Waterfront, Floriana, FRN 1913, Malta. FXDD Malta is an affiliate of Forexware and a wholly owned subsidiary of Defendant CMH Malta.

8.      Defendant Nukkleus is a corporation duly organized under the laws of the State of Delaware with a place of business at 525 Washington Boulevard, Jersey City, New Jersey 07310. As of February 2018, CMH Bermuda owned 91.5% of Nukkleus.

9.      Defendant Nukkleus Bermuda is a limited corporation formed under the laws of Bermuda with a place of business at 525 Washington Boulevard, Jersey City, New Jersey 07310. Nukkleus Bermuda is a wholly owned subsidiary of Nukkleus.

10.      Defendant CMH Bermuda is a limited corporation formed under the laws of Bermuda with a place of business at 525 Washington Boulevard, Jersey City, New Jersey 07310. CMH Bermuda is a wholly owned subsidiary of CMH.  Upon information and belief, CMH Bermuda's sole business purpose is to act as a holding company.

11.      On March 2, 2015 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing the Chapter 11 bankruptcy case currently pending in the United States Bankruptcy Court for the District of Massachusetts (Eastern Division) entitled *In re BT Prime LTD.*, Case No. 15-10745 (the "Bankruptcy Case").

12.     On May 10, 2016, the Court entered an Order confirming the Debtor's Liquidating Plan and appointing John Haggerty as Liquidating Supervisor.

13.     This Court has jurisdiction over this adversary proceeding as an action arising under title 11, pursuant to 28 U.S.C. § 157 and § 1334. This action is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2)(A), (F), (H), and (O).

14.     Venue of this adversary proceeding is appropriate pursuant to 28 U.S.C. § 1409.

### Background

#### A.  The Debtor.

15.     In 2007, George Popescu formed Boston Technologies, Inc. ("BTI"), and through BTI developed a computerized trading platform used for trading in the currency markets.  BTI's initial business was to license its platform to third party currency brokers.

16.     Subsequently, Mr. Popescu decided to expand the business of BTI from licensing its software platform to currency traders to providing currency brokerage services.

17.     In furtherance of this expansion of BTI, Mr. Popescu caused the Debtor and Boston Prime Limited ("Boston Prime") to be formed.  The Debtor was formed under the laws of the British Virgin Islands (and later Bermuda) to provide currency brokerage services to customers outside the United States.  Boston Prime was formed under the laws of the United Kingdom to provide regulated currency brokerage services.

18.     The Debtor's and Boston Prime's currency trading businesses were part of a business enterprise controlled and managed by BTI (collectively with the Debtor and Boston Prime, the "BTI Group").  The three entities were distinct in name only.

19.     Upon its formation, the Debtor was required to enter into a license agreement with BTI ("License Agreement").  Pursuant to the License Agreement: (a) BTI licensed its software to

the Debtor (§1); and (b) BTI provided all professional services for the operation of the Debtor,

including assignment of employees, operational support, marketing and sales services, business

and technical consulting services, office space, and telecommunications and computing services

(Schedule A, §2).

20.    The Debtor had no employees, and BTI employees controlled the Debtor by

managing all aspects of the Debtor's business and controlling the Debtor's operations, including

all trading activity, accounting services, and maintaining the Debtor's books and records.

21.    In exchange, the Debtor was obligated under the License Agreement to pay BTI

all of its net revenues determined on a monthly basis ("Monthly Net Revenues").  As a

consequence thereof, the Debtor was unable to maintain cash reserves to meet any subsequent

cash flow shortfalls.

22.    As a result of the foregoing, from its inception, the Debtor had no existence

independent of BTI.

23.    From its formation, Boston Prime had a similar relationship with BTI, also

entering into a license agreement with BTI which contained terms substantially identical to the

Debtor's License Agreement.  Pursuant to the license agreement BTI employees controlled

Boston Prime and made all managerial and operational decisions for Boston Prime.  As a result

of the foregoing, from its inception, Boston Prime also had no existence independent of BTI.

**B.  BTI's Software Bug and the Forexware Transaction.**

24.    On or about April 20, 2014, a bug in the BTI trading software purportedly caused,

over a period of 30 minutes, BTI to negligently place voluminous spot gold and foreign

exchange trades in the aggregate amount of several hundred million dollars on behalf of the

Debtor's customers. As a consequence of BTI's negligence, the Debtor suffered losses of several million dollars.

25.     As a result of the foregoing, the Debtor was rendered insolvent and its liabilities to customers substantially exceeded the amount of its available funds.

26.     Consequently, BTI explored a sale of the BTI Group.

27.     These efforts ultimately led to negotiations to sell the BTI Group to Forexware, an existing player in the foreign currency exchange industry.

28.     Emil Assentato, who owned and controlled, directly or indirectly, each of the affiliated Forexware Defendants, operated them as a single entity through Forexware.

29.     On June 14, 2014, the BTI Group and certain affiliates entered into a Purchase Agreement with Forexware and certain affiliates (the "Purchase Agreement").

30.     The Purchase Agreement provided for Forexware (and certain affiliates) to acquire the assets of the BTI Group subject to their liabilities for a purchase price of one million dollars in a two-step transaction to allow time for regulatory approval of the Boston Prime acquisition.

31.     In the first step, Forexware agreed to acquire substantially all of BTI's assets subject to its liabilities, and to form Forexware Bermuda LTD. ("Forexware Bermuda") to acquire substantially all of the Debtor's assets subject to its liabilities (the "First Closing"). In the second step, CMH Malta agreed to acquire substantially all of the assets of Boston Prime subject to its liabilities (the "Second Closing").

32.     Under the Purchase Agreement, Forexware (through Forexware Bermuda) agreed to assume all of the Debtor's obligations to its customers of approximately $17 million, even

though Forexware calculated a shortfall in the Debtor's cash accounts of approximately $4.7 million.

33.     The Agreement further provided a mechanism for adjusting the total purchase price based on the amount of actual shortfall in the Debtor's cash accounts calculated at the time of the Second Closing (the "Working Capital Adjustment").

34.     Prior to the closing of the Purchase Agreement, a shareholder of the Debtor's and Boston Prime's parent company, BT Trading, brought suit disputing Mr. Popescu's right to act on behalf of BT Trading, which delayed consummation of the proposed sale of the Debtor.

35.     As a result thereof, the BTI Group and Forexware, and certain affiliates, executed the Amended and Restated Purchase Agreement dated July 11, 2014 (the "Amended Purchase Agreement").  A true and correct copy of the Amended Purchase Agreement is attached as Exhibit A.

36.     The Amended Purchase Agreement deferred the closing of the sale of the Debtor from the First Closing until the Second Closing to occur at the same time as the acquisition of Boston Prime.

37.     The Amended Purchase Agreement similarly provided for Forexware's assumption of all of the Debtor's liabilities at the time of the Second Closing including, but not limited to, a shortfall in its customer account balances that Forexware calculated as of the execution of the Amended Purchase Agreement as $4,800,000.

38.     The First Closing under the Amended Purchase Agreement (the "BTI Sale") occurred on July 11, 2014.

### C.  Forexware Took Complete Control Over the Operation, Management and Assets of the Debtor and Boston Prime.

39.     In conjunction with the BTI Sale, the License Agreement was amended and assigned to Forexware, which succeeded BTI as licensor.  A true and correct copy of the License Agreement as amended as of July 10, 2014, is attached as <u>Exhibit B</u> ("Amended License Agreement").  Pursuant to the Amended License Agreement, the Debtor was now obligated to pay Forexware its Monthly Net Revenues.

40.     After the BTI Sale, Forexware hired virtually all of BTI's employees and those who were not hired were terminated.  While the Debtor's customers continued to conduct trades through the Debtor, the employees who controlled those accounts became Forexware employees, and Forexware controlled their activities.

41.     Forexware took control of, and directed, the Debtor's operations, management and assets, including the Debtor's customer trading accounts and customer funds held on deposit totaling over $12 million at the time of the BTI Sale.

42.     Forexware also now controlled and maintained the Debtor's books and records.

43.     Through the BTI Sale, Forexware effectively obtained for itself all of the benefits of the Amended Purchase Agreement without consummating the contemplated Second Closing and without expressly assuming any of the Debtor's liabilities or paying the purchase price required under the Amended Purchase Agreement.

44.     Similarly with respect to Boston Prime, Forexware was also assigned the corresponding virtually identical license agreement, and Forexware took over the operations, management, assets and books and records of Boston Prime.

**D.  <u>Forexware Begins Looting the Debtor.</u>**

45.     After gaining control of the Debtor's operations, on July 11, 2014 through

January 15, 2015, Forexware transferred approximately $2.7 million from the Debtor to itself

consisting of the following transfers:

| Payee | Date | USD Amount |
|-------|------|-----------|
| Forexware | 7/28/2014 | $150,000.00 |
| Forexware | 8/12/2014 | $100,000.00 |
| Forexware | 8/26/2014 | $23,572.64 |
| Forexware | 8/27/2014 | $100,000.00 |
| Forexware | 9/10/2014 | $250,000.00 |
| Forexware | 9/2/2014 | $250,000.00 |
| Forexware | 9/16/2014 | $250,000.00 |
| Forexware | 9/24/2014 | $265,336.92 |
| Forexware | 9/29/2014 | $41,283.54 |
| Forexware | 10/8/2014 | $250,000.00 |
| Forexware | 10/15/2014 | $250,000.00 |
| Forexware | 11/13/2014 | $250,000.00 |
| Forexware | 11/24/2014 | $120,000.00 |
| Forexware | 11/28/2014 | $100,000.00 |
| Forexware | 12/10/2014 | $100,000.00 |
| Forexware | 12/11/2014 | $70,722.04 |
| Forexware | 1/9/2015 | $30,000.00 |
| Forexware | 1/15/2015 | $90,000.00 |
| Forexware | 1/15/2015 | $64,883.11 |

(the "Forexware Transfers").

46.     Forexware did not provide an invoice, statement or otherwise account to the

Debtor for the Forexware Transfers.

47.     To the extent the Forexware Transfers were purported to be payments due to it

under the Amended License Agreement, Forexware has failed to provide the Debtor with any

computation of Monthly Net Revenues, or any accounting of the Debtor's monthly revenues and

expenses during the period following the First Closing as required by the Amended License

Agreement.

48.     Upon information and belief, to the extent payments were called for under the Amended License Agreement, Forexware failed to maintain complete and accurate accounting records of the Debtor from which a determination of the Monthly Net Revenues could be made.

49.     Upon information and belief, the Forexware Transfers were made on account of purported obligations that were illusory, incorrectly computed, or otherwise not legitimate obligations of the Debtor to Forexware, or constituted payments in exchange for which the Debtor received inadequate consideration.

**E.  Forexware Requires the Debtor to Transfer its Liquidity Accounts to FXDD.**

50.     At the time of the BTI Sale, the Debtor utilized several "liquidity providers"— entities with which the Debtor deposited its customer funds and placed its customers' currency trades—including Rabobank.  The Debtor maintained a trading account with each liquidity provider, funded with deposits made by the Debtor's customers.

51.     On or about August 28, 2014, Forexware established a trading account for the Debtor at Defendant FXDD Malta, a liquidity provider and affiliate of Forexware (the "FXDD Trading Account").

52.     Forexware employees located in the United States controlled and directed all of FXDD Malta's business operations and assets and maintained its books and records.  Like the Debtor's previous relationship with BTI, FXDD Malta had no separate existence from Forexware.

53.     Forexware then caused all of the Debtor's trades to be conducted through the FXDD Trading Account, thereby furthering its control of the Debtor's assets while charging the Debtor substantial commissions on the trades.

11

54.     In September 2014, Forexware closed the Debtor's other trading accounts, including the account at Rabobank, and directed Rabobank to transfer $5,063,259.96 to the Debtor.  On September 12, 2014, Forexware transferred $5,063,259.96 from the Debtor's accounts to FXDD Malta to fund the FXDD Trading Account (the "Rabobank Transfer").

55.     In addition to the Rabobank Transfer, Forexware made other transfers from the Debtor's accounts to the FXDD Trading Account, totaling approximately $5,086,850 million, consisting of the following:

| Payee | Date | USD Amount |
|---|---|---|
| FXDD Malta Limited | 12/5/2014 | $2,000,000.00 |
| FXDD Malta Limited | 1/20/2015 | $1,736,850.00 |
| FXDD Malta Limited | 1/20/2015 | $1,050,000.00 |
| FXDD Malta Limited | 1/20/2015 | $300,000.00. |

56.     Neither Forexware nor FXDD Malta accounted for the transferring of these funds from the Debtor to the FXDD Trading Account.  On information and belief, the transfers were made for the benefit of the Forexware Defendants to the detriment of the Debtor, and for which the Debtor received no or inadequate consideration.

**F.  Forexware's Manipulation of the Debtor and Boston Prime.**

57.     On January 15, 2015, the Swiss government announced that it would unpeg its currency from the euro, causing an upheaval in the currency market and huge losses to be sustained by traders including, on information and belief, Forexware and its affiliates including FXDD Malta and FXDirect.

58.     Upon information and belief, following the Swiss unpegging, Forexware manipulated the accounts of Boston Prime and the Debtor and made transfers from their accounts in whole or in part to cover losses sustained by the Forexware Defendants.

59.     Specifically, on January 20, 2015, Forexware transferred approximately
$4.2 million from Boston Prime to the Debtor's TD Bank client fund account.  Immediately upon
receipt of the funds into the Debtor's account at TD Bank, Forexware transferred $2.4 million
from the Debtor's TD Bank account into the FXDD Trading Account (the "$2.4 Million
Transfer").

60.     On January 22, 2015, Forexware transferred $3 million in funds from Boston
Prime directly to the FXDD Trading Account, purportedly to cover the Debtor's losses in the
FXDD Trading Account.  Forexware, however, has not provided any accounting as to the losses
that were purportedly covered by the $3 million transfer (the "$3 Million Transfer") (the
$2.4 Million Transfer and the $3 Million Transfer, collectively, the "Boston Prime Transfers").

61.     Upon information and belief, Forexware directed the transfers through the Debtor
to conceal that Forexware and its affiliates were the actual beneficiaries of the Boston Prime
Transfers.

62.     The Boston Prime Transfers directed by Forexware caused the Debtor to incur
liability to Boston Prime for the benefit of the Forexware Defendants and for which the Debtor
received no or inadequate consideration.

63.     Defendants have not provided adequate documentation that would support or
validate the Boston Prime Transfers or an accounting of the losses the Boston Prime Transfers
were purported to cover in the FXDD Trading Account.  As a consequence of Forexware's
manipulation of the Debtor and Boston Prime, Boston Prime has asserted a claim against the
Debtor for $7.2 million, which includes the Boston Prime Transfers, which upon information and
belief were ultimately transferred for the benefit of the Forexware Defendants.  As a result,
Boston Prime is scheduled as the largest claim in the Debtor's Bankruptcy Case.

**G.  Improper Reduction of Debtor's Account Balance.**

64.     The Debtor stopped trading on January 26, 2015.  As of February 3, 2015, the Debtor had a $1,322,590.02 balance on deposit in its FXDD Trading Account.

65.     On February 3, 2015, Forexware, FXDD Malta, or FXDirect transferred $1,300,000 from the FXDD Trading Account, reducing the balance from $1,322,590.02 to $22,590.02 (the "$1.3 Million Transfer").

66.     No accounting for the $1.3 Million Transfer was provided to the Debtor nor were the Forexware Defendants entitled to this money.

**H.  Forexware's Failure to Account for the Transactions.**

67.     Following the BTI Sale, Forexware maintained possession, custody, and control of the Debtor's business and financial records.

68.     During the Debtor's Bankruptcy Case, Forexware produced or made available an incomplete set of the Debtor's business and financial records to the Debtor.

69.     By Stipulation and Agreed Order Regarding Turnover of Debtor's Property and Records dated April 30, 2015 (Adversary Proceeding 15-01043, Dkt. No. 48), Forexware was ordered to produce or make accessible to Debtor's representatives, among other items:

> a.   Customer Account Records: all records for each customer having an account with the Debtor, including, but not limited to, "all records … concerning deposits, trades, credits, debits, adjustments, payments, reconciliations, and statements for the period from and after July 11, 2014"; and
>
> b.   FXDD Account Records: "[a]ll records concerning the Debtor's trading account with either or both of [FXDD] and [FXDirect] … including without limitation account applications, account agreements, deposits, trades, credits, debits,

adjustments, payments, reconciliations, and statements, for the period from and after

July 11, 2014[.]"

70.     The Forexware Defendants have failed to provide an adequate accounting of the

Customer Account Records, including, but not limited to, failing to provide verifications of each

customer trade it executed purportedly in the name of Debtor, or a reconciliation of each

customer having an account with Debtor.

71.     The Forexware Defendants have also failed to provide adequate information or a

basis for any of the payments or transfers to the Forexware Defendants, including, but not

limited to, records concerning adjustments or reconciliations concerning the FXDD Trading

Account, or a computation of Monthly Net Revenue payments Forexware directed from the

Debtor to Forexware.

### I.   **The Debtor's Financial Condition Worsens Under Defendants' Control.**

72.     During the period of time Forexware, directly or indirectly through its affiliates

FXDD Malta and FXDirect, controlled the operations, management and assets of the Debtor, the

Debtors' financial condition significantly worsened and the Debtor's insolvency increased by not

less than $10 million.

73.     While the Debtor's liabilities were significantly increasing, Forexware continued

to pay itself and its affiliates FXDD Malta and FXDirect substantial monies from the Debtor.

74.     Forexware is responsible for the losses incurred after the BTI Sale which losses

occurred under its operation, management and control of the Debtor's business.

### Count I
### (Declaratory Relief - Joint Venture Against Forexware)

75.     The Debtor repeats each of the foregoing allegations as though fully set forth

herein.

76.     Prior to the First Closing, the Debtor's currency trading businesses was part of a single integrated business enterprise controlled and managed by BTI.  The Debtor's currency trading business was distinct in name only and operated as part of the BTI Group joint venture, which also included Boston Prime, with all net revenues from the joint venture flowing to BTI.

77.     The Debtor did not have an existence separate and independent from the BTI joint venture.

78.     BTI employees controlled the Debtor by making all managerial and operational decisions and controlled all aspects of Debtor's operations, including all trading activity, accounting services, and maintaining the books and records.

79.     Upon Forexware's acquisition of BTI, and its assumption of the Amended Licensing Agreement, Forexware succeeded to and replaced BTI's position in the BTI Group joint venture and Forexware continued to operate the Debtor as part of a single integrated joint venture to conduct currency trading for customers.

80.     Forexware controlled the Debtor by making all managerial and operational decisions and controlled all aspects of the Debtor, including all trading activity, accounting services, and maintaining the books and records.

81.     Forexware as a joint venture with the Debtor is liable for the liabilities and debts incurred in connection with the operation of the joint venture.

82.     Forexware disputes that it engaged in a joint venture with the Debtor and disputes that it is liable for the liabilities and debts incurred by the business.

83.     As a consequence, there exists an actual and justiciable controversy between the Debtor and Forexware, in need of a declaration as to whether the Debtor and Forexware were

engaged in a joint venture making Forexware jointly liable for all debts and liabilities of the Forexware/Debtor joint venture.

84.      Pursuant to 28 U.S.C. § 2201, the Debtor requests a declaration that the Debtor and Forexware were engaged in a joint venture to conduct currency trading business, and, as such, Forexware is jointly liable for all debts and liabilities of the Debtor.

**Count II**
**(Declaratory Relief – De Facto Merger Against Forexware)**

85.      The Debtor repeats each of the foregoing allegations as though fully set forth herein.

86.      Forexware obtained the assets and assumed the liabilities of BTI, which controlled the operations, management and assets of the Debtor.

87.      Through Forexware's retention of BTI's employees and assumption of the Amended License Agreement, Forexware obtained complete control of the Debtor's revenue; directed and controlled all management and operational activities of the Debtor; maintained the Debtor's books and records; controlled the employees who controlled all of Debtor's accounts; and controlled all of the Debtor's funds and assets.

88.      Forexware's control over the management, operations and assets of Debtor amounted to an uninterrupted continuation of the Debtor's currency trading business following the BTI sale.

89.      The transactions by which Forexware acquired the assets and liabilities of BTI, and acquired complete control over the operation, management and assets of the Debtor, without expressly assuming the Debtor's liabilities constitute a de facto merger of the Debtor with Forexware.

90.    As a consequence, Forexware is liable as a successor entity of the Debtor and is liable for all of the debts and liabilities of the Debtor.

91.    Forexware disputes that it is liable as a successor entity of the Debtor and responsible for the Debtor's debts and liabilities.

92.    There exists an actual and justiciable controversy between the Debtor and Forexware, in need of a declaration as to whether Forexware is liable as a successor entity of the Debtor and responsible for the Debtor's debts and liabilities.

93.    Pursuant to 28 U.S.C. § 2201, the Debtor requests a declaration that Forexware is the successor of the Debtor and is liable for all debts and liabilities of Debtor.

## <u>Count III</u>
## (Breach of Fiduciary Duty Against Forexware)

94.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

95.    Forexware, at all times following the BTI Sale, controlled all aspects of the operation, management and assets of the Debtor and its currency trading business.

96.    As a result of Forexware's complete control of the Debtor, Forexware owed a fiduciary duty to the Debtor.

97.    Forexware's duties to the Debtor included the duties of care and loyalty in the control over the management and operation of the Debtor's currency trading business.

98.    Forexware breached its duties of care and loyalty, among other things, when it operated, managed and controlled the Debtor's business for Forexware's own benefit, transferred money from the Debtor for its own benefit, and used the Debtor's customer funds for its own benefit, all while causing the Debtor's insolvency to deepen.

99.     Forexware additionally breached its duties of care and loyalty by manipulating the Debtor's business, engaging in self-dealing, and causing transfers of the Debtor's cash deposits and other assets to Forexware and its affiliates for its own advantage and to the detriment of the Debtor.

100.     Forexware breached its duty of care, among other things, when it failed to take steps to ensure that the Debtor had sufficient funds to operate its business and meet its obligations to its customers.

101.     Based on the foregoing, Forexware is liable to Debtor for losses and damages caused by Forexware's breach of fiduciary duty in an amount to be determined at trial.

## Count IV
### (Breach of Contract as Against Forexware)

102.     The Debtor repeats each of the forgoing allegations as though fully set forth herein.

103.     The Amended License Agreement set forth the parties' contractual obligations with respect to the operation of the Debtor's currency trading business.  The Debtor had no monetary obligation to Forexware under the Amended License Agreement other than to pay, on a monthly basis, the Debtor's Monthly Net Revenues to Forexware.

104.     Debtor performed all of its obligations in accordance with the Amended License Agreement.

105.     Forexware breached the Amended License Agreement by directing payments (including those set forth in paragraph 45) ostensibly due under the Amended License Agreement that were in fact illusory, incorrectly computed, or otherwise not legitimate obligations of the Debtor to Forexware.  Such payments bore no relationship to the Debtor's actual net revenues.

19

106.     As a result of Forexware's breach of the Amended License Agreement, Debtor has suffered harm in an amount to be determined at trial but not less than $2.7 million.

## Count V
### (Avoidance of Fraudulent Transfers – Constructive – to Forexware
### Pursuant to 11 U.S.C. §§ 548, 550 and 551)

107.     The Debtor repeats each of the foregoing allegations as though fully set forth herein.

108.     The transfers of the Debtor's property, more specifically described in paragraphs 45, 59, 60, 65 above, were transfers to or for the benefit of Forexware for which the Debtor received no or inadequate consideration.

109.     The above-referenced transfers were made within two years before the date of the filing of the Debtor's petition.

110.     The Debtor was insolvent on the dates the above-referenced transfers were made.

111.     The above-referenced transfers constitute fraudulent transfers pursuant to 11 U.S.C. §§548(a)(1)(B).

112.     The Debtor is entitled to avoid these transfers pursuant to §§548(a).

113.     The Debtor is entitled to recover the value of the transfers pursuant to 11 U.S.C. §§550(a).

## Count VI
### (Avoidance of Fraudulent Transfers – Actual – to Forexware
### Pursuant to 11 U.S.C. §§ 548, 550 and 551)

114.     The Debtor repeats each of the foregoing allegations as though fully set forth herein.

115.     The transfers of the Debtor's property, more specifically described in paragraphs 45, 59, 60, 65 above, were transfers to or for the benefit of Forexware with the actual intent to hinder, delay or defraud some or all of the Debtor's creditors.

116.     The above-referenced transfers were made within two years before the date of the filing of the Debtor's petition.

117.     The Debtor was insolvent on the dates the above-referenced transfers were made.

118.     The above-referenced transfers constitute fraudulent transfers pursuant to 11 U.S.C. §§548(a)(1)(A).

119.     The Debtor is entitled to avoid these transfers pursuant to §§548(a).

120.     The Debtor is entitled to recover the value of the transfers pursuant to 11 U.S.C. §§550(a).

## Count VII
### (Avoidance of Fraudulent Transfers – Constructive – to FXDD Malta and FXDirect Pursuant to 11 U.S.C. §§ 548, 550 and 551)

121.     The Debtor repeats each of the foregoing allegations as though fully set forth herein.

122.     The transfers of the Debtor's property, more specifically described in paragraphs 59, 60, 65 above, were transfers to or for the benefit of FXDD Malta and/or FXDirect for which the Debtor received no or inadequate consideration.

123.     The transfers described in paragraphs 59, 60, 65 were made within two years before the date of the filing of the Debtor's petition.

124.     The Debtor was insolvent on the dates the transfers described in paragraphs 59, 60, 65 were made.

125.     The transfers described in paragraphs 59, 60, 65 constitute fraudulent transfers pursuant to 11 U.S.C. §§548(a)(1)(B).

126.     The Debtor is entitled to avoid the transfers described in paragraphs 59, 60, 65 pursuant to §§548(a).

127.     The Debtor is entitled to recover the value of the transfers described in paragraphs 58, 59 and 64 pursuant to 11 U.S.C. §§550(a).

**Count VIII**
**(Avoidance of Fraudulent Transfers – Actual – to FXDD Malta and FXDirect**
**Pursuant to 11 U.S.C. §§ 548, 550 and 551)**

128.     The Debtor repeats each of the foregoing allegations as though fully set forth herein.

129.     The transfers of the Debtor's property, more specifically described in paragraphs 59, 60, 65 above, were transfers to or for the benefit of FXDD and/or FXDirect with the actual intent to hinder, delay or defraud some or all of the Debtor's creditors.

130.     The transfers described in paragraphs 59, 60, 65 were made within two years before the date of the filing of the Debtor's petition.

131.     The Debtor was insolvent on the dates the transfers described in paragraphs 59, 60, 65 were made.

132.     The transfers described in paragraphs 59, 60, 65 constitute fraudulent transfers pursuant to 11 U.S.C. §§548(a)(1)(A).

133.     The Debtor is entitled to avoid the transfers described in paragraphs 59, 60, 65 pursuant to §§548(a).

134.     The Debtor is entitled to recover the value of the transfers described in paragraphs 58, 59 and 64 pursuant to 11 U.S.C. §§550(a).

## Count IX
### (Preference Pursuant to 11 U.S.C. §§ 547, 550 and 551 Against Forexware)

135.   The Debtor repeats each of the foregoing allegations as though fully set forth herein.

136.   As described more fully above, each of the payments made to Forexware were on account of an antecedent debt allegedly owed by the Debtor to Defendants before such payments were made.

137.   At the time of each Forexware payment, Forexware was an insider of the Debtor based on Forexware's control over the management, operations and assets of the Debtor.

138.   The payments constituted transfer of an interest of the Debtor in property.

139.   The payments were allegedly made to and for the benefit of Defendants.

140.   The payments were made within one year before the Petition Date.

141.   The payments were made while the Debtor was insolvent.

142.   The payments allowed Defendants to receive more than they would have received if the case were a case under Chapter 7 of the Bankruptcy Code, if the payments had not been made, and if Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

143.   The payments constitute preferential transfers of property within the meaning of 11 U.S.C. §547.

## Count X
### (Preference Pursuant to 11 U.S.C. §§ 547, 550 and 551 Against Forexware)

144.   The Debtor repeats each of the foregoing allegations as though fully set forth herein.

145.    As described more fully above, Forexware required the Debtor to make payments on account of an antecedent debt allegedly owed by the Debtor to Defendants before such payments were made.

146.    The payments constituted a transfer of an interest of the Debtor in property.

147.    The payment was made to and for the benefit of Defendants.

148.    The payment was made within ninety (90) days before the Petition Date.

149.    The payment was made while the Debtor was insolvent.

150.    The payment allowed Defendants to receive more than they would have received if the case were a case under Chapter 7 of the Bankruptcy Code, if the payment had not been made, and if Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

151.    The payment constitutes a preferential transfer of property within the meaning of 11 U.S.C. §547(b).

## **Count XI**
**(Preference Pursuant to 11 U.S.C. §§ 547, 550 and 551 Against FXDD Malta and FXDirect)**

152.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

153.    As described more fully above, each of the payments made to FXDD Malta and/or FXDirect were on account of an antecedent debt allegedly owed by the Debtor to Defendants before such payments were made.

154.    At the time of each payment, FXDD Malta and FXDirect were insiders of the Debtor based on their control over the management, operations and assets of the Debtor.

155.    The payments constituted transfer of an interest of the Debtor in property.

156.    The payments were allegedly made to and for the benefit of Defendants.

24

157.    The payments were made within one year before the Petition Date.

158.    The payments were made while the Debtor was insolvent.

159.    The payments allowed Defendants to receive more than they would have received if the case were a case under Chapter 7 of the Bankruptcy Code, if the payments had not been made, and if Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

160.    The payments constitute preferential transfers of property within the meaning of 11 U.S.C. §547.

**Count XII**
**(Preference Pursuant to 11 U.S.C. §§ 547, 550 and 551 Against FXDD Malta and FXDirect)**

161.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

162.    As described more fully above, Forexware required the Debtor to make payments on account of an antecedent debt allegedly owed by the Debtor to Defendants before such payments were made.

163.    The payments constituted transfer of an interest of the Debtor in property.

164.    The payments were allegedly made to and for the benefit of Defendants.

165.    The payments were made within ninety (90) days before the Petition Date.

166.    The payments were made while the Debtor was insolvent.

167.    The payments allowed Defendants to receive more than they would have received if the case were a case under Chapter 7 of the Bankruptcy Code, if the payments had not been made, and if Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

168.     The payments constitute preferential transfers of property within the meaning of 11 U.S.C. §547(b).

## Count XIII
**(Turnover Pursuant to 11 U.S.C. §542 Against Forexware, FXDirect and FXDD Malta)**

169.     The Debtor repeats each of the foregoing allegations as though fully set forth herein.

170.     Defendants are in possession of assets and funds owned by the Debtor, including but not limited to, the $1,300,000 removed from the Debtor's FXDD Trading Account on February 3, 2015 without cause or explanation.

171.     Under 11 U.S.C. §542 the Debtor is entitled to turnover of property in the possession of Defendants and belonging to the Debtor.

172.     Based on the foregoing, the Debtor is entitled to judgment against Defendants for compensatory damages in an amount not less than $1,300,000, and for such other relief as this Court deems just and proper.

## Count XIV
**(Conversion Against Forexware, FXDirect and FXDD Malta)**

173.     The Debtor repeats each of the foregoing allegations as though fully set forth herein.

174.     On February 3, 2015, Defendants transferred the sum of $1.3 million from the Debtor's FXDD Trading Account to their own account.

175.     The Defendants wrongfully exercised dominion and control over the property of the Debtor taking it for their own behalf.

176.     The Defendants had no right or basis to make this wrongful transfer from the Debtor's account.

177.    The Defendants have no right in law or equity to remove these amounts, and must repay the value of the amount wrongfully obtained in an amount not less than $1,300,000, and for such other relief as this Court deems just and proper.

## Count XV
### (Declaratory Relief - The Forexware Defendants Are A Single Integrated Business, Jointly And Severally Liable To The Debtor)

178.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

179.    At all relevant times, Emil Assentato owned and controlled, directly or indirectly, each of the Forexware Defendants.

180.    From April 2014 through at least May 2016, Emil Assentato was the majority member of Max Q, which was the majority shareholder of both CMH and CMH Malta. CMH was the sole shareholder of FXDirect. CMH Malta was the sole shareholder of FXDD Malta.

181.    In both official and unofficial capacities, Emil Assentato controlled and directed the activities of each of the Forexware Defendants.

182.    Under Emil Assentato's direction, the Forexware Defendants operated in the currency trading business as a single integrated business controlled and managed by Forexware.

183.    CMH, CMH Malta, FXDirect, and FXDD Malta did not have an existence separate and independent from the integrated business controlled and managed by Forexware.

184.    The Forexware Defendants shared and relied upon the same resources, including the same office space and same employees, who performed services for each of the Forexware Defendants.

185.    To the extent that any of the Forexware Defendants are liable to the Debtor as a consequence of the foregoing, all of the Forexware Defendants are collectively liable, jointly and severally, to the Debtor for the extent of any such liability.

186.    Because Defendants dispute that the Forexware Defendants should be considered a single integrated business such that they should be jointly and severally liable to the Debtor, an actual and judicable controversy exists.

187.    Pursuant to 28 U.S.C. § 2201, the Debtor requests a declaration that to the extent that any of the Forexware Defendants are liable to the Debtor, all of the Forexware Defendants are jointly and severally liable to the Debtor for the extent of any such liability.

**COUNT XVI**
**(Declaratory Relief - Nukkleus, Nukkleus Bermuda, and CMH Bermuda Are A Mere Continuation Of Forexware And Are Jointly And Severally Liable For Forexware's Liabilities)**

188.    The Debtor repeats each of the foregoing allegations as though fully set forth herein.

189.    Prior to May 24, 2016, the Forexware Defendants operated as an integrated entity to engage in a foreign currency exchange business.  From July 2014 through February 2015, this integrated business included the BTI Group.

190.    In the spring of 2016, Emil Assentato, as the person in control of each of the Forexware Defendants, orchestrated a series of transactions to transfer the Forexware business to previously dormant or newly formed entities.

191.    In furtherance of this scheme, on May 24, 2016, CMH Bermuda, Nukkleus and Nukkleus Bermuda entered into an Asset Purchase Agreement pursuant to which CMH Bermuda conveyed to Nukkleus Bermuda certain assets as set forth on Schedule 1-1 (Asset Purchase Agreement attached as <u>Exhibit C</u>).  The conveyed assets consisted of substantially all of

Forexware's assets, including but not limited to servers, patents, software programs, technology, and the Forexware brand.

192.    In exchange for the conveyance of Forexware assets to Nukkleus Bermuda, its parent, Nukkleus, conveyed to CMH Bermuda substantially all of Nukkleus's issued and outstanding common stock.  Nukkleus and CMH Bermuda also engaged in additional stock transactions, resulting in CMH Bermuda holding in excess of 90% of Nukkleus's issued and outstanding common stock.

193.    Contemporaneously with the execution of the Asset Purchase Agreement, Nukkleus Bermuda entered into a Global Service Agreement ("GSA") with each of FXDD Malta and FXDirect.

194.    Pursuant to the GSA between Nukkleus Bermuda and FXDD Malta, FXDD Malta agreed to pay $2,000,000 per month to Nukkleus Bermuda in exchange for software and personnel services, including in operational and technical support, marketing, sale support, accounting, monitoring, documentation processing and customer care and support.

195.    Pursuant to the GSA between Nukkleus Bermuda and FXDirect, Nukkleus Bermuda agreed to pay $1,975,000 per month to FXDirect in exchange for the personnel services referenced in the preceding paragraph, which would be provided to FXDD Malta.

196.    Nukkleus Bermuda's payments to FXDirect were subsequently reduced to $1,575,000 per month to reflect a corresponding reduction in the payments from FXDD Malta to Nukkleus Bermuda to $1,600,000 per month.

197.    The Forexware Defendants, including FXDirect and FXDD Malta, as well as Nukkleus, Nukkleus Bermuda, and CMH Bermuda are all owned and controlled, directly or indirectly, by Emil Assentato.

198.    Following the transactions described in this Count, the Forexware Defendants, Nukkleus, Nukkleus Bermuda, and CMH Bermuda were operated as a single business enterprise with no separate existence outside of their collective business relationship.

199.    The Forexware Defendants, Nukkleus, Nukkleus Bermuda, and CMH Bermuda shared and relied upon the same resources, including the same office space and same employees, who performed services for each of the Defendants.

200.    Nukkleus, Nukkleus Bermuda, and CMH Bermuda use the offices of Forexware and FXDirect at 525 Washington Boulevard, Jersey City, New Jersey 07310 free of rent obligations.

201.    Nukkleus, Nukkleus Bermuda, and CMH Bermuda are a continuation of the business of Forexware and are successors-in-interest to Forexware.

202.    To the extent that any of the Forexware Defendants are liable to the Debtor as a consequence of the foregoing, Nukkleus, Nukkleus Bermuda, and CMH Bermuda are collectively liable, jointly and severally, to the Debtor for the extent of any such liability.

203.    Because Defendants dispute that Nukkleus, Nukkleus Bermuda, and CMH Bermuda should be considered a continuation of Forexware's business such that they should be jointly and severally liable to the Debtor, an actual and judicable controversy exists.

204.    Pursuant to 28 U.S.C. § 2201, the Debtor requests a declaration that to the extent that any of the Forexware Defendants are liable to the Debtor, all of Nukkleus, Nukkleus Bermuda, and CMH Bermuda are jointly and severally liable to the Debtor for the extent of any such liability.

**WHEREFORE,** Debtor BT Prime Ltd. prays that the Court enter judgment as follows:

1.   On Count I, for the Debtor, declaring that the Debtor and Forexware were engaged in a joint venture in conducting the Debtor's business and Forexware is jointly liable for all of the Debtor's debts and liabilities.

2.   On Count II, for the Debtor, declaring that Forexware, by virtue of its obtaining the assets of BTI, which controlled Debtor, and by controlling the operation, management and assets of the Debtor, is liable for all of the Debtor's debts and liabilities.

3.   On Count III, for the Debtor, in an amount equal to the total damages suffered by the Debtor as a result of Forexware's breach of its fiduciary duty owed to the Debtor, plus interest and costs;

4.   On Count IV, for the Debtor, in an amount equal to the total damages suffered by the Debtor and its creditors as a result of Forexware' breach of the License Agreement, in a total amount to be determined at trial, but not less than $2.7 million plus interest and costs;

5.   On Count V, for the Debtor, avoiding the constructive fraudulent transfers to Forexware, pursuant to 11 U.S.C. §548, 550 and 551, and directing Forexware to pay a sum in a total amount to be determined at trial, plus interest from the date of this Complaint;

6.   On Count VI, for the Debtor, avoiding the actual fraudulent transfers to Forexware, pursuant to 11 U.S.C. §548, 550 and 551, and directing Forexware to pay a sum in a total amount to be determined at trial, plus interest from the date of this Complaint;

7.   On Count VII, for the Debtor, avoiding the constructive fraudulent transfers to FXDD and FXDirect, pursuant to 11 U.S.C. §548, 550 and 551, and directing FXDD and FXDirect to pay a sum in a total amount to be determined at trial, plus interest from the date of this Complaint;

8.   On Count VIII, for the Debtor, avoiding the actual fraudulent transfers to FXDD and FXDirect, pursuant to 11 U.S.C. §548, 550 and 551, and directing FXDD and FXDirect to pay a sum in a total amount to be determined at trial, plus interest from the date of this Complaint;

9.   On Count IX, for the Debtor, avoiding the payments to Forexware as preferential transfers made to an insider within one year of the Petition Date pursuant to 11 U.S.C. §547(b), and directing Forexware to pay a total amount to be determined at trial, plus interest and costs;

10. On Count X, for the Debtor, avoiding the payments to Forexware as preferential transfers made within ninety (90) days of the Petition Date pursuant to 11 U.S.C. §548, 550 and 551, and directing Forexware to pay a total amount to be determined at trial, plus interest from the date of this Complaint;

11. On Count XI, for the Debtor, avoiding the payments to FXDD and FXDirect as preferential transfers made to an insider within one year of the Petition Date pursuant to 11 U.S.C. §547(b), and directing FXDD and FXDirect to pay a total amount to be determined at trial, plus interest and costs;

12. On Count XII, for the Debtor, avoiding the payments to FXDD and FXDirect as preferential transfers made within ninety (90) days of the Petition Date pursuant to 11 U.S.C. §548, 550 and 551, and directing FXDD and FXDirect to pay a total amount to be determined at trial, plus interest from the date of this Complaint;

13. On Count XIII, for the Debtor, ordering turnover of property belonging to the Debtor pursuant to 11 U.S.C. §542, plus costs;

14. On Count XIV, for the Debtor, ordering repayment of property wrongfully converted from the Debtor, plus costs;

15. On Count XV, for the Debtor, declaring that to the extent that any of the Forexware Defendants are liable to the Debtor, all of the Forexware Defendants are jointly and severally liable to the Debtor for the extent of any such liability.

16. On Count XVI, for the Debtor, declaring that to the extent that any of the Forexware Defendants are liable to the Debtor, all of Nukkleus, Nukkleus Bermuda, and CMH Bermuda are jointly and severally liable to the Debtor for the extent of any such liability.

17. For such other relief as this Court deems just and proper.

Dated:  April 16, 2020                             BT PRIME LTD.

                                                            By its attorneys,


                                                             /s/ Charles R. Bennett, Jr.
                                                            Harold B. Murphy (BBO #631941)
                                                            Charles R. Bennett, Jr. (BBO #037380)
                                                            Shawn Lu (BBO #679755)
                                                            Murphy & King, Professional Corporation
                                                            One Beacon Street
                                                            Boston, MA  02108
                                                            (617) 423-0400
                                                            HMurphy@murphyking.com
                                                            CBennett@murphyking.com
                                                            SLu@murphyking.com
*770207*