# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

In re:

BT PRIME LTD.,

      Debtor.

_____

**Chapter 11**

**Case No. 15-10745-FJB**

BT PRIME LTD.

      Plaintiff,

v.

BOSTON TECHNOLOGIES POWERED BY
FOREXWARE LLC f/k/a FOREXWARE LLC,
CURRENCY MOUNTAIN HOLDINGS LIMITED
f/k/a FOREXWARE MALTA HOLDINGS LTD.,
FXDIRECTDEALER, LLC, FXDD MALTA LTD.,
CURRENCY MOUNTAIN HOLDINGS LLC,
NUKKLEUS, INC., NUKKLEUS BERMUDA
LIMITED, and CURRENCY MOUNTAIN
HOLDINGS BERMUDA, LTD.

      Defendants.

_____/

**Adversary Proceeding
No. 16-1178**

## MOTION AND INCORPORATE MEMORANDUM OF LAW OF DEFENDANTS CURRENCY MOUNTAIN HOLDINGS LIMITED, FXDD MALTA LTD, CURRENCY MOUNTAIN HOLDINGS, LLC, NUKKLEUS, INC., NUKKLEUS BERMUDA LIMITED, AND CURRENCY MOUNTAIN HOLDINGS BERMUDA, LTD FOR PARTIAL SUMMARY JUDGEMENT PURSUANT TO FED. R. CIV. P. 56

Stefan Savic (BBO No. 688338)
**SHIPKEVICH PLLC**
165 Broadway, STE 2300
New York, New York 10006
Telephone:    (212) 252-3003
Facsimile:    (888) 568-5815
ssavic@shipkevich.com
*Attorneys for the Movants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 2

STANDARD.................................................................................................................................. 5

ARGUMENT ................................................................................................................................. 5

    I.    THE COURT SHOULD ENTER A JUDGMENT IN FAVOR OF NUKKLEUS US,
           NUKKLEUS BERMUDA, AND CMH BERMUDA AS TO COUNT XVI AS THE
           CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS AND BECAUSE
           THE UNDISUTED FACTS SHOW THAT THESE PARTIES WERE NOT A MERE
           CONTINUATION OF FOREXWARE. ....................................................................... 5

           A. Count XVI is Barred by the Three-Year Statute of Limitations Applicable to
              Successor Liabilities Claims. ............................................................................ 5

           B. Nukkleus US, Nukkleus Bermuda, and CMH Bermuda are Not the Successors
              in Interest of Forexware Because Forexware Continued Operations After the
              Asset Purchase Agreement................................................................................ 9

    II.   THE COURT SHOULD ENTER A JUDGMENT IN FAVOR OF FXDD MALTA
           AS TO COUNTS VII FOR CONSTRUCTIVE FRAUDULENT TRANSFER, AND
           XI AND XII FOR PREFERENCE AS EACH OF THOSE CLAIMS ARE BARRED
           BY THE SWAP PARTICIPANT SAFE HARBOR IN 11 U.S.C. §§ 546(g) AND
           548(d)(2). .................................................................................................................. 11

   III.  THE COURT SHOULD ENTER A JUDGMENT IN FAVOR OF FXDD MALTA
           AS TO COUNT XIII FOR TURNOVER AS FXDD MALTA DID NOT OWE A
           DEBT TO BT PRIME AT THE TIME THE FUNDS WERE TRANSFERRED AND
           BT PRIME SEEKS A TURNOVER OF FUNDS THAT NEVER BELONGED TO
           BT PRIME. ................................................................................................................ 25

CONCLUSION............................................................................................................................. 27

CERTIFICATION PURSUANT TO LOCAL BANKRUPTCY RULE 9013-1(b) ..................... 27

# **TABLE OF AUTHORITIES**

## **Cases**

*Bushkin Assocs., Inc. v. Raytheon Co.*,
   393 Mass. 622 (1985) ................................................................................................ 6

*Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A.*,
   390 B.R. 595 (Bankr. N.D. Ill. 2008) ..................................................................... 15

*Chandler v. Ciccoricco*,
   No. Civ.A. 19842-NC., 2003 WL 21040185 (Del. Ch. May 5, 2003) ...................... 7

*Cohen v. Hathaway*,
   595 F. Supp. 579 (D. Mass. 1984) ........................................................................... 7

*Cowell v. Hale*,
   289 B.R. 788 (1st Cir. BAP 2003) ........................................................................... 5

*Enron Corp. v. Credit Suisse First Boston Int'l*,
   328 B.R. 58 (Bankr. S.D.N.Y. 2005) ..................................................................... 14

*Enron Corp. v. Lehman Bros. Fin. S.A.*,
   No. 01-B-16034 (AJG), 2005 WL 3873896 (Bankr. S.D.N.Y. Jul. 29, 2005) ........ 12

*Farm Family Cas. Co. v. Cumberland Ins. Co.*,
   No. K11C-07-006 JTV, 2013 WL 5488656 (Del. Super. Ct. Oct. 2, 2013) ............. 8

*Genentech, Inc. v. Arendal Mgmt., Inc.*,
   92 Mass. App. Ct. 1108 (Mass. App. Ct. 2017) ..................................................... 10

*Gilbert v. City of Cambridge*,
   932 F.2d 51 (1st Cir.) ............................................................................................... 6

*Goldsmith v. Marsh USA, Inc.*,
   604 B.R. 600 (Bankr. D. Mass. 2019) ...................................................................... 6

*Guzman v. MRM/Elgin*,
   409 Mass. 563 (1991) .......................................................................................... 9, 10

*Harrison v. NetCentric Corp.*,
   433 Mass. 465 (2001) ............................................................................................... 7

*Hoffman v. Optima Systems, Inc.*,
   683 F. Supp. 865 (D. Mass. 1988) ........................................................................... 7

iii

*Huton v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distrib., LLC)*,
    556 F.3d 247 (4th Cir. 2009) .......................................................................................... 13, 17

*In re Asbestos Litigation*,
    517 A.2d 697 (Del. Super. Ct. 1986) ..................................................................................... 10

*In re Barfield*,
    261 B.R. 793 (Bankr. M.D. Fla. 2001) .................................................................................. 26

*In re Sapient Corporation Derivative Litigation*,
    555 F. Supp. 2d 259 (D. Mass. 2008) ...................................................................................... 7

*In re USA Cafes, L.P. Litig.*,
    600 A.2d 43 (Del. Ch. 1991) .................................................................................................... 7

*Interbulk, Ltd. v. Louis Dreyfus Corp.*,
    240 B.R. 195 (Bankr. S.D.N.Y. 1999) ....................................................................... 12, 15, 19

*Labrador v. Indus. Contractors' Supplies, Inc.*,
    No. CV 13-13029-MLW, 2015 WL 5737141 (D. Mass. Sept. 30, 2015).................................. 8

*Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*,
    No. CIV.A. S11C-04013ESB, 2011 WL 4826106, (Del. Super. Ct. Sept. 19, 2011).............. 10

*McCarthy v. Litton Industries, Inc.*,
    410 Mass. 15 (1991).......................................................................................................... 9, 10

*Meadows at Mainstone Farm Condo. Tr. v. Strathmore Ins. Co.*,
    No. CV 16-12546-MBB, 2018 WL 4696745 (D. Mass. Sept. 28, 2018)................................. 5

*Mesnick v. Gen. Elec. Co.*,
    950 F.2d 816 (1st Cir. 1991) .................................................................................................... 5

*Milliken & Co. v. Duro Textiles, LLC*,
    451 Mass. 547 (Mass. 2008) .................................................................................................. 10

*Nahass v. Harrison*,
    207 F. Supp. 3d 96 (D. Mass. 2016) ........................................................................................ 7

*Peterson v. Enhanced Investing Corp. (Cayman) Ltd.*,
    467 B.R. 643 (Bankr. N.D. Ill. 2012).................................................................................... 15

*Rohn Industries, Inc. v. Platinum Equity LLC*,
    887 A.2d 983 (Del. Super. Ct. 2005) ........................................................................................ 9

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*,
    505 B.R. 135 (S.D.N.Y. 2013)................................................................................................ 12

*Secure Leverage Grp., Inc. v. Bodenstein*,
  510 B.R. 190 (Bankr. N.D. Ill. 2014)........................................................................................ 14

*Sher v. JP Morgan Chase Funding, Inc.*,
  518 B.R. 329 (Bankr. D. Md. 2014)......................................................................................... 13

*Stone v. Williams*,
  970 F.2d 1043 (2d Cir. 1992)..................................................................................................... 5

*Xpress Mgmt. v. Hot Wings Int'l*,
  No. CIV.A. 2856-VCL, 2007 WL 1660741 (Del. Ch. May 30, 2007) ...................................... 7

### Statutes

11 U.S.C. § 101 ................................................................................................................... 14, 15

11 U.S.C. § 541 ......................................................................................................................... 25

11 U.S.C. § 542 ......................................................................................................................... 25

11 U.S.C. § 145 ........................................................................................................................... 6

11 U.S.C. § 546.................................................................................................... iii, 1, 11, 15, 17

11 U.S.C. § 547 ......................................................................................................................... 11

11 U.S.C. § 548 ................................................................................................... 1, 11, 16, 17

Del. Code. tit. 10, § 8106 ........................................................................................................... 8

### Other Authorities

124 Cong Rec. H 11,097 (daily ed. Sept. 28, 1978) ................................................................ 16

13 AM. BANKR. INST. L. REV. 641 (2005) ............................................................................. 16

5 Collier on Bankruptcy § 546.08 ............................................................................................. 13

5 Collier on Bankruptcy, at § 548.09 ........................................................................................ 16

H.R. REP. No. 101-484 (1990) ........................................................................................... 14, 19

H.R. REP. No. 101-484, P.L. 311 (1990) ................................................................................. 12

H.R. REP. No. 109–31 (2005) ................................................................................................... 13

Restatement (Second) of Conflict of Laws § 6 ........................................................................... 6

**Rules**

Fed. R. Civ. P. 15 ................................................................................................................... 8

Fed. R. Civ. P. 56 ............................................................................................................... 1, 5

Local Rule of the United States District Court for the District of Massachusetts Rule 56.1 .......... 1

United States Bankruptcy Court District of Massachusetts Rule 7056-1 ...................................... 1

Defendants Currency Mountain Holdings Limited, FXDD Malta, Ltd. ("FXDD Malta"),

Nukkleus, Inc. ("Nukkleus US"), Nukkleus Bermuda Limited ("Nukkleus Bermuda"), and

Currency Mountain Holdings Bermuda, Ltd ("CMH Bermuda") (collectively, the "Moving

Defendants") herein submit this motion for summary judgment and incorporated memorandum of

law (hereafter, the "Motion") as to Counts VII for a constructive fraudulent conveyance, XI and

XII for preference, XIII for turnover, and XVI for successor liability of the Amended Complaint

(Dkt. No. 164) filed by the Debtor BT Prime Ltd. ("BT Prime") pursuant to Federal Rule of Civil

Procedure (the "Rules") 56 and Local Rule of the United States District Court for the District of

Massachusetts Rule 56.1 made applicable to this case by Local Bankruptcy Rules of the United

States Bankruptcy Court District of Massachusetts Rule 7056-1.

## PRELIMINARY STATEMENT

The Court should enter a judgment in favor of Nukkleus US, Nukkleus Bermuda, and CMH

Bermuda as Count XVI, the only claim against them, is barred by the three-year statute of

limitations that expired nearly a year before BT Prime moved to amend its complaint. Moreover,

undisputed facts show that these defendants were not successors in interest—based on a mere

continuation theory—of Forexware as alleged in Count XVI as Forexware continues to operate to

date.

FXDD Malta is also entitled to summary judgment as to counts VII, XI, and XII, as these

claims are barred by the swap participant safe harbor provided in 11 U.S.C. § 546(g) and 548(d)(2).

All of the transfers that BT Prime seeks to have returned as constructive fraudulent conveyances

and preference payments were completed prior to BT Prime's bankruptcy petition. All of the

transfers were also subject to a swap agreement, as that term is defined in the Bankruptcy Code,

between BT Prime and FXDD Malta, making both BT Prime and FXDD Malta swap participants

and warranting judgment barring BT Prime from seeking the return of those transfers.

The Court should issue a judgment in favor of FXDD Malta as to Count XIII for turnover of the $1.3 million that BT Prime seeks as those funds were returned to Boston Prime after Boston Prime made a $3 million transfer to BT Prime days earlier and BT Prime anyway seeks a turnover of funds that never belonged to BT Prime as the funds in question were customer funds.

## STATEMENT OF FACTS[1]

### *BT Prime's History with Forexware and FXDD Malta*

On July 11, 2014, the Debtor BT Prime entered into an Amended Asset Purchase Agreement with Defendant Forexware and Currency Mountain Holdings Limited that was to occur in two closings. (SOF, ¶¶ 1–2.) The second closing never happened. (SOF, ¶¶ 4–8.) Shortly before the execution of the Amended Asset Purchase Agreement—and as part of the reason BT Prime was interested in the Amended Asset Purchase Agreement— George Popescu ("Popescu"), a director of BT Prime, as well as Boston Prime Limited and 7 Hills Capital Limited (SOF, ¶¶ 1, 71–72), decided that since its liquidity provider, Rabobank, was withdrawing from the industry, FXDD Malta would be a good replacement. (SOF, ¶¶ 9–12.) As part of BT Prime's transition from Rabobank to FXDD Malta, BT Prime executed a Customer Agreement, Risk Disclosure And Trading Rules & Regulations Documents with FXDD Malta (the "Customer Agreement") that described the relationship between the parties, including the margin requirements on the account. (SOF, ¶¶ 9, 36–42.)

---

[1] All factual citations are derived from the Moving Defendants' Statement of Undisputed Facts pursuant to the Local Rule of the United States District Court for the District of Massachusetts Rule 56.1 ("SOF").

*Rabobank Transfer*

On September 11, 2014, Popescu authorized the transfer of $5,063,259.93 from BT Prime's account with Rabobank to BT Prime's TD bank account. (SOF, ¶ 85.) This transfer was necessary because in and around May of 2014, Rabobank informed BT Prime that it would soon cease providing BT Prime with liquidity and that BT Prime would need to find a new liquidity provider by August 2014. (SOF, ¶ 86.) Indeed, according to Popescu, one of the reasons that Forexware was the "front runner of potential suitors" prior to the transaction was because of "its affiliation with a broker [FXDD Malta] who would allow BT Prime and Boston Prime to continue to trade" after Rabobank ceased providing BT Prime with liquidity services (SOF, ¶ 87.) According to BT Prime, after it received the $5,063,259.93 in its TD bank account, it then transferred those funds to BT Prime's ECP account at FXDD Malta to fund that account. (SOF, ¶ 88.)

*The SNB Event and BT Prime's Margin Payments*

On January 15, 2015, the Swiss government unpegged the Swiss Franc from the Euro (the "SNB Event"), resulting in a volatile forex market. (SOF, ¶ 56.) As a result of the SNB Event, BT Prime's account with FXDD Malta went negative, which resulted in BT Prime needing to make margin payments to FXDD Malta in order to bring the account at least back to even. (SOF, ¶¶ 57–60.) As of January 19, 2015, BT Prime owed FXDD Malta between $9 and $10 million. (SOF, ¶ 75.) It took BT Prime four days after the SNB Event, until January 20, 2015, to begin making its margin payments to FXDD Malta. (SOF, ¶¶ 65–69.) Starting January 20, 2015, until January 22, 2015, BT Prime sent FXDD Malta five margin payments: (1) on January 20, 2015, $2,499,980.00; (2) on January 20, 2015, 125,000,000 Japanese Yen, which equated to approximately $1,063,829.79; (3) on January 20, 2015, 1,500,000.00 Euros, which equated to approximately $1,742,550.00; (4) on January 20, 2015, $300,000.00; and (5) on January 22, 2015, $3 million.

3

(SOF, ¶¶ 68–83.) Following the fifth transfer—which was a transfer from the ECP account with FXDD Malta of Boston Prime Limited ("Boston Prime"), a sister company to BT Prime described in more detail *infra*, to BT Prime's ECP account with FXDD Malta—it was determined that Boston Prime had sent BT Prime an excess of $1.3 million and on February 3, 2015, BT Prime returned $1.3 million to Boston Prime's ECP account. (SOF, ¶ 89.) In addition to the margin payments that occurred after the SNB Event, BT Prime previously made a margin payment to FXDD Malta on December 5, 2014, in the amount of $2,000,000.00. (SOF, ¶¶ 43–55.)

Many of the transfers to BT Prime's ECP account with FXDD Malta originated from Boston Prime and utilized a company called 7 Hills Capital Limited ("7 Hills") as an intermediary. (SOF, ¶ 71.) Popescu was a director of 7 Hills, BT Prime, and Boston Prime. (SOF, ¶¶ 1, 71–72.) Boston Prime treated 7 Hills as a liquidity provider under United Kingdom law whereas BT Prime treated 7 Hills as a client; the purpose of 7 Hills was only to transfer funds from Boston Prime—a regulated entity in the United Kingdom—to BT Prime, while avoiding various regulatory rules in the United Kingdom. (SOF, ¶ 71.) As a result of Popescu's involvement with Boston Prime, in 2017 Popescu was banned from acting as a director of any United Kingdom company for a period of 12 years. (SOF, ¶ 72.)

*The Nukkleus Asset Purchase Agreement*

After all of the events underlying BT Prime's petition for bankruptcy, on May 24, 2016, Nukkleus US—a Delaware company—entered in an Asset Purchase Agreement (the "APA") to purchase certain of Forexware's—also a Delaware company—assets. (SOF, ¶¶ 18, 27.) BT Prime was not associated with the APA in any way. (SOF, ¶ 19.) Forexware is also not a party to the APA. (SOF, ¶ 24.) On May 31, 2016, the APA was publicly filed with the Securities and Exchange Commission as Nukkleus US is a publicly traded company and is required to make certain

disclosures. (SOF, ¶¶ 20–21.) Following the APA, Forexware continued to operate with the majority of its assets that remained after the APA. (SOF, ¶¶ 27.)

## STANDARD

Summary judgment is warranted when "there is no genuine dispute as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Creating a genuine issue of material fact requires hard proof rather than spongy rhetoric." C*owell v. Hale (In re Hale)*, 289 B.R. 788, 791 (1st Cir. BAP 2003) (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)). To defeat a motion for summary judgment, the evidence presented must be sufficient to allow a reasonable factfinder to resolve an issue in favor of the nonmoving party. *See Id.* at 792.

## ARGUMENT

**I.    THE COURT SHOULD ENTER A JUDGMENT IN FAVOR OF NUKKLEUS US, NUKKLEUS BERMUDA, AND CMH BERMUDA AS TO COUNT XVI AS THE CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS AND BECAUSE THE UNDISUTED FACTS SHOW THAT THESE PARTIES WERE NOT A MERE CONTINUATION OF FOREXWARE.**

**A.  Count XVI is Barred by the Three-Year Statute of Limitations Applicable to Successor Liabilities Claims.**

The Court should enter a judgment in favor of Nukkleus US, Nukkleus Bermuda, and CMH Bermuda because Count XVI for successor liability, framed as a declaratory judgment claim, is barred by the three-year statute of limitations. Where there is a cause of action for a declaratory judgment, "it is barred only if relief on a direct claim based on such rights would also be barred." *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992), *cert. denied*, 508 U.S. 906 (1993) (quoted in *Meadows at Mainstone Farm Condo. Tr. v. Strathmore Ins. Co*., No. CV 16-12546-MBB, 2018 WL 4696745, at *13 (D. Mass. Sept. 28, 2018)) (granting summary judgment dismissing declaratory judgment claim as barred by statute of limitations applicable to breach of contract

5

claim arising from same facts). This is to "prevent plaintiffs from making a mockery of the statute of limitations by the simple expedient of creative labeling—styling an action as one for a declaratory judgment rather than for damages." *Gilbert v. City of Cambridge*, 932 F.2d 51, 57-58 (1st Cir.), *cert. denied*, 502 U.S. 866 (1991) (internal quotation marks omitted) (holding that "if a claim for declaratory relief could have been resolved through another form of action which has a specific limitations period, the specific limitations period of time will govern").

Pursuant to the Massachusetts "functional choice-of-law approach," courts determine the applicable law for causes of action based upon "the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985). Massachusetts courts analyze the issue of governing law by considering the factors set forth in sections 6 and 145 of the Restatement (Second) of Conflict of Laws. *Goldsmith v. Marsh USA, Inc. (In re GlassHouse Tech., Inc.)*, 604 B.R. 600, 614 (Bankr. D. Mass. 2019) (citation omitted). Section 6(2) provides that in the absence of a statutory directive,

> the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6. These factors are neither exclusive nor listed in order of importance. *See id*. at cmt. c. Moreover, § 145 provides that:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence,

nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id*. at § 145.

Delaware has a strong interest in seeing that companies and corporations formed under its laws have disputes resolved in a predictable manner. *Xpress Mgmt. v. Hot Wings Int'l*, No. CIV.A. 2856-VCL, 2007 WL 1660741, at *5 (Del. Ch. May 30, 2007) ("It is an indisputable proposition that this State has a strong, and often paramount, interest in seeing such disputes resolved in a rapid, orderly, and predictable manner."); *Chandler v. Ciccoricco*, No. Civ.A. 19842-NC., 2003 WL 21040185, at *12 (Del. Ch. May 5, 2003) ("Delaware has a strong interest in resolving disputes involving the ownership of shares in, and the governance of, corporations formed under its laws."); *In re USA Cafes, L.P. Litig.*, 600 A.2d 43, 51 (Del. Ch. 1991) ("[Delaware] . . . has a strong interest in the effective administration of the law governing corporations and limited partnerships organized under its laws.").

Moreover, Delaware law should apply to disputes where a contract that was primarily negotiated by Delaware entities is at issue. *Cohen v. Hathaway*, 595 F. Supp. 579, 582 (D. Mass. 1984) ("contract was primarily negotiated and performed in Delaware"). Similarly, "Massachusetts law requires that a court look to the law of the state of incorporation to determine the corporation's liability . . . ." *Hoffman v. Optima Systems, Inc.*, 683 F. Supp. 865, 872 (D. Mass. 1988). The Massachusetts Supreme Judicial Court has also previously determined that "pursuant to the Massachusetts 'internal affairs' doctrine, the law of the state of incorporation applies to disputes over the internal workings of a corporation." *Nahass v. Harrison*, 207 F. Supp. 3d 96, 102 (D. Mass. 2016) (citing *Harrison v. NetCentric Corp.*, 433 Mass. 465, 470–72 (2001); *In re Sapient Corporation Derivative Litigation*, 555 F. Supp. 2d 259, 262 (D. Mass. 2008) ("Here, Delaware

law applies because Sapient is a Delaware corporation.").

Nukkleus US is a Delaware corporation and Forexware US is a Delaware limited liability company. (SOF, ¶¶ 13–14.) The Asset Purchase Agreement that is the subject of Count XVI for successor liability concerns a purchase of Forexware's—a Delaware corporation—assets by Nukkleus US—also a Delaware corporation—with two other companies being involved only through subsidiary-parent relationships. (SOF, ¶ 13, 14, 22.) BT Prime had nothing to do with the APA. (*See generally*, SOF, ¶ 19.)

Under Delaware law, the statute of limitations for a successor liability claim is three-years. *See* Del. Code. Ann. tit. 10, § 8106; *see, e.g., Farm Family Cas. Co. v. Cumberland Ins. Co.*, No. K11C-07-006 JTV, 2013 WL 5488656, at *4 (Del. Super. Ct. Oct. 2, 2013).

The APA was entered into on May 24, 2016. (SOF, ¶ 18.) Therefore, any cause of action based on the APA had to be filed on or before May 24, 2019. *See* Del. Code. Ann. tit. 10, § 8106; *Farm Family*, No. K11C-07-006 JTV, 2013 WL 5488656, at *4.

The successor liability cause of action cannot relate back to the filing of the original Complaint as it has nothing to do with the original allegations or BT Prime. Pursuant to Fed. R. Civ. P. 15(c)(1)(A), "[a]n amendment to a pleading relates back to the date of the original pleading when: (A) the law that provides the applicable statute of limitations allows relation back." Delaware Superior Court Rule 15(c)(2) permits relation back where "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Even under Massachusetts relation back law, a plaintiff's amendment may relate back as to new defendants if the plaintiff originally intended to bring the action against the new defendants. *Labrador v. Indus. Contractors' Supplies, Inc.*, No. CV 13-13029-MLW, 2015 WL 5737141, at *4 (D. Mass. Sept. 30, 2015).

Here, the successor liability claim has nothing to do with the allegations in the original Complaint. Count XVI asserts an entirely new cause of action against Nukkleus US, Nukkleus Bermuda, and CMH Bermuda that were never mentioned in the Complaint, entities that had no dealings or interactions with BT Prime or its creditors at any time, and that are alleged to have engaged in a series of transactions with Forexware that are not the subject of any of the causes of action set forth in the Complaint. (SOF, ¶ 32.) BT Prime cannot point to any evidence that the successor liability cause of action has anything to do with the allegations in the Complaint.

The Court should issue a judgment in favor of Nukkleus US, Nukkleus Bermuda, and CMH Bermuda as BT Prime's successor liability cause of action is barred by the three-year statute of limitations and does not relate back to the initial filing of the Complaint.

**B. Nukkleus US, Nukkleus Bermuda, and CMH Bermuda are Not the Successors in Interest of Forexware Because Forexware Continued Operations After the Asset Purchase Agreement.**

Nukkleus US, Nukkleus Bermuda, and CMH Bermuda cannot be the successors in interest to Forexware because it is undisputed that Forexware continued to operate after the Asset Purchase Agreement. "It is a settled rule of corporate law that, when one company purchases the assets of another, the purchaser does not thereby acquire the debts and liabilities of the seller." *McCarthy v. Litton Industries, Inc.*, 410 Mass. 15, 21 (1991) (citing *Guzman v. MRM/Elgin*, 409 Mass. 563 (1991)); *Rohn Industries, Inc. v. Platinum Equity LLC*, 887 A.2d 983, 996 (Del. Super. Ct. 2005) *aff'd in part, rev'd in part on other grounds*, 911 A.2d 379 (Del. 2006), (internal quotation marks omitted) ("It is a well-settled rule of corporate law that where one company sells or transfers all of its assets to another, the second entity does not become liable for the debts and liabilities, including torts, of the transferor."). There are four exception to this rule, one of which is where "the purchasing corporation is 'merely a continuation' of the selling corporation." *McCarthy*, 410 Mass. at 21 (citing *Guzman*, 409 Mass. at 566); *Rohn Industries*, 887 A.2d at 996 (identifying same four

exceptions to general rule). BT Prime's Count XVI is based on the "mere continuation" exception. (SOF, ¶ 23.)

The elements of a successor liability claim under a "mere continuation" theory are (1) a common identity of officers, directors, and stockholders of the predecessor and new corporations, and (2) the existence of only one corporation following a transfer. *See, e.g.*, *Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*, No. CIV.A. S11C-04013ESB, 2011 WL 4826106, at *3 (Del. Super. Ct. Sept. 19, 2011) ("Both Meridian and Artesian continued to exist as separate legal entities after the closing on the sale of assets."); *Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 557-58 (Mass. 2008) (quoting *McCarthy v. Litton Indus., Inc.*, 410 Mass. 15, 23 (1991) ("[T]he indices of a 'continuation' are, at a minimum: continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets."). It is well-established that a selling corporation's liabilities are not imposed on the purchaser absent, *inter alia*, a finding that the purchaser is a mere continuation of the seller. *Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 556 (Mass. 2008) (quoting *Guzman v. MRM/Elgin*, 409 Mass. 563, 566 (1991)); *Rohn Industries*, 887 A.2d at 996 (same under Delaware law). Where a corporation, "ceases all of its ordinary business operations, which are assumed by another corporation, and liquidates its assets," successor liability will be imposed. *Milliken & Co.*, 451 Mass. at 558. However, where one corporation transfers only a portion of its operations to a second corporation, the second corporation is not a mere continuation "because the original corporation survived the sale of a portion of its assets and continued to" do business. *Id*. at 558–59; *see also Genentech, Inc. v. Arendal Mgmt., Inc.*, 92 Mass. App. Ct. 1108 (Mass. App. Ct. 2017) (affirming trial court's decision not to impose successor liability despite alleged predecessor company closing down and evidence of asset transfers of software from alleged predecessor company because alleged

successor company "did not carry on the operations" of predecessor); *In re Asbestos Litigation*, 517 A.2d 697, 700 (Del. Super. Ct. 1986) (finding corporation not a mere continuation where it purchased "the land, buildings, fixtures, machinery, equipment, raw materials and supplies, work in progress and finished goods inventories, and various records and files relating to K M's Industrial Products Division. In addition, Nicolet received the patents, trademarks, trade names and the good will related to the trademarks and trade names" because the purchaser did not purchase the whole company).

There are no facts, disputed or otherwise, that would support BT Prime's mere continuation theory as Forexware has continuously operated from its inception until today and did not cease operations after the APA. (SOF, ¶ 27.)  Indeed, most of Forexware's assets were unaffected and remained with Forexware. (SOF, ¶¶ 27). For example, Forexware continued to have and serve customers following the APA (SOF, ¶ 25). It continued to maintain and pay employees following the APA who were providing services to its customers (SOF, ¶ 25). It also continued to own, and still does, license agreements with MetaQuotes Software Corp. that were in effect both before and after the APA was executed and that are required for Forexware employees to provide services to Forexware's customers. (SOF, ¶ 25.) It cannot be disputed that Forexware has continued operations following the APA. The sale of some of its assets as part of the APA does not make Nukkleus US, Nukkleus Bermuda, or CHM Bermuda Forexware's mere continuation.

II.  **THE COURT SHOULD ENTER A JUDGMENT IN FAVOR OF FXDD MALTA AS TO COUNTS VII FOR CONSTRUCTIVE FRAUDULENT TRANSFER, AND XI AND XII FOR PREFERENCE AS EACH OF THOSE CLAIMS ARE BARRED BY THE SWAP PARTICIPANT SAFE HARBOR IN 11 U.S.C. §§ 546(g) AND 548(d)(2).**

The Court should enter a judgment in favor of the Maltese Parties as to Counts VII for constructive fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B), and XI and XII for preference pursuant to 11 U.S.C. § 547 as each of those causes of action are barred by the swap

participant safe harbor provided in 11 U.S.C. § 546(g) ("546(g)").

Section 546(g) of the Bankruptcy Code provides that, notwithstanding Sections 544, 545, 547, 548(a)(1)(B) and 548(b), "the trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title." *See* 11 U.S.C. § 546(g). The legislative history of Section 546(g) demonstrates that the purpose of the section is to ensure that the swap financial market remains stabilized and protected from "uncertainties regarding the treatment of [its] financial instruments under the Bankruptcy Code." *Enron Corp. v. Lehman Bros. Fin. S.A.*, No. 01-B-16034 (AJG), 2005 WL 3873896, at *7 (Bankr. S.D.N.Y. Jul. 29, 2005) (citing H.R. REP. No. 101-484, P.L. 311 (1990)).

Based on the language of the statute, three factors must be considered for a transfer to fall within the safe harbor set forth in Section 546(g): (i) whether the transfer took place pre-petition; (ii) whether the transfer was made by, to, or for the benefit of a "swap participant" or a "financial participant;" and (iii) whether the transfer was made in connection with a "swap agreement."

There is no dispute that the transfers are alleged to have taken place prior to the Petition Date. As such, the remaining question is whether the transfers were made to or for the benefit of a "swap participant" under or in connection with a "swap agreement."

The transfers were made in connection with a "swap agreement." A "swap" is "a bilateral agreement, frequently between a commercial entity involved with commodities or subject to interest rate, currency, or equity price fluctuations and a financial intermediary, whereby cash payments are exchanged periodically (or a lump sum at termination) between the parties based upon changes in the price of the underlying asset or index as determined by an agreed-upon

benchmark." *Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 201 (Bankr. S.D.N.Y. 1999); *see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Madoff)*, 505 B.R. 135, 138 n.1 (S.D.N.Y. 2013) (defining "swap agreement"); *Enron*, 2005 WL 3873896, at *7-8 (discussing definitions of "swap agreement").

With the 2005 amendments to the Bankruptcy Code, Congress substantially expanded the protections it had given to financial derivatives participants and transactions by expanding the definitions of "swap participants" and "swap agreements" exempted from the automatic stay and from trustees' avoidance powers under the Bankruptcy Code. *Huton v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distrib., LLC)*, 556 F.3d 247, 253 (4th Cir. 2009). As the House of Representatives Report attached to the 2005 bill explained:

> As amended, the definition of "swap agreement" will update the statutory definition and achieve contractual netting across economically similar transactions that are the subject of recurring dealings in the swap agreements.
>
> The definition of "swap agreement" originally was intended to provide sufficient flexibility to avoid the need to amend the definition as the nature and uses of swap transactions matured. To that end, the phrase "or any other similar agreement" was included in the definition.

*Id*. (citing H.R. REP. No. 109–31, pt. 1, at 121 (2005)). The definition of a "swap agreement" in the Bankruptcy Code is now "extremely broad, covering several dozen enumerated contracts and transactions, as well as combinations of them, options on them, and similar contracts or transactions." *See* 5 Collier on Bankruptcy § 546.08[2][a]; *see also Sher v. JP Morgan Chase Funding, Inc. (In re TMST, Inc.)*, 518 B.R. 329, 346 (Bankr. D. Md. 2014) (finding that agreements at issue, which required cash payments to be exchanged between parties based upon index calculation, constituted "swap agreements" for purposes of safe harbor provision set forth in Section 546(g)).

Included in the definition of "swap agreement" under the Bankruptcy Code are the

13

following:

- "a spot, same day-tomorrow, tomorrow-next, forward, or other *foreign exchange*, precious metals, or other commodity agreement;"

- "a *currency swap*, option, future or forward agreement,"

- "*any agreement or transaction that is similar to any other agreement or transaction referred to in [the statute]* and that (I) is of a type that has been, is presently, or in the future becomes, the subject of recurrent dealings in the swap or other derivatives markets (including terms and conditions incorporated by reference therein); and (II) is a forward, swap, future, option, or spot transaction on one or more rates, *currencies*, commodities, equity securities, or other equity instruments … ,"* or

- "any security agreement or arrangement or other credit enhancement related to any agreements or transactions referred to" in the provision.

11 U.S.C. § 101(53B) (emphases added); *see also Secure Leverage Grp., Inc. v. Bodenstein (In re Peregrine Fin. Grp., Inc.)*, 510 B.R. 190, 199 (Bankr. N.D. Ill. 2014) (holding foreign currency trades were spot contracts). Legislative history also makes clear that foreign currency exchange arrangements, such as those at issue here, were intended to be treated as "swap agreements" under the statute.  The House Report concerning the enactment of the provision explains that "the bill provides the same exemption from the Bankruptcy Code's automatic stay and trustee avoidance provisions to interest rate and *foreign currency rate swap agreements* that current law provides to other similar types of financial agreements[.]" H.R. REP. No. 101-484 (1990) (emphasis added).

To determine whether a transaction not specifically identified in Section 546(g) qualifies as "any other agreement" under the statute, courts have held that "it is necessary to establish if the swap market generally understands it to be a swap agreement." *Enron Corp. v. Credit Suisse First Boston Int'l*, 328 B.R. 58, 71 (Bankr. S.D.N.Y. 2005) (reasoning that evidence was required showing whether, at time of transactions at issue, equity swaps involving corporation's own stock were understood in market to be swap agreements such that Section 546(g) applied).

Finally, courts have held that a transfer is "in connection with" a swap agreement for

purposes of Section 546(g) if the transfer is "substantially related to" the swap agreement. *Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio Majapara S.A. de C.V.)*, 390 B.R. 595, 599, 600 (Bankr. N.D. Ill. 2008) (holding pre-petition pre-judgment attachments of debtor's bank accounts were "transfers" in connection with swap agreement, and thus could not be avoided, where there was no dispute that foreign exchange spot transactions constituted swap agreement); s*ee also Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Investors Fund, L.P.)*, 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012) (explaining term "in connection with" is "by its own terms very broad" and, in context of avoidance of transfers, has been interpreted to mean "related to an agreement").

Section 546(g) requires that any transfer be made by, to or for the benefit of a "swap participant." *See* 11 U.S.C. § 546(g). A "swap participant" is "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor." 11 U.S.C. § 101(53C). If a court determines that an agreement is a "swap agreement," then the parties to that agreement are necessarily "swap participants" within the meaning of the Bankruptcy Code. *See Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 202 n.6 (Bankr. S.D.N.Y. 1999) (explaining that if freight forwarding agreements were "swap agreements," then both parties thereto would be "swap participants"). Here, the undisputed facts show that the transfers were made by, to, or for the benefit of a "swap participant."

Applying these principles here, it is undisputed that the agreement that BT Prime had with FXDD Malta in respect to its foreign exchange trading—the Customer Agreement with FXDD Malta—was a swap agreement. It is also undisputed that BT Prime and FXDD Malta were necessarily swap participants for purposes of Section 546(g). *See In re Interbulk, Ltd.*, 240 B.R. at 202 n.6 (parties to a swap agreement are necessarily "swap participants"). Thus, to the extent the

15

transfers were made by, to or for the benefit of either, they are shielded from avoidance and cannot be recovered from FXDD Malta.

In addition, Section 548(d)(2) also protects the transfers from being avoided. Section 548(d)(2)(D) of the Bankruptcy Code provides that "a swap participant or financial participant that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer[.]" 11 U.S.C. § 548(d)(2)(D).  For purposes of Section 548, "value" is defined in relevant part as "property, or satisfaction or securing of a present or antecedent debt of the debtor[.]" 11 U.S.C. § 548(d)(2)(A). The impact of these provisions is to insulate swap participants from constructive fraudulent conveyance liability under Section 548(a)(1)(B).  *See* 5 Collier on Bankruptcy, at § 548.09[7]; Edward R. Morrison & Joerg Riegel, Financial Contracts and the New Bankruptcy Code:  Insulating Markets from Bankrupt Debtors and Bankruptcy Judges, 13 AM. BANKR. INST. L. REV. 641, 641 (2005) ("Without these safe harbors, markets might suffer serious shocks—perhaps even a systemic liquidity crisis, causing markets to collapse—when debtors enter bankruptcy."). "The protection consists of a legislative fiat that, in these types of transactions, the nondebtor party gives sufficient value to the extent of any monetary transfer received." 5 Collier on Bankruptcy, at § 548.09[7].

The legislative history relating to Section 548(d)(2) demonstrates that:

> the intent of section 548(d)(2) is to provide that margin payments and settlement payments previously made by a [debtor] to a commodity broker … are nonvoidable transfers by the [debtor's] trustee. … [I]t is the intention of section 548(d)(2) to protect all margin payments in the customer-broker-clearinghouse chain.  This vital protection substantially reduces the likelihood that the bankruptcy of one customer or broker will lead to the bankruptcy of another broker or clearinghouse.

5 Collier on Bankruptcy, at ¶ 548.09[7][a] n.68 (citing 124 Cong Rec. H 11,097 (daily ed. Sept. 28, 1978); S 17,414 (daily ed. Oct. 6, 1978)). Given the overlap in terminology, Section 546(g) and Section 548(d)(2)(D) are often considered together since, for example, the safe harbors set

forth therein will apply if a pre-petition transfer sought to be avoided was a transfer made to a "swap participant" in connection with a "swap agreement." *See* 11 U.S.C. § 548(d)(2)(D) (providing swap participant that receives transfer in connection with swap agreement takes for value to extent of transfer); 11 U.S.C. § 546(g) (providing that trustee generally may not avoid pre-petition transfer made to swap participant under or in connection with swap agreement); *see also Huton v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distrib., LLC)*, 556 F.3d 247, 254 (4th Cir. 2009) (explaining defendants invoked protections of Sections 546(g) and 548(d)(2)(D) in alleging that natural gas agreements were "swap agreements").

In the case at bar, the transfers at issue fall within the scope of Section 546(g) as transfers made to a "swap participant" in connection with a "swap agreement."  As such, by the express terms of Section 548(d)(2)(D), the transfers are "for value" and the Defendants are shielded from any constructive fraudulent conveyance liability under Section 548(a)(1)(B).

Here, BT Prime seeks the return of transfers to BT Prime's trading account at FXDD Malta in the amounts of $2.4 million for funds transferred from Boston Prime UK to [7 Hills] to BT Prime and then to BT Prime's trading account with FXDD Malta (the "$2.4 Million Transfer"), for $3 million transferred directly from Boston Prime to Boston Prime's trading account with FXDD Malta (the "$3 Million Transfer"), and for $1.3 million transferred out of BT Prime's trading account at FXDD Malta. (SOF, ¶ 33 (citing Amended Complaint, ¶¶ 59, 60, 65).) BT Prime further seeks the return of funds based on the one-year and 90-day preference periods, though without specifying which exact funds it is seeking from which defendant. (SOF ¶ 35.) The Amended Complaint identifies four additional transfers: (1) December 5, 2014, for $2,000,000; (2) January 20, 2015, for $1,736,850; (3) January 20, 2015, for $1,050,000; and (4) January 20, 2015, for $300,000. (SOF, ¶ 34.) Each of the transfers occurred before the Bankruptcy Petition

Date of March 2, 2015. (SOF, ¶ 16.)

On August 4, 2014, Popescu, in his role as a director of BT Prime, agreed to a Customer Agreement, Risk Disclosure And Trading Rules & Regulations Documents with FXDD Malta (the "Customer Agreement"). (SOF, ¶ 9.) The Customer Agreement identifies the "terms and conditions that apply to the opening of a margined spot foreign exchange and/or Precious Metals trading account with FXDD [Malta]." (SOF, ¶ 37.) In the Customer Agreement, BT Prime agreed that it "understands that because of the low margin/high leverage normally available in Foreign Currency and Precious Metals trading, price changes in Foreign Currency and Precious Metals Contracts may result in significant losses…[that] may substantially exceed [BT Prime's] investment and margin deposit" and accepted the risk of "loss in excess of [its] margin deposit." (SOF, ¶ 38 (all capitalization removed).) Furthermore, BT Prime agreed that "all initial and subsequent deposits for margin purposes shall be made in U.S. dollars, in such amounts as FXDD [Malta] *may in its sole discretion require*" and that "[a]ll Customer accounts will have margin requirements established by the FXDD dealing desk." (SOF, ¶ 39 (emphasis added), 9.) FXDD Malta, thus, had "sole discretion" as to the amounts and form of margin, BT Prime agreed to "maintain sufficient margin" in its account, and FXDD Malta was permitted to ask for additional margin "at any time Customer's Margin Balance [fell] below the FXDD Maintenance Margin Level as applied to that Account and at any time FXDD, in its sole discretion, believes that it is prudent to do so." (SOF, ¶ 40.) Finally, in the event BT Prime filed for bankruptcy, or a petition for the appointment of a receiver, or any other insolvency proceeding, or BT Prime had insufficient margin—among other things—FXDD Malta was permitted to "satisfy any obligation Customer may have to FXDD, either directly or by way of guaranty of surety, out of any of Customer's funds or property in its custody or control." (SOF, ¶ 41.) It is undisputable that BT Prime and Boston

Prime's accounts with FXDD Malta were margin accounts. (SOF, ¶ 42.)

The Customer Agreement is a "swap agreement" as that term is defined in § 546(g). H.R. REP. No. 101-484 (1990) ("the bill provides the same exemption from the Bankruptcy Code's automatic stay and trustee avoidance provisions to interest rate and *foreign currency rate swap agreements* that current law provides to other similar types of financial agreements") (emphasis added)). Moreover, because the Customer Agreement is a "swap agreement," BT Prime and FXDD Malta are necessarily "swap participants." *See In re Interbulk, Ltd.*, 240 B.R. at 202 n.6 (parties to a swap agreement are necessarily "swap participants").

As a result of the SNB Event, on January 15, 2015, as of 11:48 a.m., BT Prime's trading account had already gone negative. (SOF, ¶ 57.) At 11:48 a.m. on January 15, 2015, Marina Borisova ("Borisova")—the controller for BT Prime—emailed that "Lily just told me that [BT Prime] account went into negative balance today. Let us know if we need to send more funds." (SOF, ¶ 58.) Over six hours later, Michael Oreper ("Oreper ")—a seconded employee per the license agreement[2]—responded that "we show that we need to send about 7 Million USD to get to positive equity in BT [Prime] ECP account" with FXDD Malta. (SOF, ¶ 59.) As a result of BT Prime's trading account with FXDD Malta being negative at least $7 million, FXDD Malta made a margin call on BT Prime, requesting that BT Prime make a payment to bring its account to at least even. (SOF, ¶ 60 (Oreper emailed Popescu that "Forexware is asking that primes send the money to the Forexware account asap").)

As of January 19, 2015, FXDD Malta estimated that BT Prime's liability had increased at that BT Prime owed FXDD Malta between "$9M-$10M." (SOF, ¶ 75.) On January 19, 2015, and

---

[2] Individuals that were previously BT Prime employees were made employees of Forexware but then seconded back to BT Prime. (SOF, ¶ 44.)

in response to FXDD Malta informing BT Prime that it owed between "$9M-$10M," Borisova emailed FXDD Malta what Borisova referred to as the "updated scheduled of the wires." (SOF, ¶ 76.) The "updated schedule of the wires" included three BT Prime wires directly to FXDD Malta. (SOF, ¶ 77.) The first wire from BT Prime to FXDD Malta in the "updated schedule of the wires" from Borisova was a transfer from BT Prime's account at ANZ bank in the amount of 125,000,000 Japanese Yen, which, according to Borisova's math and based on the exchange rate that she had at the time, equated to $1,063,829.79—this is represented in the Amended Complaint as a $1,050,000 transfer.[3] (SOF, ¶ 78.) The second wire from BT Prime to FXDD Malta in the "updated schedule of the wires" from Borisova was a transfer from BT Prime's account at ANZ bank in the amount of 1,500,000.00 Euros, which, according to Borisova's math and based on the exchange rate that she had at the time, equated to $1,742,550.00—this is represented in the Amended Complaint as a $1,736,850 transfer. (SOF, ¶ 79.) The third and final transfer from BT Prime to FXDD Malta in the "updated schedule of the wires" from Borisova was a transfer from BT Prime's account at ANZ bank in the amount of $300,000.00. (SOF, ¶ 80.) On January 20, 2015, Borisova confirmed that "3 wires for total amount in USD $3.1 mln were sent from BTP ANZ account yesterday." (SOF, ¶ 81.)

Prior to the "updated schedule of the wires"—unbeknownst to FXDD Malta at the time—and after substantial back and forth and intentional delay by and between BT Prime's seconded employees Popescu (who was also the director, chief executive officer, and owner of BT Prime), Borisova, Linda Melchione, and Oreper discussed whether they should abide by the Customer Agreement that they signed in August 2014, on January 16, 2015, Popescu ultimately decided that

---

[3] Due to the conversions necessary, the numbers were not exact for transfers that required currency conversions.

BT Prime had to send FXDD Malta margin payments. (SOF, ¶ 61 (Borisova indicating that based on her call with Popescu that day, she would send funds to FXDD Malta and requesting Popescu confirm the same, which he did); SOF, ¶ 62 ("Marina is playing accounting game to delay the wires <ss type="laugh">:D</ss>").) At about the same time as Borisova confirmed her phone call with Popescu, Borisova also emailed FXDD employee Annemarie Caiati ("Caiati") asking if the "bank information [is] the same as before" and included details of an account titled "FXDD – SD Customer Incoming" as the account Borisova would send funds to for the margin payment. (SOF, ¶ 64.) Borisova and Caiati continued the discussions as to payment amounts, currency of payments, and accounts for four days[4] before, on January 20, 2015, Popescu finally permitted the transfers to take place. (SOF, ¶ 65.) On the same day, January 20, 2015, Popescu executed two consent forms authorizing two transfers from Boston Prime to 7 Hills[5] to "settle trading funds with BT Prime" in the amounts of $2.5 million and $1.7 million for a total of $4.2 million. (SOF, ¶ 66.) After Popescu executed the consent forms, Borisova instructed seconded employee Matthew Van Riper ("Riper") to execute the transactions. (SOF, ¶ 67.) The same day, Borisova completed a $2.5 million[6] wire transfer from Boston Prime's client account to BT Prime's account at TD Bank. (SOF, ¶ 68.)

---

[4] This four day delay during the discussions about currency type was intentional and due to Popescu's instruction on January 16, 2015, to Borisova to "[e]xplain that you need to convert from other currencies ... . That we are moving the cash, that we did not expect this and we didn't have the cash readily available. All we need is to buy ourselves 48h, no more." (Margin Payment Discussion, 3 (ellipses in original).) Popescu even bragged to Natallia Hunik—a seconded employee—on January 16, 2015, that he hoped FXDD Malta went bankrupt because, if so, "we will just cancel the closing, and w[e] are back in business as we will have made about 7m profit" before sending to Hunik "if they are bust, we don't do the 2nd closing, move all employees to Boston Prime and we keep going and we count our profits <ss type="smile">:)</ss>" (SOF, ¶ 63 (the "<ss type="smile">:)</ss>" is likely the coding for a "smiley face emoji")).)

[5] BT Prime and Boston Prime used 7 Hills as a conduit to take money from Boston Prime—a regulated UK entity—and send it to wherever the BTI Group decided. This was done through Boston Prime listing 7 Hills as a liquidity provider on its books, making transfers to 7 Hills inauspicious to the UK regulators, and simultaneously listing 7 Hills on BT Prime's books as a customer to allow for the in-flow of funds. (SOF, ¶ 71.)

[6] The total amount was $2,499,980.00 and $2.4 million and $2.5 million were being used interchangeably between the individuals working on the payments.

Despite $4.2 million in funds being sent to FXDD Malta to satisfy the margin call, the "negative margin [was] greater than this number" and FXDD Malta would still be owed money by BT Prime as a result of BT Prime's margin account going so far negative. (SOF, ¶ 70.) On January 22, 2015, FXDD Malta stated that "2.4 done" in connection with the $2,499,980.00 transfer to BT Prime's ECP account with FXDD Malta. (SOF, ¶ 73.)

BT Prime now alleges that it is entitled to $2.4 million of that $4.2 million margin payment to be returned, after Popescu in his role as director authorized that payment. On January 22, 2015, FXDD Malta indicated that it had received a total of $5,578,903.44 from BT Prime, consisting of the four payments: (1) January 20, 2015, for $1,718,550.00; (2) January 21, 2015, for $300,000.00; (3) January 22, 2015, for $1,060,373.42; and (4) January 22, 2015, for $2,499,980.00. (SOF, ¶ 82.)

On January 22, 2015, and following the $2.4 million being applied to BT Prime's margin account, the BT Prime margin account was still negative. (SOF, ¶ 74 ("The BT account has a negative amount and we need to put that wire in but the account is in USD.") Therefore, on January 22, 2015, Boston Prime transferred $3 million from its ECP account with FXDD Malta to BT Prime's ECP account with FXDD Malta. (SOF, ¶ 84.) On February 3, 2015, however, it was determined that the January 22, 2015, $1.3 million of the $3 million ECP transfer from Boston Prime to BT Prime should be returned from BT Prime's ECP account to Boston Prime's ECP account. (SOF, ¶ 89 ("Please transfer $1.3m from Boston Prime ECP to BT Prime ECP. . . . Sorry the direction should be from BT prime to Boston Prime.").) Nevertheless, BT Prime alleges that Defendants FXDD Malta, FXDD, and Forexware are "in possession of assets and funds owned by the Debtor, including but not limited to, the $1,300,000 removed from the Debtor's FXDD Trading Account on February 3, 2015 without cause or explanation." (SOF, ¶ 90.) In the February 3, 2015, $1.3 Million Transfer, BT Prime alleges that either FXDD Malta, FXDD, or Forexware transferred

$1.3 million out of BT Prime's margin account with FXDD Malta and did not account for that transfer. (SOF, ¶ 91.) BT Prime's account with FXDD Malta was a margin account that contained only customer funds. (SOF, ¶ 93.)

BT Prime's account at FXDD Malta, as of February 3, 2015, had been funded, repeatedly, by Boston Prime, through transfers from Boston Prime to 7 Hills to BT Prime to BT Prime's ECP account at FXDD Malta, or through Boston Prime directly sending transfers to BT Prime's ECP account at FXDD Malta. (SOF, ¶ 92 (authorizing $4.2 million to be transferred from Boston Prime to the BT Prime's ECP account with FXDD Malta and authorizing a $3 million transfer from Boston Prime's ECP account at FXDD Malta to BT Prime's ECP account at FXDD Malta).) According to the Amended Complaint, after these transfers from Boston Prime to BT Prime's ECP account with FXDD Malta, either FXDD Malta, Forexware, or FXDD removed $1.3 million from BT Prime's margin account. (SOF, ¶ 93.) But those funds were never BT Prime's funds to begin with as evidenced by Boston Prime transferring the funds into the account, and on February 3, 2015, the funds were actually transferred back to Boston Prime. (SOF, ¶ 94 (authorizing the transfer of $1.3 million from BT Prime's account to Boston Prime's account on February 3, 2015)).

In addition to the transfers above that occurred after the SNB Event, BT Prime also seeks the return of approximately $5 million in funds sent from Rabobank to BT Prime's TD Bank account and then to BT Prime's ECP account with FXDD Malta, and a December 5, 2014, margin payment that occurred prior to the SNB Event.

On September 11, 2014, Popescu authorized the transfer of $5,063,259.93 from BT Prime's account with Rabobank to BT Prime's TD bank account. (SOF, ¶ 85.) This transfer was necessary because in and around May of 2014, Rabobank informed BT Prime that it would soon cease providing BT Prime with liquidity and that BT Prime would need to find a new liquidity provider

by August 2014. (SOF, ¶ 86.) Indeed, according to Popescu, one of the reasons that Forexware was the "front runner of potential suitors" prior to the transaction was because of "its affiliation with a broker [FXDD Malta] who would allow BT Prime and Boston Prime to continue to trade" after Rabobank ceased providing BT Prime with liquidity services (SOF, ¶ 87 According to BT Prime, after it received the $5,063,259.93 in its TD bank account, it then transferred those funds to BT Prime's ECP account at FXDD Malta to fund that account. (SOF, ¶ 88.) This transfer was made in association with the Customer Agreement—a swap agreement—between BT Prime and FXDD Malta—swap participants—prior to the bankruptcy petition and thus is not avoidable.

On November 28, 2014, BT Prime was notified that its ECP account was negative and that FXDD Malta was requesting funds be sent to that account. (SOF, ¶ 43.) On December 1, 2014, Oreper responds and requests that Borisova review the emails and Oreper informs Borisova that FXDD Malta is requesting BT Prime "send more money into the BT ECP account." (SOF, ¶ 45.) On December 3, 2014, Borisova suggested sending funds "from Barclays BP UK account to BT Prime TD Bank account via 7 Hills deposit. BT Prime then can sends [sic] funds to ECP account at FXDD. It will be booked the following way (7 Hills is LP for BP UK and FIX API client for BTP): - On BP UK books: 7 Hill [sic] LP (DB) Barclays USB bank account (CR) – On BTP books: TD Bank account (DB) Client AP Liability account (FIX API Client 7 Hills) #310039 (CR)." (SOF, ¶ 46.) A couple hours later, Borisova asks "ORA[7] team, how much should we send?" and Oreper responded "I think $2 million USD would be good for the moment, *but of course we'll have to send more in the future when that amount is depleted*." (SOF, ¶ 47 (emphasis added).)

---

[7] Popescu explained in his deposition that "ORA" was "a group of people inside the -- a department inside of Boston Technologies." (SOF, ¶

Borisova then instructed Van Riper to "send $2mln to BTP and then to FXDD." (SOF, ¶ 49.) Van Riper then responded with a screenshot demonstrating the payment and stated that "First Wire is Done." (SOF, ¶ 50.) Caiati responded to Van Riper that the funds that were sent "need to go to Malta's customer account." (SOF, ¶ 51.) Borisova then clarified "[i]t still will be deposit to BTP ECP account, correct? Please send us the wire instructions." (SOF, ¶ 52.) Caiati confirmed that the funds would be deposited to "BTP ECP account" and Taryn Holly sent Borisova the wire instructions on December 3, 2014. (SOF, ¶ 53.) On December 4, 2014, Borisova then instructed Van Riper to "please send $2mln from BTP TD Bank to FXDD Malta." (SOF, ¶ 54.) On December 5, 2014, Van Riper complied and sent a screenshot of the wire transfer and states "Wire transfer is done." (SOF, ¶ 55.) The December 5, 2014, transfer is also not avoidable as transferred pursuant to a swap agreement between swap participants.

All of the transfers pursuant to BT Prime's claims for constructive fraudulent conveyance and preference are protect by the 546(g) safe harbor and BT Prime is not permitted to seek the reversal of those transfers.

## III.    THE COURT SHOULD ENTER A JUDGMENT IN FAVOR OF FXDD MALTA AS TO COUNT XIII FOR TURNOVER AS FXDD MALTA DID NOT OWE A DEBT TO BT PRIME AT THE TIME THE FUNDS WERE TRANSFERRED AND BT PRIME SEEKS A TURNOVER OF FUNDS THAT NEVER BELONGED TO BT PRIME.

The Court should issue a judgment in favor of FXDD Malta as to Count XIII for turnover as BT Prime seeks a turnover of funds that never belonged to it because the $1.3 million that BT Prime seeks were returned to Boston Prime after Boston Prime made a $3 million transfer to BT Prime days earlier. Pursuant to 11 U.S.C. § 542(a) and (b), entities must turn over any property of the estate that it has in its "possession, custody, or control, during the case, of property that the trustee may use, sell, or lease" and entities that "owe[] a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the

trustee." Property of the estate—as that term is used in § 542—is defined in 11 U.S.C. § 541 and does not include property of a third-party that is not involved in the adversary proceeding.

Therefore, there are generally three requirements to a turnover proceeding that a debtor must prove: (1) that the property the debtor seeks is "property of the estate" pursuant to § 541; (2) that "at the moment [the debtor's] petition was filed, debtor had a right to use, sell or lease the property" per § 542; and (3) if the defendant in the adversary proceeding so requests, the court "must ensure that any interest of the third party in the property is adequately protected before ordering turnover." *In re Barfield*, 261 B.R. 793, 797 (Bankr. M.D. Fla. 2001).

BT Prime alleges that Defendants FXDD Malta, FXDD, and Forexware are "in possession of assets and funds owned by the Debtor, including but not limited to, the $1,300,000 removed from the Debtor's FXDD Trading Account on February 3, 2015 without cause or explanation." (SOF, ¶ 90.) In the February 3, 2015, $1.3 Million Transfer, BT Prime alleges that either FXDD Malta, FXDD, or Forexware transferred $1.3 million out of BT Prime's margin account with FXDD Malta and did not account for that transfer. (SOF, ¶ 91.)

BT Prime's account at FXDD Malta, as of February 3, 2015, had been funded, repeatedly, by Boston Prime, through transfers from Boston Prime to 7 Hills to BT Prime to BT Prime's margin account at FXDD Malta, or through Boston Prime directly sending transfers to BT Prime's margin account at FXDD Malta. (SOF, ¶ 92.) According to the Amended Complaint, after these transfers from Boston Prime to BT Prime's ECP account with FXDD Malta, either FXDD Malta, Forexware, or FXDD removed $1.3 million from BT Prime's ECP account. (SOF, ¶ 93.) But those funds were never BT Prime's funds to begin with, as evidenced by Boston Prime transferring the funds into the account, and on February 3, 2015, $1.3 million of the funds were actually transferred back to Boston Prime. (SOF, ¶ 94 (authorizing the transfer of $1.3 million from BT Prime's

26

account to Boston Prime's account on February 3, 2015). BT Prime's turnover cause of action fails

as the funds were not BT Prime's funds prior to its bankruptcy petition—or at any time.

## CONCLUSION

The Court should enter a judgment in favor of the moving defendants as to Counts VII, XI,

XII, XIII and XVI of the Amended Complaint in their entirety for the above-referenced reasons.

## CERTIFICATION PURSUANT TO LOCAL BANKRUPTCY RULE 9013-1(b)

The undersigned counsel hereby certifies that the movant' counsel conferred with BT

Prime's counsel prior to filing of this motion via telephone and that BT Prime's counsel indicated

that BT Prime would oppose the motion.


Dated: October 16, 2020                           Respectfully submitted,


                                                  _____
                                                  Stefan Savic (BBO No. 688338)
                                                  Brian L. Grossman*
                                                  **SHIPKEVICH PLLC**
                                                  165 Broadway, STE 2300
                                                  New York, New York 10006
                                                  Telephone:    (212) 252-3003
                                                  Facsimile:     (888) 568-5815
                                                  ssavic@shipkevich.com
                                                  bgrossman@shipkevich.com
                                                  *Admitted Pro Hac Vice

                                                  *Attorneys for Defendants Currency Mountain
                                                  Holdings Limited, FXDD Malta, Ltd., Currency
                                                  Mountain Holdings LLC, Nukkleus, Inc., Nukkleus
                                                  Bermuda Limited, and Currency Mountain Holdings
                                                  Bermuda, Ltd .*

# <u>CERTIFICATE OF SERVICE</u>

I, Stefan Savic, hereby certify that on the 16th day of October, 2020, I caused copies of the within document to be served through the Court's CM/ECF system upon the following registered electronic filers appearing in this adversary proceeding:

Harold B. Murphy, Esq.
Charles R. Bennett, Jr., Esq.
Shawn Lu, Esq.
Murphy & King, P.C.
One Beacon Street
Boston, Massachusetts 02108

Attorneys for BT Prime Ltd.

Respectfully submitted,

_____
Stefan Savic (BBO No. 688338)
**SHIPKEVICH PLLC**
165 Broadway, STE 2300
New York, New York 10006
Telephone:    (212) 252-3003
Facsimile:    (888) 568-5815
ssavic@shipkevich.com

*Attorneys for Defendants Currency Mountain Holdings Limited, FXDD Malta, Ltd., Currency Mountain Holdings LLC, Nukkleus, Inc., Nukkleus Bermuda Limited, and Currency Mountain Holdings Bermuda, Ltd*