UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

|  |  |
|---|---|
| In re:<br><br>BT PRIME LTD.<br><br>      Debtor. | Chapter 11<br><br>Case No. 15-10745-FJB |
| BT PRIME LTD.<br><br>      Plaintiff,<br><br>v.<br><br>BOSTON TECHNOLOGIES POWERED BY FOREXWARE LLC f/k/a FOREXWARE LLC, CURRENCY MOUNTAIN HOLDINGS LIMITED f/k/a FOREXWARE MALTA HOLDINGS LTD., FXDIRECTDEALER, LLC, FXDD MALTA LTD., CURRENCY MOUNTAIN HOLDINGS LLC, NUKKLEUS, INC., NUKKLEUS BERMUDA LIMITED, CURRENCY MOUNTAIN HOLDINGS BERMUDA, LTD.<br><br>      Defendants | Adversary Proceeding<br>No. 16-01178 |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff BT Prime Ltd. ("BT Prime") hereby opposes Defendants Currency Mountain Holdings Limited, FXDD Malta Ltd, Currency Mountain Holdings, LLC, Nukkleus, Inc., Nukkleus Bermuda Limited, and Currency Mountain Holdings Bermuda, Ltd's Motion for Partial Summary Judgment.[1]

---

[1] BT Prime hereby incorporates by reference its Supplemental Statement of Material Facts ("SOF") filed herewith. BT Prime is also contemporaneously filing, and hereby incorporates by

I.  **Summary judgment standard**.

A party is entitled to summary judgment only upon a showing that there is no genuine issue of material fact and that, on the uncontroverted facts, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), made applicable by Fed. R. Bankr. P. 7056; *see Chen v. Xing Ping Liang (In re Xing Ping Liang)*, Nos. 15-14193-FJB, 16-01096-FJB, 2017 Bankr. LEXIS 1899, at *7-8 (Bankr. D. Mass. July 6, 2017) (citation omitted). Where the burden of proof at trial would fall on the party seeking summary judgment, that party must support its motion with evidence—in the form of affidavits, admissions, depositions, answers to interrogatories, and the like—as to each essential element of its cause of action. The evidence must be such as would permit the movant at trial to withstand a motion for directed verdict under Fed. R. Civ. P. 50(a). *Id.* (citation omitted). Provided it does so, the burden then shifts to the opposing party to adduce evidence that establishes a genuine issue of material fact as to at least one essential element of the moving party's case. The court must view all evidence in the light most favorable to the nonmoving party and indulge all inferences favorable to that party. *Id.* (citation omitted). The ultimate burden of proving the absence of a genuine issue of material fact remains at all times on the moving party. *Id.*

II. **Summary judgment should be denied as to Count XVI because the claim is timely, and there is at least a genuine dispute of material fact concerning the Nukkleus Defendants' participation in the Forexware integrated enterprise**.

Defendants Nukkleus, Inc., Nukkleus Bermuda Limited, and Currency Mountain Holdings Bermuda, Ltd. (collectively, "Nukkleus Defendants") resurrect the same arguments as to Count XVI that have already been rejected by the Court in a detailed Memorandum of

---

reference, a Response to Defendants' Statement of Undisputed Facts, responding to each numbered paragraph.

2

Decision denying Defendants' Motions to Dismiss [Doc. 107] (the "Prior Decision") and an Order dated June 26, 2020 denying the Nukkleus Defendants' Motion to Dismiss [Doc. 215].

The Amended Complaint alleges that the Forexware Defendants[2] operated as one integrated enterprise helmed by Forexware, which included the BTI Group[3] after the acquisition. *See* Amended Compl. [Doc. 164] ¶¶ 75-93, 178-87; *infra* at Section II, 4; SOF ¶¶ 1-16, 37-52. As detailed in Count XVI, Emil Assentato, who directly or indirectly owns and controls all of the Defendant entities, orchestrated a series of transactions for the Nukkleus Defendants to strip Forexware of assets but continue to operate the same business under the same brand through the same affiliates, including FXDirect and FXDD Malta, as an integrated enterprise. *See* Amended Compl. ¶¶ 188-204; *infra* at Section II, 4. Accordingly, the Amended Complaint seeks to hold all of the Forexware Defendants (under Count XV) and the Nukkleus Defendants (under Count XVI) jointly and severally liable to BT Prime.

    1. Massachusetts law applies to Count XVI.

Defendants seek to impose a three-year statute of limitations under Delaware law, which does not apply here. The Court already ruled in the Prior Decision that Massachusetts law applies to BT Prime's claims that do not arise under the Bankruptcy Code. The Court held (p. 32):

> Before addressing the various counts, it is necessary to address the choice-of-law issue as to the six counts that do not arise under the Bankruptcy Code. No party has expressly addressed this issue. The moving parties have framed their arguments entirely under Massachusetts law, and the Debtor has responded in kind. Each party has thus implicitly taken the position that the counts in issue are governed by Massachusetts law. In view of the parties' positions and agreement on the issue, and because it appears from the alleged facts that the Commonwealth of Massachusetts has been the center of the Debtor's activities (conducted first

---

[2] The "Forexware Defendants" as defined in the Amended Complaint and referenced herein are: Forexware LLC ("Forexware"); FXDirectDealer, LLC ("FXDirect"); Currency Mountain Holdings LLC; Currency Mountain Holdings Limited; and FXDD Malta Ltd. ("FXDD Malta").
[3] The "BTI Group" as defined in the Amended Complaint and referenced herein are: Boston Technologies, Inc. ("BTI"), BT Prime, and Boston Prime Limited ("Boston Prime").

3

through BT Prime and later through Forexware) at all relevant times, I hold that Massachusetts law governs as to Counts I-IV, IX, and XV.

Defendants argued in their own prior dispositive motions that Massachusetts law applies. The Court appropriately "doubt[ed] the efficacy" of Defendants' afterthought attempt to reserve their rights to subsequently argue that another state's law applied. *Id*. at p. 32 n.3. Defendants should be judicially and equitably estopped from "deliberately changing positions according to the exigencies of the moment." *In re Norton*, No. 17-12913-JNF, 2018 Bankr. LEXIS 3200, at *8 (Bankr. D. Mass. Oct. 16, 2018) (citing *RFF Family P'ship, LP v. Ross*, 814 F.3d 520 (1st Cir. 2016) and other cases).[4] Defendants, having previously persuaded the Court to apply Massachusetts law, now seek to apply Delaware law to derive an unfair advantage. The Court should bar such efforts to "play fast and loose with the courts." *Id.* (citation omitted).

In any event, the Court already concluded pursuant to the well-known conflict of laws factors that Massachusetts law is appropriate, as "the Commonwealth of Massachusetts has been the center of the Debtor's activities (conducted first through BT Prime and later through Forexware) at all relevant times" and this forum has a strong interest in resolving this case. *See also* Prior Decision, pp. 26-30 (discussing factual connections to Massachusetts in context of specific personal jurisdiction over Malta Defendants). The same underlying conduct and claims alleged against Forexware, which the Court has determined is governed by Massachusetts law,

---

[4] Three considerations for applying the equitable doctrine of judicial estoppel are: "First, a party's earlier and later positions must be clearly inconsistent . . . Second, the party must have succeeded in persuading a court to accept the earlier position . . . To demonstrate acceptance of the prior position by a court, a party need not show that the earlier representation led to a favorable ruling on the merits of the proceeding in which it was made, but must show that the court adopted and relied on the represented position either in a preliminary matter or as part of a final disposition. . . Third, the party seeking to assert the inconsistent position must stand to derive an unfair advantage if the new position is accepted by the court." *Id*. (internal citations and quotations omitted).

give rise to liability against the Nukkleus Defendants under Count XVI. *See infra* at Section II, 2. The Court's application of Massachusetts law is, and has been, the law of the case. Nothing has changed other than Defendants' exigencies.

        2.   Count XVI is timely and relates back to the filing of the Complaint.

The Court need not determine the applicable statute of limitations because Count XVI is timely, as relating back to the filing of the Compliant. Fed. R. Civ. P. 15(c)(1)(A) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when: (A) the law that provides the applicable statute of limitations allows relation back[.]" Fed. R. Civ. P. 15(c)(1)(A).[5] As the First Circuit explained in *Morel v. Daimler-Chrysler AG,* 565 F.3d 20, 26 (1st Cir. 2009), Rule 15(c)(1)(A) "cements in place a one-way ratchet; less restrictive state relation-back rules will displace federal relation-back rules, but more restrictive state relation-back rules will not."

"Massachusetts law is more liberal than federal law with respect to the relation back principle and is, therefore, controlling." *Palacio v. City of Springfield*, 25 F. Supp. 3d 163, 168-69 (D. Mass. 2014) (citations omitted); *see also Fernando v. Fed. Ins. Co.*, No. 18-10504-MBB, 2019 U.S. Dist. LEXIS 89429, at *36 n.23 (D. Mass. May 28, 2019) (Massachusetts relation-back rule is "more forgiving" for Rule 15(c)(1)(A) purposes, including amendments changing a party). In *Herrick v. Essex Reg'l Ret. Bd.*, the Massachusetts Appeals Court, citing G. L. c. 231,

---

[5] In seeking to apply Delaware law, Defendants agree that Count XVI derives any applicable statute of limitations from state law, albeit the wrong state law. *See Palacio v. City of Springfield*, 25 F. Supp. 3d 163, 168 (D. Mass. 2014) (relation back under Rule 15(c)(1)(A) available where parties agree state law supplies statute of limitations).

5

§ 51[6] and Mass. R. Civ. 15(c),[7] explained that this "liberal approach to the amendment of pleadings, and their retrospective effect, has its theoretical roots in the idea that if an action was timely brought at the outset, every consideration ought to be given an amendment which would prevent the plaintiff's claim from being lost if an amendment were not allowed." 68 Mass. App. Ct. 187, 191 (2007) (citation omitted).

The First Circuit has described Massachusetts law as providing an "absolute right" to add a defendant against whom the plaintiff intended to bring the original action. *Labrador v. Indus. Contractors' Supplies, Inc.*, No. 13-13029-MLW, 2015 U.S. Dist. LEXIS 133050, at *4 (D. Mass. Sep. 30, 2015) (quoting *Marshall v. Mulrenin*, 508 F.2d 39, 41 (1st Cir. 1974)). Therefore, a plaintiff may substitute a defendant or add a defendant "even if the statute of limitations has expired." *Herrick*, 68 Mass. App. Ct. at 191; *Ramirez v. Graham*, 64 Mass. App. Ct. 573, 577 (2005) (relation back rule "applies notwithstanding the fact that a new complaint against the proposed additional defendant would be time-barred").

Unlike Rule 15(c)(1)(C), Rule 15(c)(1)(A) does not require a plaintiff to have made a specific kind of "mistake" regarding the identity of the proper party. BT Prime's lack of

---

[6] G. L. c. 231, § 51 provides:
> In all civil proceedings, the court may at any time, allow amendments adding a party, discontinuing as to a party or changing the form of the action, and may allow any other amendment in matter of form or substance in any process, pleading or proceeding, which may enable the plaintiff to sustain the action for the cause or for recovery for the injury for which the action was intended to be brought, or enable the defendant to make a legal defense. Any amendment allowed pursuant to this section or pursuant to the Massachusetts Rules of Civil Procedure shall relate to the original pleading.

[7] Mass. R. Civ. 15(a) provides:
> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment (including an amendment changing a party) relates back to the original pleading.

knowledge of the Nukkleus Defendants' transactions with Forexware until amending the Complaint does not bar Count XVI for statute of limitations purposes. *See Labrador*, 2015 U.S. Dist. LEXIS 133050, at *8 ("Labrador intended to bring suit against the maker of the allegedly defective bit. His claims against 3M are not barred by the fact that he was unaware of its alleged role in manufacturing the bit."); *Herrick*, 68 Mass. App. Ct. at 191 ("That an original action against the substituted defendant would be precluded by expiration of the statute of limitations does not prevent the allowance of the amendment, and may furnish a reason for it." (Internal citations and quotations omitted)).

"Under Massachusetts law, the only requirement for adding a defendant under the relation back doctrine is that the claims asserted against the new defendant 'arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.'" *Labrador*, 2015 U.S. Dist. LEXIS 133050, at *6 (quoting Mass. R. Civ. P. 15(c)). Defendants falsely claim that Count XVI "has nothing to do with the allegations in the original Complaint" (Defendants' Brief, p. 9), whereas Count XVI expressly seeks to hold the Nukkleus Defendants, as participants in the Forexware integrated enterprise, liable for the same <u>underlying conduct of the Forexware Defendants</u> alleged in both the original Complaint and the Amended Complaint. *See* Amended Compl. ¶¶ 188-204; *infra* at Section II, 4. If there is no liability against the Forexware Defendants, there is also no liability upon the Nukkleus Defendants. Thus, it cannot be legitimately disputed that Count XVI arises out of the same "conduct, transaction, or occurrence" set forth in the original Complaint and is a timely claim relating back to the filing.[8]

---

[8] Emil Assentato, who owns and controls the Nukkleus Defendants as well as the Forexware Defendants, has been on notice of the basis for the underlying claims from the commencement of this adversary proceeding.

> 3. Alternatively, Count XVI is timely as an equitable claim to enforce a judgment.

Although the Court need not reach any statute of limitations issues given the application of Rule 15(c)(1)(A), it may also consider Count XVI an equitable claim to enforce a judgment, which bears a statute of limitations of twenty years pursuant to M.G.L. c. 260, § 20.

In *CSX Transp., Inc. v. Tri Cty. Recycling*, No. No. 18-cv-12095-DJC, 2019 U.S. Dist. LEXIS 118653 (D. Mass. July 17, 2019), the plaintiff brought a claim for successor liability to enforce a judgment, seeking to impose liability on a successor company for a predecessor company's debt based on *de facto* merger and mere continuation theories. The successor-company defendant argued that a three-year statute of limitations applied on the basis that the cause of action "clearly sounds in tort, because it requires a finding that the successor, through its activity established under common law elements, harmed an innocent creditor[.]" *Id*. at *9. The District Court disagreed, holding that the successor liability claim premised on *de facto* merger and continuation theories was distinguishable as an equitable claim for enforcing a judgment, and therefore was subject to the twenty-year statute of limitations pursuant to M.G.L. c. 260, § 20.

The transactions between the Nukkleus Defendants and Forexware, subject to a *de facto* merger or continuation theory, are an equitable basis for placing the Nukkleus Defendants in the shoes of Forexware for joint and several liability purposes. *See infra* at Section II, 4. The claim in Count XVI, as in *CSX*, is not a tort claim, but an equitable claim to enforce a judgment that enters against Forexware against the Nukkleus Defendants. *See Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 559-60 (2008) (doctrine of successor liability is an equitable remedy, which is a "flexible tool[] to be applied with the focus on fairness and justice.").

8

It is not necessary for the Forexware Defendants' liability to BT Prime to already be fully adjudicated for BT Prime to bring an equitable claim to impute that liability against the Nukkleus Defendants. *See* Prior Decision, p. 44; *see also* Proceeding Memorandum and Order [Doc. 162], ¶ 3 ("joinder of the new defendants in this proceeding is preferable to the commencement of a separate adversary proceeding against the new defendants, which then would be adjudicated with the present adversary proceeding.").

    4. There is at least a genuine dispute of material fact concerning the Nukkleus Defendants' participation in the Forexware integrated enterprise.

In the Prior Decision (p. 34-35), the Court discussed the elements of a *de facto* merger/mere continuation claim in the context of Count II.[9] The factors courts consider—especially cessation of the transferor's business and continuity of ownership and control—"are mere indicia [] of the ultimate issue to be decided, which is whether the parties achieved what amounts to a merger in a way which was inequitable to the seller's creditors." *Nat'l Gypsum Co. v. Cont'l Brands Corp.*, 895 F. Supp. 328, 342 (D. Mass. 1995). Each case must be decided on its specific facts and circumstances, *Cargill, Inc. v. Beaver Coal & Oil Co.*, 424 Mass. 356, 362 (1997), and no one "factor [] is essential to a finding of liability." *Nat'l Gypsum Co.*, 895 F. Supp. at 342.

Defendants argue that the Nukkleus Defendants cannot be successors in interest to Forexware based solely upon their <u>factual</u>, disputed contention that Forexware maintained some level of independent operations after the Nukkleus transactions. As set forth in Count XVI, Emil

---

[9] In Count II, "the Debtor seeks a declaration that the transaction by which Forexware acquired the assets and liabilities of BTI, and thereby acquired complete control over the operation, management, and assets of the Debtor, without expressly assuming the Debtor's liabilities, amounted to a *de facto* merger of the Debtor with Forexware, as a consequence of which Forexware is liable as a successor entity of the Debtor and is liable for all the Debtor's debts and liabilities." Prior Decision, p. 34.

9

Assentato owns and controls all of the Forexware Defendants and the Nukkleus Defendants, and has continuously operated these entities as one integrated enterprise. *See* Amended Compl., ¶¶ 2-10, 179, 189, 190, 197; SOF ¶¶ 1-5 (Forexware Group sharing common ownership), 6-16 (Forexware Group sharing resources, employees, and operations), 62-66 (Nukkleus Group sharing common ownership).

According to Nukkleus Inc.'s Form 10-K for the fiscal year ending September 30, 2017 (the "Form 10-K," SOF Ex. 3), Assentato is the majority member of Max Q Investments LLC ("Max Q"). *See generally* SOF ¶¶ 62-66; Form 10-K, p. 5 ("Item 1. Business"). Max Q owns 79% of Currency Mountain Malta LLC, which is the sole shareholder of FXDD Malta. Max Q is also the majority shareholder of Currency Mountain Holdings LLC, which is the sole shareholder of FXDirect. Currency Mountain Holdings Bermuda, Limited, which is the parent of Nukkleus Inc., is wholly-owned by an entity that is owned by Assentato. Nukkleus Limited is a wholly owned subsidiary of Nukkleus, Inc. Assentato is Nukkleus Inc.'s Chief Executive Officer, Chief Financial Officer, President, Secretary, Treasurer, and Chairman of the Board of Directors, and Nukkleus Limited's Chairman. *Id*.

Through the transactions engineered by Assentato on or about May 24, 2016 pursuant to an Asset Purchase Agreement (the "Forexware APA," SOF Ex. 28 [Doc. 164-8]), Nukkleus Inc. acquired substantially all of Forexware's assets, including but not limited to servers, patents, software programs, technology, and the Forexware brand. *See* Amended Compl., ¶ 191 (emphasis added); Forexware APA, pp. 1 ("Acquired Assets"), 17-20 ("Schedule 1.1"); SOF ¶ 67; Form 10-K, p. 10 ("Intellectual Property" including "Forexware" trademarks and service marks), p. 24 ("Overview" stating "we have acquired" "ownership of the FOREXWARE brand

10

name" and "ownership of the customer interface and other software trading solutions being used by FXDD.com").

Following the acquisition, the Nukkleus Defendants continued operating the same business under the same Forexware brand as part of the integrated enterprise. SOF ¶ 68. In the Form 10-K, Nukkleus Inc. publicly declared that "[a]s a result of [the Forexware APA] acquisition, our operations are now focused on the operation of a foreign exchange trading business utilizing the Assets acquired[.]" Form 10-K, p. 5 ("Item 1. Business"); p. 10 ("Overview" stating: "[b]y virtue of our relationship with FXDD Malta and [FXDirect], we provide turnkey software and technology solutions for FXDD.com. We offer the customers of FXDD 24 hour, five days a week direct access to the global over the counter ('OTC') FX market, which is a decentralized market in which participants trade directly with one another, rather than through a central exchange.").

The Defendants also continued to share and rely upon the same resources, including the same office space and same employees. Amended Compl., ¶ 199; SOF ¶ 69. The Nukkleus Defendants use the offices of Forexware and FXDirect at 525 Washington Boulevard, Jersey City, New Jersey 07310 free of rent obligations. Amended Compl., ¶ 200; SOF ¶¶ 65, 69; *see* Form 10-K, p. 10 ("Corporate Office"). Contemporaneously with the Forexware APA, Nukkleus Limited entered into essentially break-even "Global Service Agreements"[10] with FXDD Malta and FXDirect to pass through shared resources between the affiliated companies. *See* Amended Compl., ¶¶ 193-96; SOF ¶ 70. Pursuant to these agreements, Nukkleus Limited provided technology and software to FXDD Malta in exchange for payments that Nukkleus Limited

---

[10] These Global Service Agreements are sometimes interchangeably referred to as "General Service Agreements."

11

forwarded to FXDirect in exchange for shared employee and personnel services. *See id.*; Form 10-K, p. 5 ("Item 1. Business"), p. 10 ("Employees").

Ultimately, whether the Forexware and Nukkleus Defendants achieved what amounts to a merger in a way that was inequitable to creditors including BT Prime depends on the totality of the facts and circumstances. Prior Decision, p. 35 (*citing Nat'l Gypsum Co.*, 895 F. Supp. at 342). The summary judgment record, evidencing numerous aspects of the Forexware/Nukkleus integrated enterprise, establishes at least a genuine dispute of material fact warranting denial of summary judgment as to Count XVI.

III. **Summary judgment should be denied as to Counts VII, XI and XII because Defendants have failed to meet their burden of establishing the safe harbors in 11 U.S.C. §§ 546(g) and 548(d)(2) as an affirmative defense based on the record**.

In Count VII against FXDD Malta and FXDirect,[11] BT Prime seeks to avoid under 11 U.S.C. § 548(a)(1)(B) and recover under 11 U.S.C. § 550(a):

(1) Approximately $2.4 million that Forexware caused to be transferred first from Boston Prime to BT Prime, then from BT Prime to FXDD Malta and/or FXDirect (the "$2.4 Million Transfer");

(2) Approximately $3 million that Forexware caused to be transferred from Boston Prime to FXDD Malta and/or FXDirect purportedly to pay liabilities for BT Prime (the "$3 Million Transfer"); and

(3) Approximately $1.3 million that Forexware caused to be transferred from BT Prime to FXDD Malta and/or FXDirect, after BT Prime had ceased operations (the "1.3 Million Transfer").

---

[11] Defendants do not move for summary judgment with respect to FXDirect, which is not a party to the motion.

*See* Amended Compl., ¶¶ 58-66, 121-127. In Counts XI and XII against FXDD Malta and FXDirect, BT Prime seeks to avoid under 11 U.S.C. § 547 and recover under § 550(a) the same transfers as preferential.[12] *See id.*, ¶¶ 152-168.

In rejecting Defendants' arguments on the same basis in the Prior Decision, the Court set forth the applicable law regarding the safe harbor provisions in 11 U.S.C. §§ 546(g) and 548(d)(2)(D). *See* Prior Decision, pp. 37-38. Section 546(g), which provides an affirmative defense to avoidance under § 548(a)(1)(B) and § 547 but not under § 548(a)(1)(A), requires the defendant to prove, as to each challenged transfer, that it was made by, to, or for the benefit of a swap participant or financial participant, under or in connection with any swap agreement, and that it was made before the commencement of the case. *Id.* (citing 11 U.S.C. § 546(g)). Subsection 548(d)(2)(D), which requires proof of virtually the same elements as § 546(g), provides that "a swap participant or financial participant that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer[.]" *Id.* (citing 11 U.S.C. § 548(d)(2)(D)).

"The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive." *Vargas v. Cummings*, 149 F.3d 29, 35 (1st Cir. 1998). As with any affirmative defense, the burden rests on the defendant to "establish beyond peradventure all of the essential elements of the . . . defense to warrant judgment in his favor." *Id.* at 36 (citation omitted). Just as the Court held at the motion to dismiss stage, Defendants can only establish that the transfers at issue were made before the

---

[12] The difference between Count XI and XII is that Count XI alleges that FXDD Malta and FXDirect were insiders of BT Prime and employs the extended one-year look-back applicable to insiders.

13

commencement of the case; the other requirements are "not remotely satisfied." *See* Prior Decision, pp. 37-38, 45-47.

Defendants cannot establish the existence of a "swap agreement" based on the summary judgment record. Defendants define a swap agreement as a bilateral agreement "whereby cash payments are exchanged periodically (or a lump sum at termination) between the parties based upon changes in the price of the underlying asset or index as determined by an agreed-upon benchmark." Defendants' Brief, p. 12; *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 505 B.R. 135, 138 n.1 (S.D.N.Y. 2013) (cited by Defendants) ("A swap is a bilateral financial transaction where one counterparty 'swaps' the cash flows of a single asset or basket of assets in exchange for cash flows from the counterparty").

Defendants fail to state a basis for concluding that the Customer Agreement, Risk Disclosure and Trading Rules & Regulations Documents (the "Customer Agreement") constitutes a *per se* swap agreement under §§ 546(g) and 548(d)(2)(D) between BT Prime and FXDD Malta. The Customer Agreement submitted by Defendants does not state that it was executed on behalf of BT Prime and in fact does not mention BT Prime anywhere in the document. Defendants have not produced any other documents establishing that George Popescu, who Defendants acknowledge became a Forexware employee, executed the Customer Agreement on behalf of BT Prime. SOF ¶¶ 43-45. Accordingly, there is a genuine dispute of material fact as to whether BT Prime was even party to such agreement.

Even if BT Prime were considered a party to the Customer Agreement, its terms merely provide for the creation of a margin account, in contrast to the types of agreements held by courts

14

to be a swap agreement involving actual swaps corresponding to an agreed-upon benchmark.[13] Here, Defendants assert that FXDD Malta could determine the amounts of margin payments from BT Prime in its "sole discretion." Defendant's Brief, p. 18. Defendants do nothing more than quote the language of the Customer Agreement and declare in conclusory fashion that it is "undisputed" that the Customer Agreement was a swap agreement. Despite bearing the burden of proving their affirmative defense, Defendants fail to provide any factual underpinning for this conclusion.

Following the acquisition of the BTI Group, BT Prime operated merely as a pass through conduit to introduce and connect its customers to trading through FXDD Malta. SOF ¶¶ 53, 56. BT Prime's customers placed their own foreign exchange trades through an electronic platform of their choice directly with FXDD Malta at trade prices provided by FXDD Malta. *Id*. BT Prime did not direct or participate in these trades, did not conduct trades of its own, and had only a credit relationship with its customers and a credit relationship with FXDD Malta. *Id*. The determination of whether the Customer Agreement constitutes a swap agreement involves questions of fact, including at least a genuine dispute over whether BT Prime can be party to a swap agreement without actually participating in trading.

To the extent that Defendants assert that the Customer Agreement qualifies as a swap agreement through Section 101(53B)'s "any other similar agreement" clause, they concede that they must "establish if the swap market generally understands it to be a swap agreement." Defendants' Brief, p. 14. Whether the swap market understands an agreement to be a swap agreement is a factual issue requiring expert testimony that cannot be resolved at summary

---

[13] To the extent that Defendants cite to cases where the parties agreed that a particular agreement was a swap agreement, the courts clearly did not examine the issue.

judgment. *See Enron Corp. v. UBS AG (In re Enron Corp.)*, Nos. 01 B 16034 (AJG), 03-93373 A, 2005 Bankr. LEXIS 3509, at *28-29 (Bankr. S.D.N.Y. Aug. 10, 2005) ("Thus, with respect to the equity swap transactions in which the transfers by Enron to UBS were not made in exchange for stock, there is a factual issue requiring expert testimony as to whether, at the time of the transactions, equity swaps involving a corporation's own stock were in general use and generally understood in the swap market to be swap agreements.").

Nor can Defendants establish based on the summary judgment record that the transfers were made by, to, or for the benefit of, a "swap participant." Pursuant to Section 101(53C), a "swap participant" is an entity that "has an outstanding swap agreement <u>with the debtor</u>" (emphasis added). To establish BT Prime and FXDD Malta as swap participants, Defendants rely entirely on their conclusory declaration that the Customer Agreement was a swap agreement. Accordingly, because Defendants have failed to establish that the Customer Agreement is a swap agreement, they have also failed to establish that BT Prime and FXDD Malta were swap participants.

Even if the Court were to determine that the Customer Agreement was a swap agreement, Defendants cannot establish based on the summary judgment record that the transfers at issue were made "under or in connection with" such agreement. By Defendants' own admission, the $2.4 Million Transfer, $3 Million Transfer, and $1.3 Million Transfer all involve funds originating <u>from Boston Prime</u> that were used to pay <u>BT Prime's</u> purported liabilities to FXDD Malta. *See* Defendants' Brief, pp. 17, 23.[14] Thus, even if the Customer Agreement purportedly between BT Prime and FXDD Malta were considered a swap agreement, it would not provide a

---

[14] Defendants assert that the $1.3 Million Transfer also involved funds originating from Boston Prime. *See* Defendants' Brief, p. 22.

basis for using Boston Prime's funds "under or in connection with" such agreement. Indeed, these transfers are what gave rise to Boston Prime's filing (by its UK Special Administrator) of a Proof of Claim for $7.2 million [Claim 153-1]; *see* Amended Compl., ¶¶ 61-63 (alleging the transfers caused BT Prime to incur liability to Boston Prime for the benefit of the Forexware Defendants without adequate consideration to BT Prime, leading to Boston Prime being scheduled as the largest claimant in the bankruptcy case).

Defendants apparently acknowledge the impropriety of these transfers and attempt to lay the blame on certain individuals, all of whom were Forexware employees at the time. *See* Defendants' Brief, p. 19-23. Indeed, it is undisputed that after the acquisition, the BT Group's employees became employees of Forexware, thereby giving Forexware authority and control over all of BTI, BT Prime, and Boston Prime's personnel, accounts, and resources. SOF ¶¶ 37-52. It was Forexware that directed and caused each of the transfers at issue involving Boston Prime's funds to be made. SOF ¶¶ 55-60. Notwithstanding any disputes of fact concerning the impropriety of the transfers by Forexware employees, for current purposes, Defendants have failed to establish based upon the summary judgment record that the transfers could be considered to have been made in connection with a swap agreement between BT Prime and FXDD Malta.

IV. **Summary judgment should be denied as to Count XIII because Defendants have established at most only a genuine dispute of material fact**.

In Count XIII against Forexware, FXDirect, and FXDD Malta, BT Prime seeks turnover pursuant to 11 U.S.C. § 542 of the $1.3 Million Transfer that was taken by Defendants after BT Prime had ceased operations.

To the extent that Defendants argue in passing that the $1.3 Million Transfer, on account of originating as Boston Prime's funds, does not constitute property of the estate, the Court

17

already held in the Prior Decision (p. 40) that such an argument simply raises a dispute of fact. As such, summary judgment cannot be awarded on this basis.

Defendants' main argument as to Count XIII is to claim, effectively as an affirmative defense, that the $1.3 Million Transfer was "actually transferred back to Boston Prime." Defendants' Brief, p. 26. In support of this factual contention, Defendants cite a February 3, 2015 email (Defendants' Exhibit FF) that provides no transfer records or account information evidencing any transfer taking place; and FXDD Malta's Reponses to BT Prime's First Set of Interrogatories (Defendants' Exhibit HH, ¶ 6), which fail to even mention any transfer to Boston Prime. Such evidence, if it can even be considered as such, is hardly conclusive. The Proof of Claim filed by Boston Prime in the amount of $7.2 million includes the $1.3 Million Transfer, in addition to the $2.5 Million Transfer and $3 Million Transfer. *See also* SOF ¶ 61 (Popescu demanding explanation on February 5, 2015 as to $1.3 Million Transfer). At most, Defendants have raised only a genuine dispute of material fact, upon which summary judgment cannot be granted.

## CONCLUSION

BT Prime requests that the Court deny Defendants' Motion for Partial Summary Judgment, and award any additional relief that the Court deems fair and proper.

Dated: November 13, 2020　　　　　　　　BT PRIME LTD.

By its attorneys,

*/s/ Shawn Lu*
Harold B. Murphy (BBO #631941)
Charles R. Bennett, Jr. (BBO #037380)
Shawn Lu (BBO #679755)
Murphy & King, Professional Corporation
One Beacon Street
Boston, MA 02108
(617) 423-0400
HMurphy@murphyking.com
CBennett@murphyking.com
SLu@murphyking.com

## CERTIFICATE OF SERVICE

I, Shawn Lu, hereby certify that on November 13, 2020, I caused a copy of the foregoing to be filed through the ECF system to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Shawn Lu*
Shawn Lu